2023–1059, –1085, –1086, –1089, –1125

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

SIERRA WIRELESS, INC., HONEYWELL INTERNATIONAL INC., TCL COMMUNICATION TECHNOLOGY HOLDINGS LIMITED, TCT MOBILE INTERNATIONAL LIMITED, TCT MOBILE, INC., TCT MOBILE (US) INC., TCT MOBILE (US) HOLDINGS, INC., THALES DIS AIS DEUTSCHLAND GMBH,

*Appellants,*

v.

SISVEL S.P.A.,

*Cross-Appellant*,

---

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2021-00580

---

## APPELLANTS' OPENING BRIEF

---

April 14, 2023

Kourtney Mueller Merrill
Amanda Tessar
PERKINS COIE LLP
1900 Sixteenth Street, Suite 1400
Denver, Colorado
Phone: (303) 291–2388
E-mail: kmerrill@perkinscoie.com
atessar@perkinscoie.com

**COUNSEL FOR APPELLANT SIERRA WIRELESS, INC.**

*[additional counsel on inside cover]*

Bradford F. Cangro
**PV LAW LLP**
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C. 20015
(202) 869-4667
bradford.cangro@pvuslaw.com

Jeremy D. Peterson
**PV LAW LLP**
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C. 20015
(202) 871-0140
jeremy.peterson@pvuslaw.com

**COUNSEL FOR APPELLANTS TCL COMMUNICATION TECHNOLOGY HOLDINGS LIMITED, TCT MOBILE INTERNATIONAL LIMITED, TCT MOBILE, INC., TCT MOBILE (US) INC., TCT MOBILE (US) HOLDINGS, INC.**

Benjamin E. Weed
Gina A. Johnson
**K&L GATES LLP**
70 W. Madison Street, Suite 3300
Chicago, IL 60602
(312) 372-1121
benjamin.weed@klgates.com
gina.johnson@klgates.com

Brian P. Bozzo
**K&L GATES LLP**
210 Sixth Avenue
Pittsburgh, PA 15222
(412) 355-6500
brian.bozzo@klgates.com

**COUNSEL FOR APPELLANT HONEYWELL INTERNATIONAL INC.**

Guy Yonay
**PEARL COHEN ZEDEK LATZER BARATZ LLP**
7 Times Square, 19th Fl.,
New York, NY 1036
(646) 878–0800
gyonay@pearlcohen.com

Kyle Auteri
**PEARL COHEN ZEDEK LATZER BARATZ LLP**
7 Times Square, 19th Fl.,
New York, NY 1036
(646) 878–0824
kauteri@pearlcohen.com

**COUNSEL FOR APPELLANT THALES DIS AIS DEUTSCHLAND GMBH**

## CLAIMS 1-5 OF THE '396 PATENT

**Claim 1.** [pre] A method of performing automatic repeat request (ARQ) in a wireless communication system, the method performed by a receiver and comprising:

[1a] detecting whether at least one data block to be received from a transmitter is missed;

[1b] starting a timer when the at least one data block is detected as missed;

[1c] stopping the timer when the at least one data block is received from the transmitter while the timer is running, in order to prevent a triggering of a status report before the timer expires; and

[1d] transmitting the status report to the transmitter after the timer expires, wherein the status report comprises a positive acknowledgement indicating receipt of at least one received data block.

**Claim 3.** The method of claim 1, wherein the at least one data block is detected as missed when a sequence number (SN) following a SN of a data block with a highest SN among received data blocks is larger than a lowest SN of the at least one data block to be received.

**Claims 4/9.** The [method/receiver] of claim [1/8], wherein the at least one data block is detected as missed when a sequence number (SN) following a SN of a data block with a highest SN among received data blocks is larger than a SN following a last in-sequence received data block.

**Claims 5/10.** The [method/receiver] of claim [1/8], wherein the timer is stopped when a sequence number (SN) following a SN of a data block with a highest SN among received data blocks when the timer was started is the same as a SN following the last in-sequence received data block.

Appx209-210(16:39-17:5, 18:9-18) (emphasis added).

## CERTIFICATES OF INTEREST

Counsel for Appellant Sierra Wireless, Inc. certifies:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case. Fed. Cir. R. 47.4(a)(1).

    **Sierra Wireless, Inc.**

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. Fed. Cir. R. 47.4(a)(2).

    **Sierra Wireless America, Inc.**

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10 percent or more of the stock of the entities:

    **None**

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. 4. 47.4(a)(4).

    (a) **Perkins Coie**: **David St. John-Larkin, Roderick O'Dorisio**

    (b) **Not applicable**

5. Related Cases. Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47.4(a)(5) and 47.5(b).

- *Sisvel Int'l SA et al. v. Cradlepoint, Inc.*, Case No. 19-cv-01142 (D. Del.);

- *Sisvel Int'l SA et al. v. Honeywell International, Inc.*, Case No. 1:19-cv-01143 (D. Del.);

- *Sisvel Int'l SA et al. v. Verifone Sys., Inc.*, Case No. 19-cv-01144 (D. Del.);
- *Sisvel Int'l SA v. Xirgo Techs.*, Case No. 19-cv-01145 (D. Del.); and
- *Sisvel Int'l SA v. HMD Am., Inc.*, 1:20-cv-22051 (S.D. Fla.).

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). *See* Fed. Cir. R. 47.4(a)(6).

**None/Not Applicable**

Dated: April 14, 2023

By: /s/ Kourtney Mueller Merrill
Kourtney Mueller Merrill

## CERTIFICATES OF INTEREST

Counsel for Appellants TCL Communication Technology Holdings Limited; TCT Mobile International Limited; TCT Mobile, Inc.; TCT Mobile (US) Inc.; and TCT Mobile (US) Holdings Inc. certifies:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case. Fed. Cir. R. 47.4(a)(1).

   TCL Communication Technology Holdings Limited
   TCT Mobile International Limited
   TCT Mobile, Inc.
   TCT Mobile (US) Inc.
   TCT Mobile (US) Holdings Inc.

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. Fed. Cir. R. 47.4(a)(2).

   **None/Not Applicable**

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10 percent or more of the stock of the entities:

   TCL Electronics Holdings Limited
   TCT Mobile Worldwide Limited
   TCT Mobile (US) Holdings Inc.
   TCT Mobile (US) Holdings Inc.
   Winning Synergy Limited

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. 4. 47.4(a)(4).

   **None/Not applicable**

5. Related Cases. Provide the case titles and numbers of any case known to be

pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47.4(a)(5) and 47.5(b).

- *Sisvel Int'l SA et al. v. Cradlepoint, Inc.*, Case No. 19-cv-01142 (D. Del.);
- *Sisvel Int'l SA et al. v. Honeywell International, Inc.*, Case No. 1:19-cv-01143 (D. Del.);
- *Sisvel Int'l SA et al. v. Verifone Sys., Inc.*, Case No. 19-cv-01144 (D. Del.);
- *Sisvel Int'l SA v. Xirgo Techs.*, Case No. 19-cv-01145 (D. Del.); and
- *Sisvel Int'l SA v. HMD Am., Inc.*, 1:20-cv-22051 (S.D. Fla.).

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). *See* Fed. Cir. R. 47.4(a)(6).

**None/Not Applicable**

Dated: April 14, 2023

By: /s/ Jeremy D. Peterson
Jeremy D. Peterson

## CERTIFICATES OF INTEREST

Counsel for Thales DIS AIS Deutschland GmbH certifies:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case. Fed. Cir. R. 47.4(a)(1).

   Thales DIS AIS Deutschland GmbH[1]

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. Fed. Cir. R. 47.4(a)(2).

   Thales DIS AIS USA, LLC[2]

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10 percent or more of the stock of the entities:

   Thales S.A.

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. 4. 47.4(a)(4).

   (a) **Not applicable**

   (b) **Pearl Cohen Zedek Latzer Baratz LLP**: **Guy Yonay, Kyle Auteri**

5. Related Cases. Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. *See* Fed. Cir. R. 47.4(a)(5) and 47.5(b).

---

[1] Thales DIS AIS Deutschland GMBH's name has been changed to Telit Cinterion Deutschland GmBH. A motion for leave to substitute Telit Cinterion Deutschland GmbH is currently pending.

[2] Thales DIS AIS USA LLC's name has been changed to Telit Cinterion USA LLC.

- *Sisvel Int'l SA et al. v. Cradlepoint, Inc.*, Case No. 19-cv-01142 (D. Del.);
- *Sisvel Int'l SA et al. v. Honeywell International, Inc.*, Case No. 1:19-cv-01143 (D. Del.);
- *Sisvel Int'l SA et al. v. Verifone Sys., Inc.*, Case No. 19-cv-01144 (D. Del.);
- *Sisvel Int'l SA v. Xirgo Techs.*, Case No. 19-cv-01145 (D. Del.); and
- *Sisvel Int'l SA v. HMD Am., Inc.*, 1:20-cv-22051 (S.D. Fla.).

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). *See* Fed. Cir. R. 47.4(a)(6).

   **None/Not Applicable**

Dated: April 14, 2023 By: /s/ Guy Yonay

Guy Yonay

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 23-1059, 23-1085, 23-1086, 23-1089, 23-1125

**Short Case Caption** Sierra Wireless, Inc. v. Sisvel S.p.A.

**Filing Party/Entity** Honeywell International Inc.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/14/2023

Signature: /s/ Benjamin E. Weed

Name: Benjamin E. Weed

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br>☑ None/Not Applicable |
| Honeywell International Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Erik Halverson (formerly of K&L Gates LLP) | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........................................ iii

**TABLE OF ABBREVIATIONS AND CONVENTIONS** ........................................ v

**RELATED CASES** ........................................ vii

**INTRODUCTION** ........................................ 1

**JURISDICTION** ........................................ 3

**STATEMENT OF ISSUES** ........................................ 4

**STATEMENT OF THE CASE** ........................................ 4

**I. THE PARTIES** ........................................ 5

**II. THE CLAIMED ARQ RETRANSMISSION REQUEST DELAY TIMER** ........................................ 6

A. The Relevant State of the Art ........................................ 7

B. The Specification ........................................ 9

C. The Prosecution History ........................................ 13

D. The Challenged Claims ........................................ 14

**III. THE SACHS PRIOR ART REFERENCE** ........................................ 16

A. The Sachs ARQ Delay Timer ........................................ 16

B. Sachs' Figures 4 and 5 Disclose Different Examples of the Same System ........................................ 19

C. Sachs' Figures 6 and 7 Depict the Same System of Figures 4 and 5 with an Additional Feature ........................................ 24

**IV. THE BOARD'S FINAL WRITTEN DECISION** ........................................ 29

A. Independent Claims 1 and 8 ........................................ 30

B. Dependent Claim 2 ........................................ 32

C. Dependent Claim 3 ........................................ 33

D. Dependent Claims 4, 9, 5, and 10 .... 34

E. Petition Grounds III, IV, and V (Wei and TS 25.322) .... 35

**SUMMARY OF ARGUMENT .... 36**

**ARGUMENT .... 38**

**I. STANDARD OF REVIEW .... 38**

**II. SACHS ANTICIPATES OR AT LEAST RENDERS OBVIOUS DEPENDENT CLAIMS 3-5 AND 9-10 .... 40**

A. The Board Failed to Apply the Correct Anticipation Standard When It Refused to Consider the Full Scope of Sachs' Disclosures .... 40

1. Sachs' Summary Explains Its Collective Teachings Across Its Figures .... 43

2. Figures 4 and 5 Describe the Same System Responding to Different Scenarios .... 45

3. The Board Likewise Erred When It Determined Sachs' Figures 6 and 7—Which Add a Feature to Figures 4 and 5—Were Different "Embodiments" than Figures 4 and 5 and Required Proof of Motivation to Combine .... 48

B. The Board Violated the APA by Not Analyzing Appellants' Additional Evidence and Arguments .... 52

1. The Board Failed to Analyze Obviousness .... 52

2. Dependent Claim 3 .... 56

3. Dependent Claims 4 and 9 .... 58

4. Dependent Claims 5 and 10 .... 60

**III. THE BOARD ERRED WHEN IT CONSIDERED AND GAVE WEIGHT TO TESTIMONY FROM SISVEL'S DECLARANT BECAUSE HE WAS NOT A POSITA UNDER THE BOARD'S DEFINITION .... 62**

**CONCLUSION .... 64**

## TABLE OF AUTHORITIES

### CASES

*Ariosa Diagnostics v. Verinata Health, Inc.*,
805 F.3d 1359 (Fed. Cir. 2015) .......... 40

*Belden Inc. v. Berk-Tek LLC*,
805 F.3d 1064 (Fed. Cir. 2015) .......... *passim*

*Blue Calypso, LLC v. Groupon, Inc.*,
815 F.3d 1331 (Fed. Cir. 2016) .......... 38

*Bos. Sci. Scimed, Inc. v. Cordis Corp.*,
554 F.3d 982 (Fed. Cir. 2009) .......... 39

*Chamberlain Grp., Inc. v. Techtronic Indus. Co.*,
935 F.3d 1341 (Fed. Cir. 2019) .......... 39, 47, 53

*Chen v. Bouchard*,
347 F.3d 1299 (Fed. Cir. 2003) .......... 64

*Consol. Edison Co. of N.Y. v. N.L.R.B.*,
305 U.S. 197 (1938) .......... 40

*Hayward Indus., Inc. v. Pentair Water Pool and Spa, Inc.*,
814 F. App'x 592 (Fed. Cir. 2020) .......... 38, 43, 53

*In re Cuozzo Speed Techs., LLC*,
793 F.3d 1268 (Fed. Cir. 2015) .......... 39

*In re Lee*,
277 F.3d 1338 (Fed. Cir. 2002) .......... 37, 52, 53

*In re NTP, Inc.*,
654 F.3d 1279 (Fed. Cir. 2011) .......... 39

*Kennametal, Inc. v. Ingersoll Cutting Tool Co.*,
780 F.3d 1376 (Fed. Cir. 2015) .......... 39, 47, 50

*King Pharm., Inc. v. Eon Labs, Inc.*,
616 F.3d 1267 (Fed. Cir. 2010) .......... 38

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
545 F.3d 1359 (Fed. Cir. 2008) .......... 41, 42

*Orion IP, LLC v. Hyundai Motor Am.*,
605 F.3d 967 (Fed. Cir. 2010) .......... 44, 51

*Perricone v. Medicis Pharm. Corp.*,
432 F.3d 1368 (Fed. Cir. 2005) .......... 39

*Sundance, Inc. v. DeMonte Fabricating Ltd.*,
550 F.3d 1356 (Fed. Cir. 2008) .......... 38, 63

*Verdegaal Brothers, Inc. v. Union Oil Company of California*,
814 F.2d 628 (Fed. Cir. 1987) .......... 41

*Victaulic Co. v. Iancu*,
753 F. App'x 895 (Fed. Cir. 2018) .......... 42, 44, 45, 50

**STATUTES**

5 U.S.C. § 706(2) .......... 52

28 U.S.C. § 1295(a) .......... 4

35 U.S.C. § 6 .......... 3

35 U.S.C. § 142 .......... 3

35 U.S.C. §§ 311-319 .......... 3

35 U.S.C. § 311(b) .......... 29

## TABLE OF ABBREVIATIONS AND CONVENTIONS

| Abbreviation | Term |
|---|---|
| ’396 patent | U.S. Patent No. 7,869,396 |
| 3GPP | Third Generation Partnership Project |
| ACK | acknowledgement message |
| Appellants | Appellants Honeywell International Inc., Sierra Wireless, Inc., TCL Communication Technology Holdings Limited, TCT Mobile International Limited, TCT Mobile, Inc., TCT Mobile (US) Inc., TCT Mobile (US) Holdings, Inc., and Thales DIS AIS Deutschland GmbH |
| Appx#### | joint appendix page #### |
| ARQ | automatic repeat request |
| Board or PTAB | Patent Trial and Appeal Board |
| CDMA | Code Division Multiple Access |
| FEC | forward error correction |
| HARQ | hybrid ARQ (automatic repeat request) |
| Honeywell | Appellant (PTAB Petitioner) Honeywell International Inc. |
| IPR | *inter partes* review |
| NACK | negative acknowledgement message |
| PDU | protocol data unit |
| POSITA | person of ordinary skill in the art |
| RLC | radio link control |
| RLP | radio link protocol |
| Sierra Wireless | Appellant (PTAB Petitioner) Sierra Wireless, Inc. |

| | |
|---|---|
| Sisvel | Appellee (PTAB Patent Owner) Sisvel S.p.A. |
| SN | sequence number |
| TCL | Appellants (PTAB Petitioner) TCL Communication Technology Holdings Limited, TCT Mobile International Limited, TCT Mobile, Inc., TCT Mobile (US) Inc., and TCT Mobile (US) Holdings, Inc. |
| Thales | Appellant (PTAB Petitioner) Thales DIS AIS Deutschland GmbH |
| UMTS | Universal Mobile Telecommunication System |
| USPTO | United States Patent and Trademark Office |
| WCDMA | Wideband Code Division Multiple Access system |
| (*x*:*y*-*z*) | column x, lines y-z |

## RELATED CASES

No other appeal in or from the same proceeding was previously before this or any other appellate court. This appeal may directly affect or be directly affected by: *Sisvel Int'l SA v. Honeywell Int'l, Inc.*, 1:20-cv-00652 (D. Del.); *3G Licensing SA v. TCL Commc'n Tech. Holdings Ltd.*, 1:20-cv-00654 (D. Del.); *Sisvel Int'l SA v. VeriFone, Inc.*, 1:20-cv-00656 (D. Del.); *Sisvel Int'l SA v. Xirgo Techs., LLC*, 1:20-cv-00659 (D. Del.); and *Sisvel Int'l SA v. HMD Am., Inc.*, 1:20-cv-22051 (S.D. Fla.).

## INTRODUCTION

The ’396 patent is directed to methods for using a timer to delay requests for retransmission of data blocks arriving out of order in a wireless communications system (*e.g.*, a cellular radio system). More specifically, the ’396 patent claims the use of a timer to allow a “grace period” for a missing data block to arrive before assuming the data block is lost and using system resources to request that the data block be retransmitted. If a data block is missed, the system starts a timer and then, if the block does not arrive before the timer expires, the system requests a retransmission of the missing data block. The use of timers to delay retransmission requests in cellular communications systems to account for data blocks arriving out of order was already well known, however, before the earliest date to which the ’396 patent claims priority. The Board therefore correctly found that every limitation of claims 1-2 and 6-8 of the ’396 patent was disclosed in the prior art.

The Board reached a different result on dependent claims 3-5 and 9-10. These dependent claims purport to further describe how a missing data block is detected as missed and received, *i.e.*, describing how to recognize a gap in the expected sequence numbers (*e.g.*, 1, 2, 3, etc.). This detection step was part of the prior art retransmission methods admitted by the ’396 patent, and neither Sisvel nor its “expert” declarant claimed any purported novelty in how the ’396 patent claims detect any missed data blocks. To the contrary, Sisvel’s expert admitted at

deposition that detecting a gap in sequentially numbered data blocks was known in the art.

Moreover, there is no dispute that the primary reference at issue in this appeal, Sachs, teaches a system with a delay timer that detects missing data blocks in the same manner described by claims 3-5, 9, and 10 (*i.e.*, due to a gap in sequential numbering of the blocks) and methodically lays out the ways that this system could be configured to respond to the varying scenarios where data blocks have arrived out of order (or have not arrived at all). The Board, however, refused to consider Sachs' complementary disclosures of the various scenarios together, unexpectedly insisting that each of Sachs' side-by-side illustrative figures is a separate "embodiment" (because Sachs had referred to them in shorthand with that moniker) and therefore a separate "disclosure" that required record evidence of motivation to combine with one another. In short, the Board treated a single reference that was obviously intended to be read as a whole as a series of at least four (and probably many more) separate references. The Board's conclusion is wrong for multiple reasons.

First, the Board erroneously applied the wrong legal standard for anticipatory references and lacked substantial evidence supporting its determination that each of Sachs' figures was a separate "embodiment" to be treated as an entirely separate reference. Second, even assuming for the sake of argument that each Sachs figure is a separate prior art reference to be combined in a traditional Section 103-style

analysis and that specific evidence of motivation to combine was required, the Board violated the Administrative Procedure Act when it failed to consider the evidence of obviousness based on each of Sachs' individual figures alone and combined with the knowledge of a POSITA. Finally, the Board erred when it considered and gave weight to the Sisvel-favorable testimony of Sisvel's "expert" declarant, who did not have the necessary education or experience to meet the Board's definition for a POSITA, even as the Board ignored that same declarant's testimony when it favored Appellants.

The Board agreed that Sachs as a whole discloses each limitation of each claim of the '396 patent—the only question is whether Sachs' teachings should be considered together or are limited, one-by-one, to what Sachs refers to as "embodiments" of his claimed system—*i.e.*, the same system's different modes of operation depending on the changing circumstances of the data blocks received out of order. As shown below, the Board's refusal to consider Sachs' teachings for each of the specific scenarios contemplated by dependent claims 3-5, 9, and 10 should not stand.

## JURISDICTION

The Board had jurisdiction under 35 U.S.C. §§ 6, 311-319 and issued its final written decision under 35 U.S.C. § 318(a) on September 12, 2022. Appx1-52. Sierra Wireless timely filed its notice of appeal on October 17, 2022, under 35 U.S.C. § 142,

37 C.F.R. § 90.3(a)(1), and Fed. Cir. R. 15(a)(1). Appx859-915. Honeywell, TCL, and Thales timely filed their notices of appeal under the same statutes on October 17, 24, and 25, 2022, respectively. Appx916-1086. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF ISSUES

1. Did the Board erroneously fail to apply the correct anticipation standard to its review of Sachs and lack substantial evidence when it declined to consider the full scope of Sachs' teachings of the same disclosed system across multiple figures?

2. Did the Board err when it failed to analyze Respondents' obviousness evidence and arguments based on Sachs' disclosures even when considering a single figure (*i.e.*, what it deemed a separate "embodiment") of Sachs in isolation?

3. Did the Board err when it considered testimony helpful to Appellee from an "expert" declarant who is not a person of ordinary skill in the art under the Board's definition and ignored testimony from that same "expert" when it favored Appellant?

## STATEMENT OF THE CASE

This is an appeal from the Patent Trial and Appeal Board's Final Written Decision finding that Appellants did not establish the unpatentability of challenged claims 3-5 and 9-10 of U.S. Patent No. 7,869,396 ("the '396 patent"). Appx43.

## I. THE PARTIES

Appellants Sierra Wireless, Honeywell, TCL, and Thales[1] (collectively, the "Appellants") manufacture and sell electronics modules and devices used in a wide array of applications, from the Internet of Things to transportation to industrial manufacturing to healthcare. The commonality between Appellants for purposes of this proceeding is that they manufacture and/or sell products that can support, among other things, connectivity to the Third Generation Partnership Project's ("3GPP") LTE cellular network, which is commonly referred to as 4G. Appellee/Cross-Appellant Sisvel has filed more than a dozen complaints alleging infringement of the '396 patent to date, including complaints filed against Honeywell, TCL, and certain Sierra Wireless and Thales customers. *See* Appx4-5.

Appellants thus joined with several additional parties (who have since resolved their disputes with Sisvel) to file an IPR petition challenging all ten claims of the '396 patent on March 9, 2021. Appx229-319. On September 12, 2022, the Board issued a final written decision concluding that Appellants had proven by a preponderance of the evidence that claims 1, 2, 6, 7, and 8 were unpatentable as anticipated and obvious but that Appellants had not established by a preponderance

---

1 Thales' name recently changed to Telit Cinterion Deutschland GmbH. An unopposed motion for leave to substitute Telit is currently pending. ECF No. 29.

of the evidence that dependent claims 3-5, 9, and 10 were also unpatentable. Appx1-44. Appellants appeal that latter conclusion.

## II. THE CLAIMED ARQ RETRANSMISSION REQUEST DELAY TIMER

The '396 patent is entitled "Data transmission method and data re-transmission method" and relates "to a data transmission method and a data retransmission method which can reduce loss in data…." Appx191, Appx202(1:17-20). The patent purports to claim a method and a receiver for performing an automatic repeat request ("ARQ") in a wireless communication system, with the purportedly novel addition of a delay timer that gives data blocks arriving out of order a "grace period" to arrive before requesting they be retransmitted. Appx209(16:39-53) (claim 1), Appx210(17:13-18:8) (claim 8). The applicant admitted that the ARQ technique is prior art but claimed to have addressed a purported need "for enhancing reliability of transmission by efficiently using the ARQ of the high-level layer and the HARQ of the low-level layer" through the additional use of a timer. Appx202(1:58-64) ("Background Art"), Appx202(2:11-13) ("Technical Problem"), Appx208(14:22-15:51) (describing claimed invention). The claims are directed to the use of ARQ with a timer, which Sisvel now alleges in litigation reads on 3GPP LTE standard-compliant devices (*i.e.*, devices capable of receiving LTE cellular data). But, as explained further below, the use of ARQ with a timer was already disclosed well before the '396 patent's earliest priority date.

### A. The Relevant State of the Art

Wireless communication systems, including cellular radio systems, were a well-developed technology long before the January 5, 2006 priority date of the '396 patent. Appx202(1:24-36). By that time, the 3rd Generation Partnership Project ("3GPP") had developed and standardized third-generation ("3G") cellular radio access technology called the Universal Mobile Telecommunication System ("UMTS"), and the fourth-generation Long Term Evolution ("LTE") standard was in development. Appx202(1:24-47); Appx1121-1126(¶¶54-66). The 3GPP's technical specifications defined, among other things, the radio interface protocols between a user equipment (*e.g.*, a cell phone) and radio access networks. These protocols require a series of transmission-side and reception-side layers supporting data transmission and dictate the functions for each of those layers. *See, e.g.*, Appx203-204(4:10-6:5), Appx194 (Figures 2 & 3). One 3GPP-defined layer is the Radio Link Control ("RLC") layer, which is responsible for receiving data transmissions and taking any corrective actions (*e.g.*, informing the transmitter which transmissions were not successfully received and need to be retransmitted). Appx1132-1133(¶80).

A wireless communications system transmits bits. Appx1127-1128(¶¶67-68). A group of bits transmitted together is a "data block" or "data packet." Appx1128-1129(¶70). Such blocks or packets may be called a "Protocol Data Unit" ("PDU")

and are frequently assigned a sequence number ("SN") to help the receiver place received data blocks in sequential order. Appx1128-1129(¶70).

One of the challenges in a wireless communications system is the potential loss or delay of data blocks or errors that are introduced to data blocks across the wireless transmission environment. Appx202(1:48-57); Appx1126-1129(¶¶66-72). Such problems can occur for a variety of reasons, such as unstable channels, user movement, or network congestion. Appx1126(¶66). The telecommunications industry had therefore developed many techniques to reduce and correct data loss and data errors by the relevant priority date, including the two techniques referenced in the '396 patent: Automatic Repeat reQuest ("ARQ") and hybrid ARQ ("HARQ"). Appx1129-1134(¶¶73-81).

ARQ is used to, as the name suggests, automatically request repeat transmissions. Appx1132-1134(¶¶78-81).[2] A receiver using ARQ will detect a missing or erroneously-received data block and then automatically request retransmission of that erroneous or missing data block through the use of status reports (*i.e.*, messages) to the transmitter. Appx1132(¶79).

---

[2] ARQ is typically implemented in the data link layer (*e.g.*, the RLC layer) of the wireless communications protocol stack. Appx1132-1133(¶80); *see also* Appx202(1:58-60).

The status reports sent from the receiver to the transmitter can include positive acknowledgement ("ACK") and negative acknowledgement ("NACK") messages. ACK messages are used to communicate the receiver's successful receipt of data blocks, which are typically identified by sequence numbers. Appx1134-1135(¶¶83-84). NACK messages are used to communicate missing or unsuccessfully received data blocks. *Id*. A status report can include an ACK, a NACK, or both. Appx1134-1136(¶¶84-85). ARQ (and HARQ[3]) were already well-known and required by the 3GPP's 2G Global System for Mobile Communications ("GSM") cellular network standard (which evolved into the accused LTE standard) by the relevant priority date. Appx1122-125(¶¶56-63) (introducing GSM and CDMA), Appx1132-134(¶¶78-81) (introducing ARQ and HARQ).

### B. The Specification

The '396 patent admits the known, prior art use of ARQ (and HARQ) techniques to reduce wireless data loss. Appx202(1:58-64). The specification explains that "radio conditions are often changed," which can cause data blocks to be received out of order (*i.e.*, out of sequence), and that receivers therefore include

---

[3] Hybrid ARQ ("HARQ") was another well-known transmission technique at the time of the purported invention, which combines ARQ methods with forward error correction ("FEC") coding schemes. Appx1129-1131(¶¶73-75); *see also* Appx202(1:60-64). While HARQ is discussed throughout the '396 patent, it is outside the scope of the claimed inventions.

a buffer for rearranging data blocks arriving out of order. *Id.*(14:5-7). "If a gap occurs in the buffer of the receiver, it means that a specific RLC PDU is not received." *Id.*(14:11-13). The '396 specification then proposes that "the RLC entity should check whether the gap generated in the RLC buffer is due to the reception failure or the inversion of transport order…." *Id.* (14:23-28). Here is the '396 patent's explanation for the claimed invention:

> The buffer of the RLC entity can use a timer. ***When a gap is generated*** in the buffer of the RLC entity, the timer is activated at once. When data corresponding to the gap is not received until the timer expires, it is judged that the gap is generated due to the reception failure and the status report information may be transmitted to the transmitter.

Appx208(14:28-33) (emphasis added). In short, the '396 patent purports to disclose the use of a timer that is activated when a gap in the sequence numbers of the received data blocks placed in the buffer is detected. If the timer expires, the data block is determined to be missing (*i.e.*, a reception failure), and a message (*i.e.*, a status report) is sent to the transmitter. If the timer is stopped, no action is taken. *Id.*; Appx1145-1146(¶¶104-107).

Figure 12, reproduced with annotations below, illustrates the claimed invention. Appx208(14:34-37); *see also* Appx3-4.




Appx200(Figure 12) (highlighting added).

Figure 12 depicts the transmission of protocol data units ("PDUs") by the Medium Access Control ("MAC") layer of the receiver ("Rx MAC" highlighted in gray in lower right-hand side) to the RLC layer of the receiver ("Rx RLC" highlighted in gray on the upper right-hand side). Appx1147-1148(¶109) (citing Appx208(14:38-44)). Starting at the left (with the passage of time shown from left to right), the green-highlighted protocol data unit PDU1 has a sequence number of 1. Figure 12 shows the successful transfer of PDU1 from the MAC layer to the RLC layer. Appx1148(¶109).

The yellow-highlighted protocol data unit PDU3 with a sequence number of 3 arrives next. This PDU does not arrive in the expected order (*i.e.*, the PDU with the next integer in numerical order (PDU2) was expected to arrive next), and the annotated red X at circled point (1) depicts the RLC layer detecting a gap in the

received data blocks "[s]ince PDU2 having a sequence number smaller than that of PDU3 does not exist" (*i.e.*, the next expected protocol data unit with a sequence number of 2 (PDU2) has not arrived). Appx208(14:38-41). Because the next expected protocol data unit (PDU2) is missing, the receiver initiates a "jitter timer" JT[4] (blue highlighted arrow) to "check" if the gap is "due to the inversion of transport order." Appx208(14:38-44). The jitter timer JT then starts at point (1).

At circled point (2) above, the specification explains that "the RLC entity receives PDU2 before the HARQ jitter timer JT expires, and the HARQ jitter timer JT stops." Appx208(14:46-47). In other words, PDU2 arrived within the allowed time, so the timer was stopped and a status report was not sent. Appx1149-1150(¶112).

Another scenario demonstrating what happens when missing PDUs never arrive is shown at circled point (3) of Figure 12 above. This time, PDUs 1-5 are followed by PDU7. The receiver recognizes that a data block is missing (PDU6) and again initiates a timer (highlighted blue). Appx208(14:48-50).[5] This time, the

---

[4] A "HARQ jitter timer" was a known timer used in telecommunications. The details of how it specifically works are unnecessary here because the '396 patent claims are broadly directed to a "timer." Appx1149(¶111).

[5] The '396 specification actually states: "In (3), similarly to (1), since the ARQ entity received PDU6 having a sequence number smaller than that of PDU7, the HARQ jitter timer JT is activated." Appx208(14:47-47). In other words, the specification slightly misdescribes Figure 12 above, which instead shows receipt of PDU7 at point (3), which has a sequence number higher than the next-in-

timer expires at point (4) without receiving the missing data block (PDU6): "The receiver judges that the reception of PDU6 fails and transmits the status report information associated therewith to the transmitter." Appx208(14:51-54). In other words, missing PDU6 did not arrive, so the timer expired and the receiver sent status report information requesting retransmission. Appx208(14:55-61); *see also* Appx1150-151(¶113). Figure 12 therefore shows two separate scenarios for the claimed timer: when the timer stops and when it expires.

### C. The Prosecution History

Prosecution of the '396 patent was short. The application that issued as the '396 patent claimed priority to five foreign applications, the earliest of which was filed on January 5, 2006. Appx1160(¶130). The applicant filed two rounds of preliminary amendments cancelling all claims and adding new claims in 2009, representing in the latter that the new claims "sufficiently correspond to allowed claims" in the Korean application to which the '396 patent claims priority. Appx1160-1161(¶131). The claims were allowed after one office action without comment on September 30, 2010. Appx1161-1162(¶133).

None of the art presented to the Board was before the Office during prosecution.

---

sequence number of missing PDU6. Appx1150(n.6).

### D. The Challenged Claims

Appellants challenged all claims of the ’396 patent. Claim 1 recites:

1[pre] A method of performing automatic repeat request (ARQ) in a wireless communication system, the method performed by a receiver and comprising:

[1a] detecting whether at least one data block to be received from a transmitter is missed;

[1b] starting a timer when the at least one data block is detected as missed;

[1c] stopping the timer when the at least one data block is received from the transmitter while the timer is running, in order to prevent a triggering of a status report before the timer expires; and

[1d] transmitting the status report to the transmitter after the timer expires, wherein the status report comprises a positive acknowledgement indicating receipt of at least one received data block.

Appx209(16:39-53). Independent claim 8 is directed to a receiver for performing this same method and further specifies that “the receiver compris[es] a Radio Link Control (RLC) entity.” Appx210(17:13-18:8); *see also* Appx1157-158(¶126) (side-by-side comparison showing claims 1 and 8 are identical beyond their preambles and verb tenses).

Dependent claims 2-5 and 9-10, which depend from claims 1 and 8, respectively, recite only limitations describing the absence and subsequent appearance of a missing data block:

- Claim 2: the missing data block is detected "when a sequence number (SN) of a currently received data block is larger than a SN of a previously received data block";
- Claim 3: the missing data block is detected "when a sequence number (SN) following a SN of a data block with a highest SN among received data blocks is larger than a lowest SN of the at least one data block to be received";
- Claims 4/9: the missing data block is detected "when a sequence number (SN) following a SN of a data block with a highest SN among received data blocks is larger than a SN following a last in-sequence received data block"; and
- Claims 5/10: stopping the timer when the missing data block arrives: "when a sequence number (SN) following a SN of a data block with a highest SN among received data blocks when the timer was started is the same as a SN following the last in-sequence received data block."

Appx209-210(16:54-18:18); *see also* Appx1159(¶129). Dependent claims 4 and 9 and 5 and 10 depend from different independent claims, but are otherwise identical. Appx1159(¶129) (side-by-side comparison of claims 4/9 and 5/10). Dependent claim 6 further specifies that the data block comprises an RLC PDU. Appx210(17:6-8). Dependent claim 7 is directed to a status report comprising a negative acknowledgement ("NACK"). Appx210(17:9-12).

As discussed below, neither Sisvel nor its expert pointed to any purported novelty in these dependent claims.

## III. THE SACHS PRIOR ART REFERENCE

The purported novelty of the '396 patent—the use of a timer to delay the transmission of status report information in an ARQ method—was also already known and disclosed in the prior art. One particularly clear example where this "grace period" concept is disclosed is World Intellectual Property Organization Patent Application Publication No. WO 02/091659 A2, published November 14, 2002 (more than two years before the '396 priority date), to Joachim Sachs *et al.* ("Sachs"). Sachs, which is titled "Reordering procedure for data packets[6] in a communication system," is, like the '396 patent, directed to a method for improving the efficiency of data transmission systems through the use of an ARQ delay timer. Appx1265(Title); Appx1267(1:12-15); Appx1165(¶143). Sachs was one of three similar references presented in the proceedings below and, for the sake of simplicity, is the sole focus of this appeal.

### A. The Sachs ARQ Delay Timer

Sachs is directed to the well-known problem of data blocks in an ARQ system arriving late, out of order, or not at all. Appx1272(6:34-7:15). Sachs addresses this

---

6 Sachs refers to data blocks as "data packets." A POSITA understood and used those terms interchangeably. Appx1127-1129(¶¶67-72).

problem the same way as the ’396 patent—by “***delay[ing]*** the triggering of a reordering procedure” through the use of a timer. Appx1274-1275(8:25-9:2 (emphasis added), 9:11-15).

Sachs’ timer, like the ’396 patent, is built into the prior art ARQ system. Sachs first introduces a communication system with a layered protocol stack for handling protocol data units (“PDUs”) assigned sequence numbers, including a link layer in which the Radio Link Controller (“RLC”) communicates between an RLC sending entity and receiving entity. Appx1267(1:19-22), Appx1268(2:1-10). The similarities between Sachs’ layered protocol architectures and the protocol architectures illustrated in Figures 2 and 3 of the ’396 patent are no coincidence; Sachs and the ’396 patent are both directed to ARQ in a 3GPP standard-compliant telecommunications system. *Compare* Appx1269(3:28-4:9), Appx1268(2:5-10) *with* Appx203(3:25-39).

After walking through the already-known ARQ technique and explaining that “transmission errors are detected by searching for gaps in the sequence numbers of the received PDUs on the receiver side,” *id.*(2:14-19), Sachs includes an introductory example of the prior art ARQ technique without a timer. In that example, PDUs 3, 4, and 7 are received at the RLC receiver. The receiver detects PDUs 5, 6 are missing from the gap in the sequence and requests retransmission of the missing PDUs “by sending a STATUS report, which acknowledges 3, 4, 7 and request[s] the

retransmission of 5 and 6," *i.e.*, a status report including both an ACK and a NACK. *Id.*(2:24-30).

Sachs then teaches the same improvement to the prior art ARQ technique claimed by the '396 patent of adding a delay timer: "a timer that is started for every data packet [sic] arriving out of sequence." Appx1275(9:11-15). If the data block does not arrive before the timer expires, the receiver requests retransmission of the missing data block. *Id.*(9:28-32) ("With this solution it is guaranteed that during the duration of the timer no retransmission is performed for the data packets, which possibly will arrive in this time interval."). If the missing data block arrives, the timer is stopped. Appx1275-1276(9:34-10:4). The data blocks are then reordered in the buffer. Appx1278(12:11-20).

Sachs then provides a series of examples applying its teachings in Figures 4-9; Sachs discloses two complementary aspects of a single system in Figures 4 and 5, and then adds another feature to that system for initiating the data block reordering in the buffer (the "state variable") in Figures 6-9. Sachs refers to the points illustrated in some of the figures as "embodiments," *see, e.g.*, Appx1278(12:25-29); Appx1280(15:5), although there is no evidence to suggest that Sachs meant to suggest that each "embodiment" was a separate system. Instead, as explained below, Sachs uses the term "embodiment" to describe different examples for how this same system would operate depending on, for instance, whether a missing data block was

received or not after a timer was started, and depending on when the system begins reordering the buffered data blocks. The Board, however, as explained below, treated each of these "embodiments" as if it was a standalone prior art reference.

### B. Sachs' Figures 4 and 5 Disclose Different Examples of the Same System

Turning to Figures 4 and 5, Sachs explains that these figures illustrate Sachs' teachings for the use of a timer (called "timer T_reorder"[7]) in the ARQ retransmission system. Figure 4 (annotated below), corresponding to the right-hand side of Figure 12 of the '396 patent, shows the linked MAC and RLC protocol layers of a receiver with the MAC layer on the left-hand side and the RLC layer on the right-hand side. Appx1169-1170(¶150). This figure shows PDUs with sequence numbers (highlighted in yellow) being transmitted from the MAC layer to the RLC layer. Figure 4 moves in chronological order from top to bottom beginning first with the receipt of PDUs 5, 6 at the RLC layer. *Id.* PDUs 5, 6 arrive out of order before PDUs 1, 2 and 3, 4, as is apparent from the out-of-sequence arrival of the numbered PDUs. *Id.* Upon receipt of PDUs 5, 6, the RLC layer detects that PDUs are missing (PDUs 1-4) and starts the T_reorder timer to allow a "grace period" to determine if

---

[7] The T_reorder timer is aptly named because it is also connected to reordering the received PDUs by sequence number in the buffer, which is explained by both Sachs (in Figures 4-7) and the '396 patent, although not mentioned in the '396 patent claims. Appx1172-1173(¶154); *also compare* Appx1278(12:11-20) (reordering) *with* Appx209(14:5-7) (rearrangement).

those data blocks will arrive out-of-order or are missing altogether. Appx1278(12:25-13:6) ("The reorder-delay timer is started for each PDU arriving out of sequence."); Appx1169-1170(¶150). While Figure 4 shows the successful receipt of PDUs 1, 2 and 7-12, "PDUs 3 and 4 are not transmitted correctly" and therefore do not arrive. Appx1278(12:30-32). This is also shown on the left-hand side of Figure 4 where Xs are drawn over PDUs 3, 4.




Appx1294(Figure 4) (highlighting added).

Sachs discloses that the T_reorder timer is connected to a "STATUS report" identifying both the PDUs received (an ACK) and not received (a NACK), which is

generated (but not sent) when the missing PDUs are first detected. Appx1279(13:19-33). This STATUS report is temporarily placed in a buffer when the timer is initiated. *Id.* If the missing PDUs are not received and the timer expires, the status report is sent: "Once T_reorder expires, the STATUS report is removed from the buffer and transmitted." *Id.* As shown in the bottom-most arrow of Figure 4 above (highlighted purple), Sachs confirms again that the STATUS report can include both a positive acknowledgement message (ACK) confirming receipt of at least PDU 14 and a negative acknowledgement message (NACK) indicating that PDUs 3, 4 were not received.[8] *Id.*; Appx1294(Figure 4); Appx1170-1171(¶¶151-152). In other words, Figure 4 shows a scenario in which the timer expires without receipt of missing PDUs 3 and 4, so the system sends a retransmission request.

Having illustrated how the disclosed RLC receiver system in Figure 4 operates when the timer expires, Sachs then turns in the very next paragraph to explain how the disclosed system performs in the alternative scenario in which the timer is instead stopped before it expires when the missing data blocks arrive: the timer "shall preferably be stopped when all outstanding PDUs are received and the sent sequence is re-established. This is [] achieved by stopping the duration of the T_reorder timer,

---

8 Figure 4 refers to a "NAK(3,4)." Appx1294(Figure 4). It is undisputed that "NAK" and "NACK" are both used to refer to a negative acknowledgement message. Appx1171(¶152 n.8).

when reordering is finished." Appx1280(14:1-5). "This embodiment is shown in figure 5." Appx1280(14:6).

Sachs explains that Figure 5 (annotated below) illustrates how the T_reorder timer depicted in Figure 4 operates when the timer is instead stopped: "The structure of the figure 5 is similar to the figure 4. ***The difference is that the PDUs 3 and 4 are transmitted over the link***." Appx1279(14:6-12) (emphasis added). In other words, Figure 5 shows the ***same system*** as Figure 4 and a scenario in which PDUs 5, 6 again arrive out of order ahead of PDUs 1-4. The ***only*** difference is that, in this scenario, all of the missing PDUs arrive ***before*** the T_reorder timer expires. Appx1279(14:1-12). In short, Sachs' second "embodiment" merely shows how the first "embodiment" behaves when presented with a different scenario.



Figure 5

Appx1295 (Figure 5) (highlighting and annotations added).

As shown above, Figure 5 depicts the same system and RLC receiver as in Figure 4. Without re-explaining the background that set up Figure 4, and just like Figure 4, PDUs 4, 5 arrive first, the receiver detects PDUs 1-4 as missed, and starts the T_reorder timer (as in Figure 4). Appx1172-1173 (¶¶153-154). This time, the RLC receiver receives all of the missing PDUs 1-4 before the timer expires. When the RLC receiver receives the last missing PDU, the figure explains to "stop timer when re-ordering is finished." The timer is stopped, and no status report on the missing PDUs is sent. Appx1295(Figure 5), Appx1280(14:1-12), Appx1172-1174(¶¶153-157).

Sachs therefore discloses the use of a timer in ARQ and provides examples showing the timer in operation both when (i) the timer expires without receipt of missing PDUS (Figure 4) and (ii) the timer is stopped because missing PDUs arrive (Figure 5). Notably, Sachs' Figure 5 directly corresponds to the left-hand side, and Sachs' Figure 4 directly corresponds to the right-hand side, of Figure 12 of the '396 patent. *Compare* Appx1295-1296(Figures 5 and 6) *with* Appx200(Figure 12).

### C. Sachs' Figures 6 and 7 Depict the Same System of Figures 4 and 5 with an Additional Feature

Sachs' relevant teachings do not stop with its disclosure of an ARQ timer and the examples in Figures 4 and 5. Sachs further discloses that an algorithm (referred to as the "state variable") can be added for increased efficiency to the ARQ system to reduce the frequency with which the reordering step must be performed. Appx1280(14:14-20). To do so, Sachs teaches four potential "implementations" incorporating complementary and interchangeable algorithms A, B, C, and D, and illustrates those teachings in Figures 6-9. *Id.*(14:22-30).

Turning first to Figure 6, this figure shows Sachs' teachings applied to an RLC receiver ("RLC RX") operating in "Acknowledged Mode" with a T_reorder timer; the ***same structure*** as the RLC AM receiver of Figures 4 and 5.[9] "Acknowledged

[9] Figure 6 separately illustrates the RLC receiver operating in "Acknowledged Mode" ("AM") (left side, shown below) and an "Unacknowledged Mode" ("UM") RLC receiver (right side, not shown). Appx1296. Appellants' expert

Mode" refers to a 3GPP scheme in which the receiver is set to communicate to the transmitter regarding its successful and unsuccessful receipt of data blocks. Appx1280-1281(14:32-15:9); Appx1296(Figure 6), Appx1268(2:15-34), Appx1199-1202(¶¶205-207). Sachs explains that the only difference in Figure 6 is the addition of a "state variable X1" that limits the number of times that the received data blocks placed in the buffer are reordered. Appx1281-1282(15:12-16:2); Appx1201-1202(¶207). The state variable decides the trigger for reordering the received data blocks by identifying the sequence number of the highest received PDU from which any gaps are determined. *Id.*

Figure 6 presents another use case for Sachs' delay timer teachings. PDU1 arrives at the RLC receiver as shown at the top of Figure 6. "In the next step PDU 4 is received, which is out of order" because PDUs 2 and 3 have not been received. "In this case T_reorder timer is started…." Appx1281-1282(15:12-16:2); Appx1201-1202(¶207). Sachs then explains that the delay timer is again used with the addition of the X1 state variable delaying the reordering of the received data blocks in the buffer:

> In respect to figure 6 X1 is initially set to 1. In the next step PDU 4 is received, which is out of order…. When the T_reorder timer is active, the X1 is not updated, whenever a PDU with a sequence number smaller then [sic] actual

provided unrebutted testimony explaining that the UM receiver is directed to another 3GPP transmission scheme unrelated to the issues here. Appx1135-1136(¶85), Appx1201(¶206), Appx1244(¶299).

> X1 value arrives. Thus X1 does not change after receiving PDU 2 and 3, the PDUs 2 and 3 are only brought to the right position in the sequence. When a PDU is received which is in-of-sequence since the value of X1 and which is higher than X1, at this moment X1 is set to the highest sequence number of PDUs received so far…. Whenever the sequence of the PDUs in the RLC receiver buffer is re-established, all in-sequence PDUs from beginning of the buffer are delivered to the higher layer and removed from the receiver buffer.

Appx1281-1282(15:21-16:2). Sachs' Figure 6 therefore continues Sachs' disclosure for its delay timer, adding to the disclosures of Figures 4 and 5 the use of an additional state variable X1 to—for additional efficiency—limit the number of times in which the PDUs are reordered. Appx1201(¶206).




Figure 6

Appx1296(Figure 6) (excerpt highlighted and annotated); Appx284-286; Appx1199-1202(¶¶205-207); Appx1280(14:32-16:27).

Figure 7 teaches the same structure as Figure 6 but applies a new algorithm B, which merely shortens the duration of the T_reorder timer. Appx1283(17:14-15) ("The structure of figure 7 corresponds to figure 6. ***The difference is the duration of the T_reorder timer.***") (emphasis added). In other words, Figure 7 depicts the same RLC receiver as Figures 4 and 5 with an additional state variable responding

to another scenario receiving PDUs in which a PDU is again detected as missing and the T_reorder timer is started, with the timer now simply expiring more quickly. This time, however, the delay timer is "***stopped***[] because the sequence of the PDUs until 4 is re-established." Appx1283(17:21-23) (emphasis added). The timer has a shorter duration than Figure 6, so "the reaction for informing the sender about the lost data packets is faster" in comparison to Figure 6. Appx1283(17:28-30).




Appx1297(Figure 7) (excerpt highlighted and annotated); Appx1213-1214(¶¶227-228).

Sachs therefore presents not only the use of a timer in connection with an ARQ method (*i.e.*, requesting retransmission when a packet is missed) but also presents multiple examples of how that timer is used in different scenarios or use cases, some of which overlap completely with the '396 patent's claims and some of which include those elements and more.

## IV. THE BOARD'S FINAL WRITTEN DECISION

Appellants filed an IPR petition challenging all ten claims of the '396 patent as anticipated or at least obvious over Sachs (Grounds I and II).[10] Appx270-298. The Board agreed in part, and the final written decision found claims 1, 2, 6, 7, and 8 unpatentable as anticipated by and obvious in view of Sachs. Appx43. The Board further determined, however, that Appellants had not established the unpatentability of dependent claims 3-5, 9, and 10 because Appellants purportedly did not demonstrate how or why "a POSITA would have been motivated to combine the differing embodiments" in Sachs' Figures 4, 5, 6, and 7. Appx26-27 (claim 3), Appx29 (claims 4 and 9), Appx31 (claims 5 and 10).

[10] Appellants further believe the '396 patent claims are invalid as indefinite and because they claim unpatentable subject matter, but Section 112 and 101 arguments cannot be raised in an IPR. 35 U.S.C. § 311(b).

### A. Independent Claims 1 and 8

In invalidating many of the challenged claims, including independent claims 1 and 8, the Board appropriately rejected a series of flawed arguments from Sisvel.[11] ***First***, the Board correctly determined that claim 1 is conditional and rejected Sisvel's argument that limitations 1[c] and 1[d] must both be performed in the prior art (even though Sachs does disclose both limitations). Appx15-17. The Board notably agreed that these limitations are mutually exclusive, as common sense dictates: the timer either stops or expires, but it cannot do both while performing the claimed method. Appx16(citing Appx255(n.5), Appx1155(¶121), Appx1180(¶169)). The Board explained:

> We clarify that limitations 1[c] and 1[d] cannot both occur in response to the same set of stimuli. Limitation 1[c] can be triggered in response to one set of stimuli and limitation [d] can be triggered in response to a different set of stimuli ***as is shown in Sachs' figures***.

---

[11] APJ Moore authored a detailed dissent that would have punted all invalidity decisions to the district court based on his Section 112 concerns as to limitation 1[c] (and corresponding limitation 8[c]): "stopping the timer when the at least one data block is received from the transmitter while the timer is running, ***in order to prevent a triggering of a status report before the timer expires***." Appx46 (quoting Appx209(16:46-49)) (emphasis added). APJ Moore's dissent explains that, through a potential mistake during prosecution, the language "in order to prevent a triggering of a status report" was added to the "stopping the timer" limitation "instead of the 'starting a timer' limitation, which would have made more sense." Appx46. He concludes that "[t]he claims are basically nonsensical" as written. Appx49. Appellants agree that the '396 claims suffer from multiple defects, but focus on the Section 102 and 103 arguments addressed by the majority opinion for purposes of this appeal.

Appx16 (emphasis added). The Board therefore concluded that Appellants "need only show one of these mutually-exclusive claim limitations to satisfy the claim," although Sachs actually disclosed both. *Id.* Specifically, the Board determined that Sachs' Figure 5 discloses limitations 1[a], 1[b], and 1[c], ***and*** Sachs' Figure 4 discloses limitations 1[a], 1[b], and 1[d].[12] Appx16-17.

***Second***, the Board considered and rejected Sisvel's argument that Sachs' T_reorder timer is directed to delaying a reordering procedure instead of triggering a status report as claimed by the '396 patent. Appx17. The Board specifically considered and rejected Sisvel's argument "because it is not supported by the cited evidence." Appx18.

***Third***, and related to the first point by the Board above, the Board considered and rejected Sisvel's argument that Appellants did not sufficiently show "a single embodiment in Sachs that meets every limitation of claims 1 or 8" because Appellants pointed to both Figures 4 and 5 as disclosing the claimed timer stopping and expiring. Appx18-19 (quoting Appx516). In this regard, the Board declined to determine whether Sachs' Figures 4 and 5 are the same or different "embodiments"

---

[12] As discussed below, Appellants believe that it was error for the Board to effectively treat Sachs' figures as separate prior art references, but this error did not affect the outcome of the Board's analysis for claims 1 and 8 because Sachs' teachings in Figures 4 and 5 did not need to be combined to invalidate conditional claims 1 and 8, which only required the delay timer to expire ***or*** stop, not both.

for purposes of claims 1 and 8 because Sachs taught both of the conditional sets of limitations through ***each*** of Figure 4 and Figure 5: "[Appellants'] showing is persuasive in both of these ways." Appx19; *see also id.* ("We need not decide whether Figure 4 and Figure 5 of Sachs are directed to different embodiments."). In other words, the Board sidestepped the question of whether Sachs' Figures 4 and 5 should be treated as separate prior art references for this initial part of its analysis.

The Board then concluded that Sachs both anticipated and rendered claim 1 obvious as a single-reference obviousness ground. Appx19. After determining that "Independent Claim 8 recites a receiver that performs substantially the same method," the Board similarly concluded that claim 8 was also anticipated and rendered obvious "[f]or reasons substantially similar to those set forth for independent claim 1." Appx20.

**B. Dependent Claim 2**

The Board similarly concluded that Sachs discloses claim 2, which recites "wherein the at least one data block is detected as missed when a sequence number (SN) of a currently received data block is larger than a SN of a previously received data block." Appx20 (quoting Appx209(16:54-57)). The Board specifically pointed to Sachs' Figure 5: "the RLC receiver notices[] that [the PDUs] are out of order, and the T_reorder timer is started" and that, "[a]fter receiving the PDUs 3 and 4 the

sequence 1,2,3,4,5,6,7,8 is reestablished and therefore the T_reorder timer is stopped." Appx22 (quoting Appx1280(14:8–10) (emphasis added)).

### C. Dependent Claim 3

The Board then considered dependent claim 3, which recites "wherein the at least one data block is detected as missed when a sequence number (SN) following a SN of a data block with a highest SN among received data blocks is larger than a lowest SN of the at least one data block to be received." Appx22-23 (quoting Appx209(16:58-62)).

The Board rejected Appellants' citation to Sachs' explanation of the prior art teachings for detecting a missing data block "[a]s not sufficient because claim 3 has a scope that is different from that of claim 2, ***and requires something more*** than [a] showing of 'a gap in sequence numbers.'" Appx26 (citing Appx287) (emphasis added). The Board did not articulate (and Appellants do not know) what that "something more" is or could be based on the language of the claim. The Board then determined that "***Figure 6 is an embodiment that differs from that which is shown in Figures 4 and 5***" because of its "***addition*** of a state variable X1, accompanied by the description of 'completely solv[ing] the problem of packet re-ordering' with a particular implementation…." Appx25-26 (quoting Appx1280) (emphasis added). The Board therefore concluded—despite recognizing that Figure 6 merely "add[s]" to Figures 4 and 5—that "it is unclear how [Appellants] intend[]

to combine Figures 4 and 6 or Figures 5 and 6 and why a POSITA would have been motivated to combine the differing embodiments." Appx26-27. The Board included a string citation acknowledging that Appellants also relied on Sachs' teachings for detecting a missing data block ***in Figure 4*** by itself, but provided no analysis for why Sachs' teachings in Figure 4 were not sufficient to disclose detecting a missing data block in the manner described in dependent claim 3. *Compare* Appx23 (citing Appx1278-1279(12:25-13:9)) *with* Appx26-27; *see also* Appx1102(¶¶210-215).

### D. Dependent Claims 4, 9, 5, and 10

The Board then carried its reasoning from dependent claim 3 (*i.e.*, its treatment of Sachs Figures 4 and 5 as each being separate references and as being separate from Figures 6 and 7, too) to its review of dependent claims 4 and 9 and 5 and 10, concluding: "it is unclear how Petitioner intends to combine Figures 4 and 6 or Figures 5 and 6 and why a POSITA would have been motivated to combine the ***differing embodiments*** …." Appx29 (claims 4 and 9) (emphasis added); *see also* Appx31 (claims 5 and 10) (similar).

Thus, having found that Sachs anticipates (and renders obvious) claims 1, 2, 6, 7, and 8 based on Sachs Figure 4 and/or Figure 5 ***separately***, the Board nonetheless found that Appellants had not demonstrated the unpatentability of dependent claims 3-5, 8, and 9 for anticipation due to its refusal to consider Sachs' Figures 4, 5, 6, and

7 ***together.*** The Board further concluded, without analysis, that Figure 4 alone or together with the other figures did not render those dependent claims obvious either.

### E. Petition Grounds III, IV, and V (Wei and TS 25.322)

Appellants also presented U.S. Patent No. 6,987,780, titled "RLP retransmission for CDMA communication systems," by Yongbin Wei et al. ("Wei") on the basis of anticipation (Ground III), obviousness as a standalone reference (Ground IV), and in combination with the 3GPP "Radio Link Control (RLC) protocol specification" Technical Specification 25.322 V5.9.0 (2004-12) ("TS 25.322"). The Board rejected these grounds. Although Wei discloses the use of a delay timer in connection with transmission of a status message in an ARQ system, the Board found that Wei's teaching of a NAK in connection with the '396 patent's 1[c] "stopping the timer" limitation was not sufficiently connected to Wei's teaching of an ACK in connection with the '396 patent's 1[d] "transmitting the status report … after the timer expires." Appx41-42. While Appellants have focused their appeal on Sachs (Grounds I and II), it is noteworthy that the Board summarily (and erroneously) disposed of Wei and the combination of Wei with TS 25.322 by ignoring its own determination that claims 1 and 8 were conditional (at Appx16-17). Appellants should not have therefore been required to demonstrate that both of the mutually-exclusive timer limitations needed to be met.

## SUMMARY OF ARGUMENT

The Court should reverse or vacate and remand the Board's decision on claims 3-5, 9, and 10. The Board erred for at least three reasons in determining that the Appellants did not carry their burden to show unpatentability of these claims:

1. The Board applied an erroneous legal standard to its review of Sachs for purposes of its invalidity analysis. Specifically, the Board failed to consider the full scope of Sachs' teachings and instead treated Sachs as a series of separate disclosures, requiring evidence of a specific motivation to combine Sachs' internal teachings with one another, even though they were all directed to the same system. The Board therefore failed to adhere to the hornbook rule that prior art references should be considered for ***all that they teach***. *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1076 (Fed. Cir. 2015) (emphasis added). The Board's determination that Sachs' teachings were confined to each figure was also not supported by substantial evidence for at least three reasons. First, the Board disregarded Sachs' summary explanation for its disclosed system and how that system performs in different scenarios presented in the subsequent figures. Next, the Board did not consider Sachs' own explanation for the continuity of its teachings through Figures 4 and 5, which Sachs explained were the same system responding to different scenarios. That alone is record evidence of a "motivation to combine," if one is needed. And, third, the Board's determination that Figures 6 and 7 were different "embodiments"

requiring combination because they added a feature to Figures 4 and 5 did not obviate their relevance to a POSITA or a POSITA's understanding of Sachs' collective teachings. The Court should therefore reverse or at least remand the Board's determination that Sachs did not anticipate or render obvious each of dependent claims 3-5, 9, and 10.

2. The Board also improperly failed to consider and address Appellants' additional evidence and arguments for each of claims 3-5, 9, and 10 that Figures 4 and/or 5 alone anticipates or renders these dependent claims obvious. This evidence included expert testimony that the dependent claims were "trivially obvious" and "self-evident," including supporting testimony from Sisvel's "expert" that the dependent claims contributed nothing novel. The Board instead focused its analysis solely on Appellants' additional presentation of Sachs' teachings for detecting missing data blocks in Figures 6 and 7, which the Board rejected as different "embodiments" from Figures 4 and 5. In so doing, the Board failed to address anticipation and obviousness in view of Figures 4 and 5 by themselves, which were the same figures on which the Board relied for purposes of invalidating claims 1, 2, and 8, and in further view of Appellants' evidence of a POSITA's relevant knowledge. The Board's determination should therefore be at least reversed and remanded to address this issue. *In re Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002).

3. Finally, the Board erred in reaching its determinations for dependent claims 3-5, 9, and 10 because it improperly considered and relied on testimony from Sisvel's "expert" declarant even though he was not and is not a POSITA under the Board's definition. *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1364 (Fed. Cir. 2008) ("[A] witness not qualified in the pertinent art may not testify as an expert as to anticipation, or any of [its] underlying questions …."). Sisvel's declarant lacked the necessary technical education and professional experience to provide relevant testimony and evidence. The Board's determination should therefore be reversed or at least remanded for reconsideration without crediting the testimony of Sisvel's declarant.

## ARGUMENT

### I. STANDARD OF REVIEW

"[A] claim is anticipated if each and every limitation is found either expressly or inherently in a single prior art reference." *King Pharm., Inc. v. Eon Labs, Inc.*, 616 F.3d 1267, 1274 (Fed. Cir. 2010) (internal quotation omitted). When conducting an anticipation analysis, "the full scope of the prior art reference's disclosure [must be] considered." *Hayward Indus., Inc. v. Pentair Water Pool and Spa, Inc.*, 814 F. App'x 592, 595-96 (Fed. Cir. 2020). "[P]rior art references should be considered for all that they teach, rather than being limited to a particular embodiment or the claimed invention of the prior art." *Id.*; *see also Blue Calypso, LLC v. Groupon,*

*Inc.*, 815 F.3d 1331, 1344 (Fed. Cir. 2016); *Belden*, 805 F.3d at 1076; *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1375-76 (Fed. Cir. 2005). A reference can anticipate a claim even if it "d[oes] not expressly spell out" all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would "at once envisage" the claimed arrangement or combination. *Kennametal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381 (Fed. Cir. 2015). There is no "blanket rule" that two "embodiments" in a reference can "never be considered in combination to make a finding of anticipation." *Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1350 (Fed. Cir. 2019). Indeed, Appellants could not locate an accepted rule or definition for what constitutes an "embodiment." Regardless, "even when a reference discloses elements in different locations in the disclosure, the relevant question is whether the reference is sufficiently clear in disclosing the combinability of those elements that a skilled artisan would 'at once envisage' the claimed combination." *Chamberlain*, 935 F.3d at 1350; *see also Bos. Sci. Scimed, Inc. v. Cordis Corp.*, 554 F.3d 982, 991 (Fed. Cir. 2009).

"Anticipation is a question of fact, as is the question of what a prior art reference teaches." *In re NTP, Inc.*, 654 F.3d 1279, 1297 (Fed. Cir. 2011). The Court reviews Board's factual findings for substantial evidence and its legal conclusions *de novo*. *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1280 (Fed.

Cir. 2015). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. N.L.R.B.*, 305 U.S. 197, 217 (1938). "The Board's ultimate determination of obviousness is [] reviewed *de novo* and its underlying factual determinations for substantial evidence." *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1364 (Fed. Cir. 2015). The underlying factual findings include "findings as to the scope and content of the prior art, the differences between the prior art and the claimed invention, the level of ordinary skill in the art, the presence or absence of a motivation to combine or modify with a reasonable expectation of success, and objective indicia of non-obviousness." *Id.*

## II. SACHS ANTICIPATES OR AT LEAST RENDERS OBVIOUS DEPENDENT CLAIMS 3-5 AND 9-10

The Board made legal errors and failed to consider all of Appellants' evidence and arguments regarding Sachs' teachings in its evaluation of anticipation and obviousness for dependent claims 3-5 and 9-10.

### A. The Board Failed to Apply the Correct Anticipation Standard When It Refused to Consider the Full Scope of Sachs' Disclosures

The Board erred when it failed to consider the full scope of Sachs' teachings and instead artificially quarantined Sachs' disclosures into at least each of the scenarios in Figures 4, 5, 6, and 7. Appx26-27, Appx28-29, Appx31-32.

The Board did not identify any legal authority on which it relied for its "embodiments" determination, although it did correctly point to *Verdegaal Brothers, Inc. v. Union Oil Company of California*, 814 F.2d 628, 631 (Fed. Cir. 1987), for the general proposition that "[a] claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, ***in a single prior art reference***." Appx6 (emphasis added). Despite correctly setting forth this standard, and apparently agreeing that each element of the challenged claims is found in Sachs, the Board nonetheless failed to follow *Verdegaal Brothers* and consider the totality of Sachs' teachings together. The Board instead partitioned Sachs by figure, contrary to the specification's explanation for the figures' interrelated disclosures. *See, e.g.*, Appx19 (declining to decide whether Figures 4 and 5 are directed to same embodiment); Appx26-27 (requiring motivation to combine Sachs' Figures 4-6); Appx28 (similar); Appx31 (similar).

While the Board does not identify the legal authority on which it relied, Sisvel pointed to *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008), to claim that Sachs does not disclose "all of the limitations arranged or combined in the same way as recited in the claim." Appx516-517. If the Board relied on *Net MoneyIN* (which we cannot know because the Board did not say), that reliance would have been in error because *Net MoneyIN* is inapposite to Sachs.

*Net MoneyIN* involved a patent directed to an Internet payment system claiming a specific combination of five particular "links." 545 F.3d at 1368-69. The district court found a single reference disclosed all five of the claimed "links" in "two separate disclosed examples" of a processing transaction. *Id.* at 1369. The Court explained in *Net MoneyIN* that "the hallmark of anticipation is prior invention," so the prior art reference "must not only disclose all elements of the claim within the four corners of the document, but must also disclose those elements 'arranged as in the claim.'" *Id.* The reference at issue in *Net MoneyIN* "discloses two separate protocols for processing an Internet credit card transaction," neither of which "contains all five links arranged or combined in the same way" as the challenged patent, so anticipation was not appropriate. *Id.* at 1371.

But this Court has explained that *Net MoneyIN* is distinguishable where, as here, the prior art reference "expressly contemplates" the use of the claimed features together as required by the challenged claim. *Victaulic Co. v. Iancu*, 753 F. App'x 895, 900 (Fed. Cir. 2018) (prior art reference that disclosed three claimed limitations across two embodiments must be read in view of reference's additional disclosures and anticipated the challenged claim). "[T]he hallmark of anticipation is prior invention," and Sachs "expressly contemplates" the claimed features of the '396 patent "arranged as in the claim": the use of a delay timer in an ARQ system that

can either be stopped or expired and with or without the use of additional algorithms relating to the reordering of blocks when they do arrive out of order.

"[P]rior art references should be considered for all that they teach, rather than being limited to a particular embodiment or the claimed invention of the prior art." *Hayward*, 814 F. App'x at 596 (citing *Belden*, 805 F.3d at 1064). As explained below, Sachs "expressly contemplates" that its disclosures are arranged or combined in the same way as recited in the challenged claims.

**1. Sachs' Summary Explains Its Collective Teachings Across Its Figures**

Sachs' "Summary" explains that it is directed to "an efficient data transmission" system in which "spurious retransmissions" (*i.e.*, requests for retransmission for data blocks that merely arrive out of sequence) are avoided. Appx1274(8:16-19); *see also* Appx1265(Abstract). Sachs further explains in this "Summary" that a "preferred embodiment" uses "a timer that is started for every data packet[] arriving out of sequence, and the triggering of the reordering procedure for providing the sequence at the receiver is delayed by the duration of the timer." Appx1275(9:11-17). The Sachs "Summary" teaches as a ***single*** disclosure that the timer can be stopped ***or*** expired:

> In acknowledged mode of a data transmission it is advantageous to ***delay*** a request for a retransmission of missing data packets by the timer. ***It is preferable to request the retransmission for the missing data packets after the timer expires.*** With this solution it is guaranteed

> that during the duration of the timer no retransmission is performed for the data packets, which possibly will arrive in this time interval. ***In a preferred embodiment the timer is stopped before the timer expiry when at the reception of a data packet the sequence is established.***

Appx1275-1276(9:11-10:4) (emphasis added). Sachs' Summary describes the "addition" of a state variable that can be used to delay the reordering procedure in the buffer. Appx1276(10:6-10). Sachs presents the state variable as an additional optional feature to further improve its teachings and never states or suggests that this additional feature is in some way incompatible with or presented apart from its other disclosures. *Id.* Sachs then walks through its teachings as presented in each of the scenarios of Figures 4-7. Appx1278-1283(12:25-17:33).

The Court's teachings in *Victaulic* apply to Sachs' clear "Summary" explanation of its single disclosure of a delay timer for an ARQ system that can either expire if the missing data blocks are not received or be stopped if the missing data blocks are received. The fact that this timer is demonstrated in various scenarios and with additional features beyond the scope of the claimed invention of the '396 patent does not obviate that Sachs discloses these teachings and the additional variables in Figures 6 and 7 ***together*** in its Summary. *See, e.g.*, *Victaulic*, 753 F. App'x at 900 ("We are aware of no precedent limiting statements like those in the summary of invention here to describing nothing more than the preferred embodiments."); *Orion IP, LLC v. Hyundai Motor Am.*, 605 F.3d 967, 977 (Fed. Cir.

2010) (rejecting attempt to distinguish prior art reference based on disclosure of additional unclaimed element). The Board's decision should therefore be reversed or at least remanded under *Victaulic*, 753 F. App'x at 900.

### 2. Figures 4 and 5 Describe the Same System Responding to Different Scenarios

Sachs "expressly contemplates" that Figures 4 and 5 are taught together. The Board's failure to honor this disclosure simply because the example is taught across two figures (referred to in Sachs as "embodiments") further erroneously applies the Court's standard for anticipation and lacks substantial evidence.

The claimed invention of the '396 patent specifies that the claimed delay timer can either stop (limitations 1[c]/8[d]) or expire (limitations 1[d]/8[d]). Appx209(16:38-53), Appx210(17:13-18:8). The '396 patent illustrates these mutually-exclusive teachings in Figure 12, in which it presents two separate events in which PDUs arrive out of order. Appx208(14:38-54). In the first scenario (shown on the left-hand side of Figure 12), a timer is started and stopped when missing a PDU is detected as missing but later arrives before the timer expires. *Id.*(14:38-47). In the second scenario (shown on the right-hand side of Figure 12), a timer is started when a missing PDU is detected, expires without receipt of the missing PDU, and status report information is transmitted. *Id.*(14:48-54). Sachs illustrates these same two, mutually-exclusive scenarios; the only differences are that Sachs rotates the

figures 90º and illustrates the scenarios into two separate figures, Figures 4 and 5, presumably for readability and understandability.

As explained above, Figures 4 and 5 are directed to the ***same*** use of a delay timer in the ***same*** ARQ RLC system and demonstrate each of the mutually-exclusive scenarios claimed in the ’396 patent: Figure 4 illustrates a scenario in which the timer expires without receipt of the missing data blocks, and Figure 5 illustrates a similar scenario in which the timer is stopped because the missing data blocks arrive. Appx1294 (Figure 4), Appx1295 (Figure 5). The specification explains the figures have the same "structure" and that "***[t]he difference*** is that the PDUs 3 and 4 are transmitted over the link," which results in the timer being stopped. Appx1280(14:6-12). In other words, Figure 5, whether called an "embodiment," an "example,"[13] a demonstration, a particular use case, or some other words, shows how the same timer in Figure 4 behaves when the missing PDUs arrive (because, as with any wireless communication system, the sequence in which the data blocks arrive cannot be controlled). *See, e.g.*, Appx1126(¶66) (describing challenges in wireless communication environments, including unstable channels, noise, user movement, network congestion, data errors, and more).

---

[13] Even Sisvel's declarant admitted Figures 4 and 5 are "examples" of the same system: Figures 4 and 5 "are two different examples of how the [Sachs] system is going to operate as it receives its PDUs." Appx3113(133:21-135:1).

Figures 4 and 5 are not therefore different "embodiments" disclosing ***different*** ARQ systems (even if Sachs uses that term), but rather explicitly-connected teachings for how Sachs' disclosed timer system responds to two common and mutually-exclusive scenarios in data transmission—the same alternative scenarios of an expired and stopped timer claimed in the '396 patent.

Moreover, even if Figures 4 and 5 could correctly be considered different embodiments, there is no "blanket rule" that two "embodiments" in a reference can "never be considered in combination to make a finding of anticipation." *Chamberlain*, 935 F.3d at 1350. The Board never analyzed whether a POSITA—*i.e.*, a person reviewing the Sachs reference as a whole—would have been able to "at once envisage" the combined disclosures of Figures 4 and 5 based on Sachs' teachings. *See Kennametal*, 780 F.3d at 1381. The Board similarly failed to address testimony from Appellants' expert explaining how a POSITA would have understood Sachs' teachings, including Figures 4 and 5. *See, e.g.*, Appx1166-1173(¶¶146-155) (testimony explaining Sachs' teachings in Figures 4 and 5).

The Board instead declined in one portion of its decision to determine whether Figures 4 and 5 were the same "embodiment" while nonetheless treating the figures as if they were from separate prior art references in another. The Board's anticipation analysis was therefore contrary to law, and its ultimate conclusions regarding Sachs' disclosures were not supported by substantial evidence.

### 3. The Board Likewise Erred When It Determined Sachs' Figures 6 and 7—Which Add a Feature to Figures 4 and 5—Were Different "Embodiments" than Figures 4 and 5 and Required Proof of Motivation to Combine

The Board's determination that Figures 4 and 5 were different "embodiments" than each of Figures 6 and 7—and its concomitant requirement of a separate showing for why a POSITA would have been motivated to combine these figures—again applied the wrong legal standard for an anticipatory reference and was not supported by substantial evidence. Appx26-27 (claim 3), Appx28-29 (claims 4 and 9), Appx30-31 (claims 5 and 10).

Appellants relied on Figures 6 and 7 (but not only Figures 6 and 7, as discussed below) for their additional disclosures of detecting a missing data block. *See, e.g.*, Appx1204-1206(¶¶213-215) (describing how the missing data blocks are detected in Figure 6); Appx1208-1209(¶¶219-220) (describing how the missing data blocks are detected in Figure 6); Appx1213-1214(¶¶227-228) (describing how the missing data blocks are detected as arrived in Figure 7).

Sachs explains the connection between its figures and describes Figures 6 and 7 as extensions of the configurations shown in Figures 4 and 5: "the previous scheme [*i.e.*, depicted in Figures 4 and 5] can be ***improved*** by ***adding*** at least one additional state variable in the receiver." Appx1280(14:14-24) (emphasis added). The improvement to the previously-described Sachs system consists of the addition of one of four algorithms (algorithms A, B, C, D) used to trigger PDU reordering.

Sachs does not present these figures as a ***new*** structure but instead expressly ***adds*** a "state variable" for delaying the reordering of the data blocks in the buffer to the structure demonstrated in Figures 4 and 5. Appx1296-1297(Figures 6 & 7); Appx1280-1282(14:22-16:22) (explaining Figure 6); Appx1283(17:11-32) (explaining Figure 7); Appx1204-1206(¶¶213-215).

The Board disregarded Sachs' explanation and Appellants' evidence of the interconnection between Figures 4-7 and performed its own analysis. While the Board admitted that "Sachs does not disclose that algorithms A, B, C, and D … are each a different embodiment," Appx24-25, the Board nonetheless adopted Sisvel's argument (based on testimony from its non-POSITA declarant, discussed below) that "in Figure 6, a 'STATUS up to 6' message is sent after the receipt of PDUs 8 and 9" whereas "[i]n Figure 4, the status message is not limited to PDUs received in order as in Figure 6." Appx26 (citing Appx517 (citing Appx1296(Figure 6)), Appx3212-3213 (¶33)). In other words, the Board relied on Sisvel's argument that Figures 6 was a different embodiment that should be treated as a different disclosure because it used a different 3GPP-defined STATUS message format to transmit ACK information. The Board concluded that "the addition of a state variable" and Sachs' description of solving the packet-reordering problem by implementing algorithm A made Figure 6 "an embodiment that differs from" Figures 4 and 5 and thus required evidence of motivation to combine. Appx25-26. That is not right.

First, the Board failed to consider whether Sachs "expressly contemplates" use of the claimed features together or would otherwise "at once envisage" their use together. *Victaulic*, 753 F. App'x at 900; *Kennametal*, 780 F.3d at 1381. As explained above, Sachs ***did*** "expressly contemplate" that its "embodiments" would be considered together and explained how they interconnected as a single disclosure. Second, the Board's reasoning also erroneously ascribes some artificial significance to the specific order of the received PDUs in Sachs' figures to limit Sachs' disclosures to only the specific scenarios depicted, not the teachings presented in and across those scenarios. *See, e.g.*, Appx26 ("Petitioner does not explain how the same sequence of PDUs cited in Figure 6 could have been obtained in Figures 4 or 5…."); Appx26 ("Petitioner does not explain whether and how the state variable affects the sequence of PDUs … in Figure 6."). Sachs' disclosed system does not purport to control or specify the sequence of PDUs received; rather, Sachs (like the '396 patent) is directed to an ARQ system intended to handle the out-of-sequence arrival of PDUs. *See, e.g.*, Appx208(14:25-28); Appx1126(¶66) (explaining why PDUs can arrive out of order). The Board's complaint that Appellants needed to demonstrate the same particular sequence of PDUs misses the point; Sachs teaches the claimed system across multiple figures precisely because the sequence of received PDUs cannot be predicted. And, finally, the Board's complaint that Sachs' Figures 6 and 7 cannot be considered together with Figures 4 and 5 as anticipatory or obvious

because Figures 6 and 7 include an ***additional*** feature (the state variable) and use of another 3GPP-defined status message ***format*** is further error and lacks substantial evidence. Sachs explains that the state variable is relevant to the PDU reordering, which is pertinent to but outside the scope of the claimed invention, and therefore does not distinguish the relevant teachings. *Orion*, 605 at 977 (rejecting attempt to distinguish prior art reference based on its disclosure of additional unclaimed element); *see also Belden*, 805 at 1076 ("A reference must be considered for everything it ***teaches*** by way of technology and is not limited to the particular ***invention*** it is describing and attempting to protect.") (quotation omitted) (emphasis in original). Sisvel never argued, and the Board never found, that the claims of the '396 patent require a particular message format, only that it include ACK information, which is true for all of Sachs' status messages. The record evidence on that issue included unrebutted testimony from Appellants' expert that a POSITA would have understood that a status message came in different forms and could include an ACK, NACK, or both. Appx1134-1136(¶¶84-85).

The Board's determination that Figures 6 and 7 are a different "embodiment" therefore includes legal errors and is not supported by substantial evidence and should be reversed or at least remanded.

### B. The Board Violated the APA by Not Analyzing Appellants' Additional Evidence and Arguments

The APA requires the Board to address each argument presented in an IPR petition and requires the Court to vacate a Board's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. § 706(2)(A) and (B). To allow for meaningful appellate review under this standard, the Board must "set forth its findings and the grounds thereof, as supported by the agency record, and explain its application of the law to the found facts." *In re Lee*, 277 F.3d at 1342. This Court routinely remands Board decisions that do not adequately explain the agency's decision. *See, e.g.*, *id.* at 1346.

Each of dependent claims 3-5, 9, and 10 is directed to the known prior art step of detecting or receiving a missing data block based on the order of the sequence numbers (*e.g.*, 1,2,3, etc.). Even if Sachs' figures were separate "embodiments" a POSITA would not consider together (which they aren't), the Board additionally erred in focusing its analysis of these dependent claims on only Figures 6 and 7 and failing to analyze Appellants' evidence of obviousness and reliance on additional evidence from Figures 4, 5, and elsewhere in the Sachs specification.

#### 1. The Board Failed to Analyze Obviousness

Appellants presented two Sachs grounds: claims 1-10 are anticipated in view of Sachs (Ground I) and claims 1-10 are obvious in view of Sachs (Ground II).

Appx43; Appx270-298. There is no "blanket rule" that two "embodiments" in a reference can never be considered in combination. *See Chamberlain*, 935 F.3d at 1350. The Board nevertheless summarily recited that Appellants did not sufficiently carry its burden "either by anticipation or obviousness" for dependent claims 3-5 and 9-10, but it did so without analyzing (i) whether a POSITA would "at once envisage" the claimed combination of Sachs' full disclosures and (ii) Appellants' evidence regarding a POSITA's own knowledge of the manner in which a missing data block is detected through an out-of-order set of PDU sequence numbers. The Board's failure to provide any substantive analysis of its denial for Ground II is therefore further basis for reversal or remand. *In re Lee*, 277 F.3d at 1342.

Preliminarily, a POSITA would have read Sachs as a whole. *Hayward*, 814 F. App'x at 595-96. In doing so, she would have necessarily considered the figures of Sachs in a single sitting and—even if it were correct as a matter of law that each figure is its own prior art reference—it is manifest that a POSITA would have had good reason just from the fact that these figures were explained together in close proximity in the same reference as an extension of each other that they could and should be combined. The Board's conclusion that there was no evidence of motivation to combine Sachs' "embodiments" ignores the "record evidence" from Sachs itself. Appx26-27; Appx1274 ("Summary and description of the invention");

*see also Belden*, 805 F.3d at 1079 ("[E]xpert testimony is not required when the references and the invention are easily understandable.").

Appellants also provided unrebutted testimony explaining that "identifying whether there is a gap in a sequence of integers, *e.g.*, PDU numbers, 1, 2, 3, etc. [*i.e.*, the element of dependent claims X, Y, and Z that the Board found hadn't been shown to be present in Sachs], would not only be obvious to a POSITA but ***self-evident to any non-POSITA*** because it only requires a basic knowledge of number sequencing," *i.e.*, ***the ability to count***. Appx1195(¶198) (emphasis added). Appellants' expert further testified that "the dependent claims of the '396 patent that are directed to identifying a gap in a sequence of integer numbers (claims 2-4 and 9) ***would all be trivially obvious*** to a POSITA." *Id.* (emphasis added); *see also* Appx1202-1203(¶¶210-211) (claim 3), Appx1206-1207(¶217) (claims 4 and 9). This point, notably, is disclosed in Figure 4 or 5 alone, without regard to combining either or both of them with other figures from Sachs.

Appellants further provided evidence of the "common knowledge" of the art to a POSITA through the detailed, 165-page testimony of expert Apostolos Kakaes, Ph.D., who discussed the state of the art, including use of data blocks, sequence numbers, ARQ/HARQ, status reports (including ACK/NACK messages), and the 3GPP radio interface protocol stack. Appx1121-1143(¶¶54-97). As Dr. Kakaes testified, and corroborated through documents, each of the '396 patent's limitations

is directed to a well-known structure that was in use well before the alleged priority date. *Id.* And the ’396 patent does not suggest otherwise, identifying the 3GPP mobile communication system as “Background Art.” Appx202(1:24-2:5); *see also* Appx506. Sachs must therefore be considered in combination with this agreed knowledge of a POSITA, who was aware of how to identify when data blocks were missing or received out of order, *see, e.g.*, Appx628-632 (explaining same)—and who also presumably knew how to count.

Importantly, the Board never even acknowledged that it was undisputed that at least dependent claims 2, 3, 4 (and therefore duplicative claim 9) did not contribute anything inventive to the ’396 patent. Sisvel’s expert, for instance, testified:

> Q. Is there anything novel about the manner in which the applicant describes detecting a gap in Claims 2, 3, and 4?
>
> A. ***I don’t think I see anything novel there***. The novelty is that we’re using the – the entire patent is using the timer to determine if, in fact, the data – the data block that’s missing, does it arrive before the timer expires or does it not arrive before the timer, which we’ve already discussed.

Appx3128(195:8-16) (emphasis added); *see also* Appx3128(195:17-196:6) (agreeing that dependent claim 5 (and therefore identical dependent claim 10) did not contribute anything novel either).

The Board did not acknowledge or address any of this evidence and instead erroneously required that Appellants either present a single embodiment (which the

Board interpreted to mean a single figure) with all of the claimed limitations. Absent that, the Board said that a specific motivation was required for a POSITA to consider Sachs' teachings ***together***. Because the Board failed to consider or provide any analysis of the unrebutted obviousness evidence that was presented, the Board's determination that Appellants failed to present sufficient evidence of obviousness should be reversed or at least remanded.

### 2. Dependent Claim 3

Dependent claim 3 adds the limitation "wherein the at least one data block is detected as missed when a sequence number (SN) following a SN of a data block with a highest SN among received data blocks is larger than a lowest SN of the at least one data block to be received." Appx209(16:58-61). Appellants pointed to three sources of evidence in Sachs that teach this limitation: (1) the Sachs system detecting a missing data block in Figure 6 (Appx288-289 (citing Appx1296(Figure 6), Appx1280-1281(14:32-15:9), and Appx1202-1205(¶¶210-214); (2) Sachs' collective teachings as to "searching for gaps in the sequence numbers" (Appx287 (citing Appx1268(2:17-19)); and (3) the Sachs explanation for detecting a missing data block in Figure 4 (Appx289 (citing Appx1278-1279(12:25-13:9)). Even setting aside the Board's decision that Figure 6 was a separate "embodiment" and could not be combined with Figures 4 and 5, the Board's analysis of Sachs' other teachings lacked substantial evidence.

First, the Board dismissed Sachs' teachings regarding "searching for gaps in the sequence numbers" as "not sufficient because claim 3 has a scope that is different from that of claim 2, ***and requires something more*** than [a] showing of a 'gap in sequence numbers.'" Appx26 (citing Appx287 (quoting Appx1268(2:17-19)). The Board did not provide any analysis for the purported difference between dependent claims 2 and 3 besides the manner in which they describe detecting the missed PDU (*i.e.*, a gap), however, nor did it identify what "something more" in claim 3 of the '396 patent was missing from Sachs.

Claim 2 describes data blocks that arrive in order ***and*** out-of-order because "a sequence number (SN) of a currently received data block is larger than a SN of a previously received data block" for both. Appx209(16:54-57); Appx284(n.14); Appx1195-1196(¶199). Sisvel's own "expert" declarant agreed that claim 2 does not necessarily describe a gap in the received data blocks, *i.e.*, a missing data block. Appx3127(190:1-191:2). Claim 2 simply describes sequence numbers proceeding in an increasing numerical order (*i.e.*, 1, 2, 3, 4, etc.). That means that claim 3, which ***is*** written to a missing data block is of course different in scope because it actually describes a missing data block. The Board's dismissal of Sachs' teachings for "a gap in sequence numbers" for claim 3 because "something more" is needed ignores that Sachs ***does*** teach "something more" than an increase in sequence number. The Board's conclusion on this point therefore lacks substantial evidence.

Moreover, the Board failed to consider Appellants' additional evidence of the detection of a gap in connection with the specification's discussion of Figure 4. Appx289 (citing Appx1278-1279(12:25-13:9)). Sachs explains: "In respect to figure 4 the T_reorder timer is started by receiving the PDUs with the number 5 and 6, ***because actually the PDUs 1 and 2 are expected***." Appx1278-1279(12:25-13:9) (emphasis added). The Board provided no analysis for why Sachs' explanation of Figure 4 as disclosing detecting a data block as missed fails to disclose dependent claim 3. *See* Appx24-27.

The Board therefore failed to consider all of Appellants' arguments and evidence for dependent claim 3, and its determination should be reversed or at least remanded for this additional reason.

**3. Dependent Claims 4 and 9**

The Board further failed to analyze each of the bases that Appellants presented for dependent claims 4 and 9, which further specify circumstances under which the at least one data block is detected as missed: "when a sequence number (SN) following a SN of a data block with a highest SN among received data blocks is larger than a SN following a last in-sequence received data block." Appx209(16:58-67). In other words, claims 4 and 9 specify that a data block is missed when the next in-sequence data block from the currently-received data block is larger than the

sequence number that would follow the last in-sequence received data block, *i.e.*, there is a gap in the sequence numbers. Appx1206-1207(¶217).

Appellants pointed to Figure 6 as one helpful example of Sachs teaching this detection of a missed data block because Figure 6 shows the detection of a gap when PDU4 arrives after PDU1. Appx290-292 (citing Appx1206-1209(¶¶216-220)). However, this was not the entirety of Appellants' argument or evidence. Appellants also pointed to Sachs' (1) overall teachings as to the detection of a gap in sequence numbers and (2) Sachs' disclosure of the detection of missing PDUs in Figure 4:

- **Appx1268(2:15-34):** "For example when PDUs, 3, 4, 7 are received, it is automatically assumed that PDUs 5,6 have been lost due to transmission errors."

- **Appx1269(3:5-16):** "For example if the PDUs 3, 4, 5, 6, 7 are received as 7, 3, 4, 5, 6 all the PDUs 3, 4, 5, 6 are discarded since the next expected PDU after 7 is 8."

- **Appx1278-1279(12:25-13:9):** "It means at first the PDUs 5 and 6 are received, followed by the PDUs 1 and 2 and so on…. In respect to figure 4 the T_reorder timer is started by receiving the PDUs with the 5 number 5 and 6, because actually the PDUs 1 and 2 are expected."

Appx292.

The Board did not consider or explain why Sachs' description of its teachings in the Summary (Appx1268(2:15-34) and Appx1269(3:5-16)) or specifically in connection with Figure 4 (Appx1278-1279(12:25-13:9)) fail to disclose dependent claims 4 and 9. *See* Appx27-29 (discussing only Figure 6 and whether and how to

combine Figure 6 with Figures 4 and 5). The Board's decision should therefore be reversed and remanded for consideration of all of Sachs' relevant teachings.

#### 4. Dependent Claims 5 and 10

The Board's decision further failed to consider Appellants' alternative arguments and evidence that dependent claims 5 and 10 are disclosed by Sachs' Figure 5. Dependent claims 5 and 10 specify that the timer of claims 1 and 8 is stopped when "a sequence number (SN) following a SN of a data block with a highest SN among received data blocks when the timer was started is the same as a SN following the last in-sequence received data block," *i.e.*, when the sequence is complete. Appx210(17:1-5, 18:14-18); Appx292-293 (citing Appx1209-1212(¶¶221-225)).

Appellants presented detailed evidence and explanation that these claims are taught by Figure 5 (same highlighting as in Petition):



Figure 5

Appx293. Appellants explained Figure 5 teaches that the T_reorder timer is stopped when the missing data blocks are received: "stop timer when re-ordering is finished." Appx294 (citing Appx1209-1212(¶¶221-226)). And Appellants' expert testified that Sachs discloses claims 5 and 10 under this or any other reasonable interpretation of these claims. *Id.* (citing Appx1213 (¶228)).

The Board never considered this alternative evidence and argument; the Board's analysis focused only on whether Figures 6 and 7 were different embodiments than Figures 4 and 5. Appx31. The Board's failure to consider invalidity based on Sachs' Figure 5 therefore violated the APA's requirements.

## III. The Board Erred When It Considered and Gave Weight to Testimony from Sisvel's Declarant Because He Was Not a POSITA Under the Board's Definition

Appellants presented, and the Board agreed, that a POSITA to the '396 patent "would have had a degree in electrical engineering or a similar discipline, with at least three years of relevant industry or research experience, including experience designing or implementing wireless radio systems for data transmission and retransmission." Appx8; Appx270. Appellants provided a factor-by-factor analysis supporting its proposed definition, including corroborating testimony and evidence. Appx1116-1120(¶¶45-53).

Sisvel never rebutted any of this evidence and did not disagree that a POSITA must have a relevant technical education and experience "designing or implementing wireless radio systems for data transmission and retransmission." *See* Appx508. But Sisvel's proposed definition did seek to eliminate the mandatory educational requirement and remove specificity from the required technical experience, presumably because its "expert" declarant lacked both. Specifically, Sisvel's declarant has ***no*** technical degree—in electrical engineering or in any other engineering or science discipline. Appx617-618; Appx3138(¶7) (Bachelor's degree in business management with coursework towards MBA); Appx3090 (43:12-22) (same). Likewise, while Sisvel's declarant has experience laying out and installing telecommunications networks, he has never designed the channels and methods for

transmitting and retransmitting data in wireless networks relevant to the '396 patent, as required by the POSITA definition adopted by the Board. Appx3091(45:18-46:16).

Because the Board adopted Appellants' POSITA definition, Sisvel's declarant did not qualify as a POSITA at or after the relevant priority date. "[A] witness not qualified in the pertinent art may not testify as an expert as to anticipation, or any of [its] underlying questions …." *Sundance*, 550 F.3d at 1364. The Board nonetheless cited to and gave weight to the testimony of Sisvel's declarant throughout its analysis (*e.g.*, Appx8, Appx17-19, Appx21-24, Appx26, Appx28, Appx30, Appx38), seemingly unaware that the POSITA definition mattered (*see, e.g.,* Appx8 (incorrectly indicating that there did not appear to be a dispute about the POSITA definition)), despite extensive briefing and argument on this issue. While the Board stated that its "findings and conclusions rendered in this Decision would not change had we adopted [Sisvel]'s definition," Appx8, that cannot be right because the Board ***did*** give weight to and rely on the declarant's testimony.

Although the Board credited the unqualified testimony of Sisvel's "expert" when it helped Sisvel, the Board notably did not credit such testimony when it supported Appellants' arguments. Most notably, the Board did not give consideration to Sisvel's declarant's testimony when he testified in favor of Appellants that, for example, the dependent claims did not include any novel

features, completely ignoring this admission when evaluating the anticipation and obviousness arguments for the dependent claims. This inconsistent approach cannot be right.

The Board's evidentiary determinations are reviewed for abuse of discretion. *See Belden*, 805 F.3d at 1078 (citations omitted). Here, no deference is due to the Board's credibility determination because it provided no analysis for its credibility findings or the reasons that it gave weight to the testimony from Sisvel's declarant; it simply ignored that he did not qualify as a POSITA. Abuse of discretion occurs if a ruling: "(1) is clearly unreasonable, arbitrary, or fanciful; (2) is based on an erroneous conclusion of law; (3) rests on clearly erroneous fact findings; or (4) follows from a record that contains no evidence on which the Board could rationally base its decision." *Chen v. Bouchard*, 347 F.3d 1299, 1307 (Fed. Cir. 2003) (citation omitted). Where, as here, the Board has failed to provide any analysis or explanation for its extensive citation to and reliance on testimony from Sisvel's declarant even though he failed to meet each of the criteria for a POSITA, Appellants respectfully submit that an abuse of discretion is present.

## CONCLUSION

The Board's decision that claims 3-5 and 9-10 were not proven to be unpatentable should be reversed, or at least vacated and remanded.

April 14, 2023

Respectfully submitted,

/s/ Kourtney Mueller Merrill
Kourtney Mueller Merrill
Amanda Tessar
PERKINS COIE LLP
1900 Sixteenth St., Suite 1400
Denver, Colorado
Phone: (303) 291–2388
E-mail: kmerrill@perkinscoie.com
atessar@perkinscoie.com

**COUNSEL FOR APPELLANT SIERRA WIRELESS, INC.**

Bradford F. Cangro
**PV LAW LLP**
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C. 20015
(202) 869-4667
bradford.cangro@pvuslaw.com

/s/ Jeremy D. Peterson
Jeremy D. Peterson
**PV LAW LLP**
5335 Wisconsin Avenue, N.W.
Suite 440
Washington, D.C. 20015
(202) 871-0140
jeremy.peterson@pvuslaw.com

**COUNSEL FOR APPELLANTS TCL COMMUNICATION TECHNOLOGY HOLDINGS LIMITED, TCT MOBILE INTERNATIONAL LIMITED, TCT MOBILE, INC., TCT MOBILE (US) INC., TCT MOBILE (US) HOLDINGS, INC.**

/s/ Benjamin E. Weed

Brian P. Bozzo
**K&L GATES LLP**
210 Sixth Avenue
Pittsburgh, PA 15222
(412) 355-6500
brian.bozzo@klgates.com

Benjamin E. Weed
Gina A. Johnson
**K&L GATES LLP**
70 W. Madison Street, Suite 3300
Chicago, IL 60602
(312) 372-1121
benjamin.weed@klgates.com
gina.johnson@klgates.com

**COUNSEL FOR APPELLANT HONEYWELL INTERNATIONAL INC.**

/s/ Guy Yonay

Kyle Auteri
**PEARL COHEN ZEDEK LATZER BARATZ LLP**
7 Times Square, 19th Fl.,
New York, NY 1036
(646) 878–0824
kauteri@pearlcohen.com

Guy Yonay
**PEARL COHEN ZEDEK LATZER BARATZ LLP**
7 Times Square, 19th Fl.,
New York, NY 1036
(646) 878–0800
gyonay@pearlcohen.com

**COUNSEL FOR APPELLANT THALES DIS AIS DEUTSCHLAND GMBH**

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

1. This brief complies with the type-volume limitation of Federal Circuit Rule 32(b). Excluding the portions exempted by rule, the brief contains 13,953 words as counted by the word-processing software used to prepare it.

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft® Word and 14-point Times New Roman type.

Dated: April 14, 2023 By: /s/ Kourtney Mueller Merrill
Kourtney Mueller Merrill

## CERTIFICATE OF AUTHORITY

I certify under penalty of perjury under the laws of the United States that I have the authority of Jeremy Peterson, counsel for Appellant TCL, Benjamin E. Weed, counsel for Appellant Honeywell, and Kyle Auteri, counsel for Appellant Thales, to file this document with their electronic signatures.

Dated: April 14, 2023 By: /s/ Kourtney Mueller Merrill
Kourtney Mueller Merrill

# ADDENDUM TABLE OF CONTENTS


| Date | Description | Appx Nos. |
|---|---|---|
| 09/12/2022 | Judgment, Final Written Decision in IPR2021-00580, Paper 49, dated Sept. 12, 2022 | Appx0001-0052 |
| -- | Exhibit 1001, U.S. Patent No. 7,869,396 B2 | Appx0191-0210 |

Trials@uspto.gov
571-272-7822

Paper 49
Entered: September 12, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

CRADLEPOINT, INC., HONEYWELL INTERNATIONAL, INC., SIERRA WIRELESS, INC., TCL COMMUNICATION TECHNOLOGY HOLDINGS LIMITED, TCT MOBILE INTERNATIONAL LIMITED, TCT MOBILE, INC., TCT MOBILE (US) INC., TCT MOBILE (US) HOLDINGS INC., and THALES DIS AIS DEUTSCHLAND GMBH,
Petitioner,

v.

SISVEL S.P.A.,
Patent Owner.

---

IPR2021-00580
Patent 7,869,396 B2

---

Before BARBARA A. PARVIS, MONICA S. ULLAGADDI, and AARON W. MOORE, *Administrative Patent Judges*.

ULLAGADDI, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

## I. INTRODUCTION

Cradlepoint, Inc., Honeywell International, Inc., Sierra Wireless, Inc., TCL Communication Technology Holdings Limited, TCT Mobile International Limited, TCT Mobile, Inc., TCT Mobile (US) Inc., TCT Mobile (US) Holdings Inc., and Thales DIS AIS Deutschland GmbH ("Petitioner") filed a Petition (Paper 8, "Petition" or "Pet.") requesting an *inter partes* review of claims 1–10 of U.S. Patent No. 7,869,396 B2 (Ex. 1001, "the '396 patent") pursuant to 35 U.S.C. §§ 311–319, accompanied by the supporting Declarations of Dr. Apostolos K. Kakaes (Ex. 1002) and Mr. Craig Bishop (Ex. 1007).[1] Sisvel S.p.A. ("Patent Owner") filed a Preliminary Response (Paper 12, "Preliminary Response" or "Prelim. Resp."), accompanied by the supporting Declaration of Mr. Regis J. Bates, Jr. (Ex. 2001).

Upon review of the record, we instituted *inter partes* review, pursuant to 35 U.S.C. § 314, as to the challenged claims based on the challenges set forth in the Petition. Paper 16 ("Institution Decision" or "Inst. Dec.").

Subsequent to institution, Patent Owner filed a Patent Owner Response (Paper 29, "PO Resp.") accompanied by the Second Declaration of Mr. Bates (Ex. 2006), Petitioner filed a Reply to Patent Owner's Response (Paper 40, "Pet. Reply"), and Patent Owner filed a Sur-Reply

[1] Petitioner originally included ZTE Corporation and ZTE (USA) Inc. ("ZTE") and Dell, Inc.—ZTE and Patent Owner entered into a settlement agreement and Dell, Inc. and Patent Owner entered into a settlement agreement. Papers 13, 30. As such, we terminated the proceeding as to ZTE and Dell and reconstituted Petitioner as the remaining entities absent ZTE and Dell. *Id.*; *see* Papers 15, 33.

(Paper 42, "Sur-Reply"). On June 15, 2022, we held an oral hearing. A transcript of the hearing is of record. Paper 48 ("Tr.").

For the reasons that follow, we conclude that Petitioner has proven by a preponderance of the evidence that claims 1, 2, 6, 7, and 8 of the ’396 patent are unpatentable. We further conclude that Petitioner has not proven by a preponderance of the evidence that claims 3–5, 9, and 10 are unpatentable.

## II. BACKGROUND

### *A. Real Parties-in-Interest*

In addition to itself, Petitioner identifies the following entities as real parties-in-interest: Dell Marketing L.P., Dell Products L.P., Dell Technologies Inc., Denali Intermediate Inc., Sierra Wireless America, Inc., Thales DIS AIS USA, LLC, Telefonaktiebolaget LM Ericsson, and Ericsson Inc. Pet. 2.[2] Patent Owner identifies itself as the real party-in-interest. Paper 10, 1.

### *B. The ’396 Patent*

The ’396 patent relates "to a data transmission method and a data retransmission method which can reduce loss in data. . . ." Ex. 1001, 1:17–20. Techniques for reducing data loss include the Automatic Repeat Request (ARQ) method, which "is performed by a high-level layer." *Id.* at 1:58–60. Another technique is the HARQ (Hybrid ARQ) method, which is performed by lower-level layers and "correct[s] an error of data by the use of the FEC and to retransmit the data by the use of the ARQ." *Id.* at 1:60–64.

Figure 12, reproduced below, is a diagram illustrating an exemplary data transmission method. *Id.* at 14:34–36.

[2] The Dell Inc. was terminated as to this proceeding. *Supra* n.1.




Figure 12 depicts that "the ARQ entity, that is, the RLC entity, receives PDU3 from the HARQ as a lower-level layer, that is, the MAC layer." *Id.* at 14:38–40. Because PDU3 is received before PDU2, "the receiver checks that the gap is generated due to the inversion of transport order of the HARQ by the use of the HARQ jitter timer JT." *Id.* at 14:40–44. The RLC entity receives PDU2 before the HARQ jitter timer expires, and so the timer stops. *Id.* at 45–46. The ARQ entity also receives PDU7 out of order, and similarly starts the HARQ jitter timer. *Id.* at 14:47–49. But, the RLC entity does not receive PDU6 before the timer expires, so "[t]he receiver judges that the reception of PDU6 fails and transmits the status report information." *Id.* at 14:50–54. Upon receiving status report information that the receiver does not receive a certain PDU, the transmitter retransmits the PDU. *Id.* at 14:55–57. "The status report information may be information on a data block received or not received by the RLC entity of the receiver." *Id.* at 9:23–25.

### *C. Related Matters*

As required by 37 C.F.R. § 42.8(b)(2), the parties identify judicial matters that would affect, or be affected by, a decision in this proceeding. In particular, the parties inform us that the '396 patent is asserted in the following district court cases:

No. 3:20-cv-01289 (N.D. Texas);

No. 1:20-cv-00649 (D. Del.);

No. 1:20-cv-00651 (D. Del.);

No. 1:20-cv-00652 (D. Del.);

No. 1:20-cv-00653 (D. Del.);

No. 1:20-cv-00654 (D. Del.);

No. 1:20-cv-00655 (D. Del.);

No. 1:20-cv-00656 (D. Del.);

No. 1:20-cv-00658 (D. Del.);

No. 1:20-cv-00659 (D. Del.);

No. 1:20-cv-22050 (S.D. Fla.);

No. 1:20-cv-22051 (S.D. Fla.); and

No. 1:20-cv-22054 (S.D. Fla.).

Pet. 2–3; Paper 10, 1.

### *D. Illustrative Claim*

Petitioner challenges claims 1–10 of the ’396 patent. Pet. 1. Claims 1 and 8 are independent. Claim 1 is illustrative and reproduced below.

> 1[pre] A method of performing automatic repeat request (ARQ) in a wireless communication system, the method performed by a receiver and comprising:
>
> 1[a] detecting whether at least one data block to be received from a transmitter is missed;
>
> 1[b] starting a timer when the at least one data block is detected as missed;
>
> 1[c] stopping the timer when the at least one data block is received from the transmitter while the timer is running, in order to prevent a triggering of a status report before the timer expires; and
>
> 1[d] transmitting the status report to the transmitter after the timer expires, wherein the status report comprises a positive acknowledgement indicating receipt of at least one received data block.

Ex. 1001, 16:39–53.

### *E. Asserted Grounds*

Petitioner presents the following challenges as summarized in the chart below. Pet. 9.

| Ground | Claim(s) Challenged | 35 U.S.C. § | Reference/Basis |
|---|---|---|---|
| 1 | 1–10 | 102[3] | Sachs[4] |
| 2 | 1–10 | 103(a) | Sachs |
| 3 | 1–5, 7 | 102 | Wei[5] |
| 4 | 1–5, 7 | 103(a) | Wei |
| 5 | 6, 8–10 | 103(a) | Wei, 3GPP TS 25.322[6] |

## III. ANALYSIS

### *A. Legal Standards*

"A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." *Verdegaal Bros., Inc. v. Union Oil Co. of California*, 814 F.2d 628, 631 (Fed. Cir. 1987).

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said

---

[3] The Leahy-Smith America Invents Act, Pub. L. No. 112–29, 125 Stat. 284 (2011) ("AIA"), included revisions to 35 U.S.C. §§ 102 and 103 that became effective after the effective filing date of the challenged claims. Therefore, we apply the pre-AIA versions of 35 U.S.C. §§ 102 and 103(a).
[4] WO 02/091659 A2, published Nov. 14, 2002 (Ex. 1003, "Sachs").
[5] US 6,987,780 B2, issued Jan. 17, 2006 (Ex. 1004, "Wei").
[6] 3rd Generation Partnership Project (3GPP) Technical Specification (TS) 25.322 V5.9.0 (2004-12), "3rd Generation Partnership Project; Technical Specification Group Radio Access Network; Radio Link Control (RLC) protocol specification (Release 5)" (Ex. 1005, "3GPP TS 25.322").

subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective evidence of nonobviousness.[7] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). The burden of persuasion never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in an *inter partes* review). Furthermore, Petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).

Thus, to prevail in an *inter partes* review, Petitioner must explain how the prior art discloses the challenged claims or how the proposed combinations of prior art would have rendered the challenged claims unpatentable. We analyze the challenges presented in the Petition in accordance with the above-stated principles.

---

[7] Patent Owner does not present objective evidence of nonobviousness.

### *B. Level Of Ordinary Skill In The Art*

Petitioner contends that:

> A POSITA at or about the time of the alleged invention (January 5, 2006) would have had a degree in electrical engineering or a similar discipline, with at least three years of relevant industry or research experience, including experience designing or implementing wireless radio systems for data transmission and retransmission.

Pet. 35 (citing Ex. 1002 ¶¶ 40–53).

Patent Owner contends that a person having ordinary skill

> at the time of invention—January 5, 2006—in the relevant art would be one a bachelor's degree in electrical engineering, computer sciences, or telecommunications, along with three to five or more years of practical experience in the field. A combination of more experience in the field and less education or more education and less experience in the field would also suffice.

PO Resp. 9 (citing Ex. 2001 ¶ 27). According to Patent Owner, "[a]lthough Patent Owner's proposed level of skill in the art is similar to Petitioners' proposal, Patent Owner includes the qualification that a combination of more experience in the field and less education, or more education and less experience in the field would also suffice." *Id.*

The parties' contentions as to the level of ordinary skill in the art are similar, and there does not appear to be a dispute that needs to be resolved. We adopt Petitioner's definition as it appears to be consistent with the specification of the '396 patent and the cited references. The findings and conclusions rendered in this Decision would not change had we adopted Patent Owner's definition.

### *C. Claim Construction*

In *inter partes* review proceedings based on petitions filed on or after November 13, 2018, such as this one, we construe claims using the same claim construction standard that would be used in a civil action under 35 U.S.C. § 282(b), as articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), and its progeny. *See* 37 C.F.R. § 42.100(b).

Petitioner proposes "that all claim terms should be accorded their plain and ordinary meaning, as understood by a POSITA and consistent with the specification and file history of the '396 patent." Pet. 34–35. Patent Owner "agrees that the claim[] terms should be given their plain and ordinary meaning" and "reserves the right to provide alternate constructions if any of the terms become material to the Board's decision." PO Resp. 10.

We need not expressly define any claim term in our Decision in order to resolve the issues before us. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (explaining that construction is needed only for terms that are in dispute, and only as necessary to resolve the controversy). We note that the parties both implicitly construe claim limitation 1[c], "stopping the timer when the at least one data block is received from the transmitter while the timer is running, in order to prevent a triggering of a status report before the timer expires" similarly. *See e.g., infra* § III.D.2.

### *D. Challenges 1 and 2—Anticipation by Sachs and Obviousness over Sachs Alone*

Petitioner contends that each of the challenged claims is unpatentable as anticipated under 35 U.S.C. § 102 over Sachs and as obvious under 35 U.S.C. § 103(a) over Sachs. Pet. 35–63.

Petitioner does not separate the anticipation and obviousness analysis. *See* Pet. 36–63. Inasmuch as anticipation is the epitome of obviousness, we analyze anticipation first. *See Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983) (internal citations omitted) ("Though it is never necessary to so hold, a disclosure that anticipates under § 102 also renders the claim invalid under § 103, for 'anticipation is the epitome of obviousness.'").

For the reasons that follow, we are persuaded that Petitioner establishes unpatentability by a preponderance of the evidence of claims 1, 2, 6, 7, and 8 with respect its anticipation and obviousness applying Sachs. We are not persuaded that Petitioner establishes unpatentability of claims 3–5, 9, and 10 by a preponderance of the evidence, with respect to either its anticipation or obviousness challenge applying Sachs.

*1. Overview of Sachs*

Sachs relates to "a method for performing a data transmission between a sending entity and a receiving entity," where data is in the form of data packets, and where the receiver "delays a triggering of a reordering procedure for providing the sequence order" when a data packet is received out of order. Ex. 1003, code (57). Sachs describes that "[t]he basic idea of the present invention is to delay all mechanisms on the link layer, which exploit in-sequence reception by a certain time, which allows receiving all re-ordered packets and putting them back in the sent sequence." *Id.* at 12:11–14. Figure 4, reproduced below, shows an embodiment that applies a timer T_reorder. *Id.* at 12:2–3.




Figure 4

Figure 4 depicts an embodiment where "T_reorder is introduced in order to delay the reaction of the RLC receiver in sending a STATUS report, which triggers also the retransmissions." *Id.* at 12:25–28. In Figure 4, the reorder-delay timer is started when PDUs 5 and 6 are received out of sequence. *Id.* at 13:2–6. In an acknowledged mode (AM), a STATUS report is placed in a buffer when a PDU is received out of order, and retransmission is delayed. *Id.* at 13:19–25. The STATUS report is updated when PDUs are received to fill the gaps in the sequence of PDUs. *Id.* at 13:25–27. When T_reorder expires, the STATUS report is removed from the buffer and transmitted. *Id.* at 13:30–31.

Figure 5, reproduced below, shows an embodiment where a reordering delay is stopped "when all outstanding PDUs are received and the sent sequence is re-established." *Id.* at 14 1–5.




Figure 5

Figure 5 is similar to Figure 4 in that PDUs 5 and 6 are received out of order, except it shows that PDUs 3 and 4 are in fact received. *Id.* at 14:6–8. In this case, "the sequence 1, 2, 3, 4, 5, 6, 7, 8 is re-established and therefore the T-reorder timer is stopped." *Id.* at 14:10–12.

### *2. Independent Claim 1*

> *1[pre] "A method of performing automatic repeat request (ARQ) in a wireless communication system, the method performed by a receiver and comprising"*

Petitioner contends that "[t]o the extent the preamble is limiting, it is disclosed by Sachs." Pet. 36. According to Petitioner, "Sachs teaches data transmission in a wireless communication system, specifically 'the UMTS system'" and that "transmission errors are recovered by applying the Automatic Repeat reQuest ARQ mechanism," which Petitioner argues is

performed by a "receiver entity." *Id.* (citing Ex. 1003, Title, Abstract, Figs. 1–2, 6–8, 1:22–23, 2:8–13, 2:16–17, 3:18–26, 4:2–5, 6:34–7:8, 8:5–12, 8:25–9:9, 10:1–4, 11:15–26, claims 1, 14).

*1[a] "detecting whether at least one data block to be received from a transmitter is missed"*

Petitioner contends Sachs teaches that "transmission errors are detected by searching for gaps in the sequence numbers of the received PDUs on the receiver side." Pet. 36–37 (quoting Ex. 1003, 2:17–19) (citing Ex. 1003, Figs. 4, 5, 9:11–15, 12:28–35, claims 4, 5).

*1[b] "starting a timer when the at least one data block is detected as missed."*

Petitioner contends Sachs teaches that "the delay parameter is a timer that is started for every data packet[] arriving out of sequence, and the triggering of the reordering procedure for providing the sequence at the receiver is delayed by the duration of the timer." Pet 39 (quoting Ex. 1003, 9:11–17) (citing Ex. 1003, 9:24–32, 10:19–23, 12:34–13:7, 14:8–10, claim 2, Figs. 4, 5).

*1[c] "stopping the timer when the at least one data block is received from the transmitter while the timer is running, in order to prevent a triggering of a status report before the timer expires"*

Petitioner contends "Sachs explains that: 'the timer is stopped before the timer expiry when at the reception of a data packet the sequence is established.'" Pet. 40 (quoting Ex. 1003, 9:34–10:4). According to Petitioner, "[i]n order to achieve a minimum reaction time of the link protocol, the reordering-delay shall preferably be stopped when all outstanding PDUs are received and the sent sequence is re-established." *Id.* at 41 (quoting Ex. 1003, 14:1–5) (citing Ex. 1003, claim 6). Petitioner argues that "[t]he unwanted effect is avoided because the negative status report

(*e.g.*, the NAK for data blocks 3,4) is not sent until the timer expires . . . , which does not happen if the timer is stopped before expiring." *Id.* (citing Ex. 1003, Fig. 4, 8:25–9:2, 9:11–17, 9:24–10:4, 13:30–34). Petitioner also explains its contentions with respect to its annotated versions of Sachs's Figures 4 and 5, reproduced below.




Figure 4




Figure 5

*Id.* Petitioner states that

> Starting first at Figure 4 (above left), the T_reorder timer (highlighted blue) begins with detection that data blocks 1-4 are missing. When the T_reorder timer expires without receipt of data blocks 3-4, a status report consisting of both a positive acknowledgement ("ACK 15") and a negative acknowledgement ("NAK (3,4)") is sent (highlighted purple).
>
> Figure 5 (above right) teaches the same embodiment except that, in this example, all of the missing data blocks (1-4) are received before the timer expires. The timer is then stopped

> before expiration, and no status report indicating non-receipt of the blocks 1-4 is triggered.

*Id.* at 42 (citing Ex. 1003, Figs. 4, 5, 12:25–13:9, 13:30–33, 14:1–12; Ex. 1002 ¶¶ 171–173).

According to Petitioner, "Sachs' description of this limitation is virtually identical to that of the '396 patent" because the description associated with the '396 patent's Figure 12, "which illustrates stopping the timer JT at point (2), does not disclose any active 'preventing' process beyond the fact that a status report is not sent." *Id.* (citing Ex. 1001, Fig. 12, 14:45–46; Ex. 1002 ¶¶ 176–177).

*1[d] "transmitting the status report to the transmitter after the timer expires, wherein the status report comprises a positive acknowledgement indicating receipt of at least one received data block"*

Petitioner contends Sachs teaches that "[i]n case of acknowledged mode AM[,] the triggering of the retransmission is delayed… Once T_reorder expires, the STATUS report is removed from the buffer and transmitted." Pet. 43 (footnote omitted) (quoting Ex. 1003, 13:19–33) (citing Ex. 1003, Figs. 4–5, 9:24–32). According to Petitioner, with reference to its annotated version of Sachs's Figure 4, "Sachs teaches that, at the expiration of the T_reorder timer, a STATUS message including a positive acknowledgement indicating receipt of at least one received data block ('Ack 15') is transmitted." *Id.* (citing Ex. 1003, Fig. 4 (Petitioner's annotated version); Ex. 1002 ¶¶ 178–181).

*Patent Owner's Response and Petitioner's Reply*

*First*, Patent Owner argues that Petitioner's position "is based on the incorrect premise that limitations 1[c] and 1[d] cannot both be performed." PO Resp. 14. Patent Owner contends that "[t]he actual language of claim 1

demonstrates that limitations 1[c] and 1[d] are not conditional" because "[t]he limitations are connected with '*and*' demonstrating that the claim comprises a single method" and "[t]he cases cited by Petitioners confirm only that words such as 'when' or 'if' indicate conditional steps." *Id.* (citing *Microsoft Corp. v. Uniloc*, 2017 LLC, IPR2019-01187, Final Written Decision (PTAB Jan. 19, 2021), 13) (emphasis omitted); Sur-Reply 4–5.

Petitioner persuasively responds that "[b]oth limitations refer back to the single timer described in 1[b]" and that "[l]imitations 1[c] and 1[d] are mutually exclusive: the timer either stops or expires, but it cannot do both while performing the method." Pet. Reply 4 (citing Pet. 20 n.5; Ex. 1002 ¶¶ 121, 169). According to Petitioner, it "need therefore only demonstrate one of the mutually exclusive limitations, 1[c] ***or*** 1[d], in the prior art" but contends that it "nonetheless presents prior art that discloses ***both*** mutually-exclusive limitations in single references." *Id.* at 5 (citing Pet. 20 n.5).

We clarify that limitations 1[c] and 1[d] cannot both occur in response to the same set of stimuli. Limitation 1[c] can be triggered in response to one set of stimuli and limitation [d] can be triggered in response to a different set of stimuli as is shown in Sachs's figures. In order for Petitioner to prevail, it need only show one of these mutually-exclusive claim limitations to satisfy the claim, as it contends. Petitioner persuasively shows that, under a first theory, with a first set of stimuli, the timer is stopped before it expires and limitations 1[a], 1[b], and 1[c] are performed as shown in Figure 5 of Sachs. Ex. 1003, Fig. 5. Under a second theory, with a different, second set of stimuli, the timer is allowed to expire and limitations 1[a], 1[b], and 1[d] are performed as shown in Figure 4 of Sachs. *Id.* at Fig. 4. In Petitioner's annotated version of Figure 4, PDUs 3 and 4 are not received within the time

period set by the T_reorder timer—as such, the T_reorder timer expires and a status report acknowledging PDUs up to 14 and negatively acknowledging PDUs 3 and 4 (i.e., indicating that PDUs 3 and 4 are missing) is sent. Pet. 41. In Petitioner's annotated version of Figure 5, the T_reorder timer is stopped when out-of-order PDUs 3 and 4 are received within the time period set by the T_reorder timer and as such, the T_reorder timer is stopped before it can expire. *Id.*

*Second*, Patent Owner argues that, in Sachs's Figure 5, "the T_reorder timer is directed to delaying a reordering procedure, not the triggering of a status report as in the '396 patent." PO Resp. 16 (citing Ex. 1003, Figs. 4, 5, Abstract, 8:25–31, 9:11–15 ("the delay parameter is a timer that is started for every data packet[s] arriving out of sequence, and the triggering of the reordering procedure . . . is delayed by the duration of the timer"); Ex. 2001 ¶ 53). According to Patent Owner, "Sachs teaches that a reordering procedure is performed ***before*** any other actions are taken—including stopping the T_reorder timer" and "[t]herefore, the timer in Figure 5 is not stopped 'in order to prevent a triggering of a status report before the timer expires' as required by claims 1 and 8." *Id.* at 17 (citing Ex. 2001 ¶ 53; Ex. 2006 ¶ 29); Sur-Reply 6–7.

Petitioner responds that "Sachs first teaches that 'it is advantageous to delay a request for a retransmission of missing data packets by the timer.'" Pet. Reply 6 (citing Ex. 1003, 9:24–26). Petitioner persuasively points to Sachs's teaching that, "[i]n a preferred embodiment, the timer is stopped before the timer expiry when ***at the reception of a data packet the sequence is established***." *Id.* (citing Ex. 1003, 9:34–10:1). Petitioner persuasively argues that "[i]t is receipt of the missing data packet, not an artificial and

*separate* 'reordering procedure,' to which the timer is tied." *Id.* (emphasis added). We agree that the cited evidence in Sachs more closely supports Petitioner's position that the "timer is stopped when and because the missing PDUs are received," and not *after* the occurrence of some *additional* step in which PDUs in the RLC buffer are shuffled into sequential order. Petitioner persuasively supports its position with, for example, its annotated version of Figure 5, reproduced above, which depicts that the T_reorder timer is stopped when out-of-order PDUs 3 and 4 are received—Sachs does not depict or describe an *additional* step of reshuffling occurring *before* the timer is stopped. Pet. 41.

Patent Owner's argument that Sachs teaches "a reordering procedure is performed ***before*** any other actions are taken" is unavailing because it is not supported by the cited evidence. In support of this argument, Patent Owner's Declarant, Mr. Regis J. Bates, Jr., offers similar testimony that "the expiry of the timer in Sachs does not trigger a status report as in the '396 patent, instead a reordering procedure is performed *before any other actions are taken*," but does not explain why the reordering procedure takes place before "any other actions." Ex. 2001 ¶ 53 (citing Ex. 1003, Figs. 4, 5, Abstract, 8:25–31, 9:11–15) (emphasis added). In his Second Declaration, Mr. Bates adds no further detail or explanation and cites the same portions of Sachs. Ex. 2006 ¶ 29. None of the cited portions of Sachs sufficiently supports a finding that Sachs teaches or suggests that "a reordering procedure is performed *before any other actions are taken*," as Patent Owner contends and as Patent Owner's Declarant testifies. *Id.*

*Third*, Patent Owner argues that "Petitioners relied primarily on a different figure (Figure 5) for claim limitation 1 [c] because Figure 4 does

not disclose 'stopping a timer' as required in limitation 1[c]" and for this reason do not sufficiently show "a single embodiment in Sachs that meets every limitation of claims 1 or 8." PO Resp. 17 (citing Ex. 2006 ¶ 30).

In its Reply, Petitioner points to Sachs's disclosure that "[t]he structure of the figure 5 is similar to the figure 4" and that "[t]he difference is that the PDUs 3 and 4 are transmitted over the link." Pet. Reply 11 (citing Ex. 1003, 14:1–10).

We need not decide whether Figure 4 and Figure 5 of Sachs are directed to different embodiments. As discussed above, Petitioner shows two different ways by which claim 1 is met—Petitioner sufficiently shows that limitations 1[a], 1[b], and 1[c] are performed in Figure 5 of Sachs. Under an alternative theory, limitations 1[a], [1[b], and 1[d] are performed in Figure 4 of Sachs. Petitioner's showing is persuasive in both of these ways.

We have reviewed the arguments and the cited evidence and are persuaded, that Sachs sufficiently discloses the limitations recited in claim 1 under both its theories. For the foregoing reasons, we are persuaded that Petitioner sufficiently establishes unpatentability of independent claim 1 as anticipated by Sachs by a preponderance of the evidence.

In a case such as this involving a single reference obviousness ground as an alternative to an anticipation ground that we have found reasonably likely to prevail, the principle that "anticipation is the epitome of obviousness" would appear to be relevant. *See Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1372–74 (Fed. Cir. 2019) (citing *Connell*, 722 F.2d at 1548) (affirming PTAB determination "that a prior art reference rendered certain claims obvious 'by virtue of its anticipation of them'"). Based on the foregoing arguments and evidence, we are persuaded that Petitioner

sufficiently establishes unpatentability of independent claim 1 as obvious over Sachs by a preponderance of the evidence.

*3. Independent Claim 8*

Independent Claim 8 recites a receiver that performs substantially the same method recited in independent claim 1. Petitioner presents substantially the same showing with regard to the receiver of claim 8 as it does for the method of claim 1. *See* Pet. 45–48. Petitioner also cites portions of Sachs that describe how each limitation is performed in an "RLC receiver." *Id.* For reasons substantially similar to those set forth for independent claim 1, we are persuaded that Petitioner sufficiently establishes unpatentability of independent claim 8 as anticipated by Sachs by a preponderance of the evidence. We are also persuaded that Petitioner sufficiently establishes unpatentability of independent claim 8 as obvious in view of Sachs by a preponderance of the evidence. *Realtime Data*, 912 F.3d at 1372–74; *Connell*, 722 F.2d at 1548.

*4. Dependent Claim 2*

Claim 2 depends from independent claim 1. Claim 2 recites "wherein the at least one data block is detected as missed when a sequence number (SN) of a currently received data block is larger than a SN of a previously received data block."

Petitioner contends that "[c]laim 2 further specifies the manner in which a data block is detected as missed: when a sequence number of a currently received data block is larger than a sequence number of a previously received data block." Pet. 48–49 (footnote omitted). Under a first theory, Petitioner contends that "Sachs discloses this: '[t]he transmission errors are detected by searching for gaps in the sequence numbers of the

received PDUs on the receiver side.'" *Id.* at 49 (citing Ex. 1003, 2:17–19, 13:2–6, 14:8–10 (describing Figures 4–5)).

Under an alternative, second theory, Petitioner contends that "[t]he left-hand side of Figure 6 (above) shows Sachs' teachings applied to an RLC receiver ('RLC RX') operating in 'acknowledged mode,' *i.e.*, with the RLC layer engaging in ARQ error recovery by requesting retransmission of missed data blocks through status reports." *Id.* at 50 (citing Ex. 1003, Fig. 6, 2:15–34, 14:32–15:9; Ex. 1002 ¶¶ 205–206." With respect to this alternative, second theory, Petitioner explains that

> The vertical line in Figure 6 shows the arrival of PDUs with time running from top to bottom. PDU1 is the first data block received followed by PDU4. Figure 6 teaches a state variable X1, which is set to the largest sequence number of a block of in-sequence PDUs. In this example, Sachs teaches that X1 is initially set to 1, which is the largest sequence number of the in-sequence PDUs. "In the next step PDU4 is received, which is out of order. In this case T_reorder timer is started . . . . " Sachs therefore teaches that at least one data block is detected as missed (in this case two data blocks, PDUs 2,3) when the sequence number of the currently-received data block (PDU4) is larger than a sequence number of a previously received data block (PDU1).

*Id.* at 51 (citing Ex. 1003, 3:5–16, 12:25–13:9, 15:9–14, 15:12–16:2, Figs. 7, 8; Ex. 1002 ¶¶ 207–208).

*Patent Owner's Response*

With respect to claim 2, Patent Owner argues that Petitioner does not "explain how Figure 6 relates to Figures 4 and 5," and contends that the "omission is problematic because Figure 6 is different from and incompatible with Figures 4 and 5." PO Resp. 18 (citing Ex. 2006 ¶ 33). In particular, Patent Owner contends that "in Figure 6, a 'STATUS up to 6'

message is sent after the receipt of PDUs 8 and 9" whereas "[i]n Figure 4, the status message is not limited to PDUs received in order as in Figure 6." *Id.* at 18 (Ex. 1003, Fig. 6; Ex. 2006 ¶ 33).

Patent Owner's arguments for claim 2 are unavailing. Petitioner's showing with respect to claim 2 is sufficient because Petitioner cites a portion of Sachs's description accompanying Figure 5 that discloses "[b]y *receiving the PDUs 5 and 6 the RLC receiver notices, that they are out of order*, and the T_reorder timer is started" and that, "[a]fter receiving the PDUs 3 and 4 the sequence 1,2,3,4,5,6,7,8 is reestablished and therefore the T_reorder timer is stopped." Ex. 1003, 14:8–10 (emphasis added). Because PDUs 5 and 6 are received before, for example, PDUs 3 and 4, Sachs discloses that "at least one data block is detected as missed" as recited in claim 2 because PDUs 3 and 4 have not yet been received.

In this particular theory, because this cited portion of Sachs accompanies Figure 5 and not Figure 6, Petitioner does cite different embodiments in support of its showing for dependent claim 2. Accordingly, we determine that Petitioner establishes sufficiently that claim 2 is unpatentable as anticipated by Sachs by a preponderance of the evidence. As anticipation is the epitome of obviousness, we further determine that Petitioner establishes sufficiently that claim 2 is unpatentable as obvious in view of Sachs by a preponderance of the evidence. *Realtime Data*, 912 F.3d at 1372–74; *Connell*, 722 F.2d at 1548.

### *5. Dependent Claim 3*

Claim 3 depends from independent claim 1. Claim 3 recites, "wherein the at least one data block is detected as missed when a sequence number (SN) following a SN of a data block with a highest SN among received data

blocks is larger than a lowest SN of the at least one data block to be received."

Petitioner contends that claim 3 requires that "the sequence number of the currently-received data block is higher than the sequence number of a data block that has not yet been received, *i.e.*, there is a gap in sequence numbers." Pet. 52. According to Petitioner, "Sachs teaches this: '[t]he transmission errors are detected by searching for gaps in the sequence numbers of the received PDUs on the receiver side.'" *Id.* (citing Ex. 1003, 2:17–19, Fig. 6).

Petitioner also cites Sachs's Figure 6 in support of its showing. Citing its annotated version of Sachs's Figure 6, Petitioner contends that

> This excerpt from Figure 6 (which also appears in Figures 7 and 8) applies Sachs' teachings to an RLC receiver ("RLC AM RX"). Sachs teaches that X1 is initially set to 1, which is the largest sequence number of the in-sequence PDUs. "In the next step PDU 4 is received, which is out of order. In this case T_reorder timer is started…." Sachs therefore teaches that at least one data block is detected as missed (PDUs 2, 3) when a sequence number following a sequence number of a data block with a highest sequence number among the received data blocks (*i.e.*, SN4 from PDU4 following the then-highest SN1 from PDU1 from the received data blocks) is larger than a lowest sequence number of the at least one data block to be received (*i.e.*, SN2 from PDU2). This limitation is taught under this or any other reasonable interpretation.

Pet. 53–54 (citing Ex. 1003, Figs. 6–8, Ex. 1003, 2:15–34, 3:5–16, 12:25–13:9, 14:32–15:9, 15:16–16:2; Ex. 1002 ¶¶ 210–215) (footnote omitted).

*Patent Owner's Response and Petitioner's Reply*

With respect to claim 3, Patent Owner argues that "Figure 6 is [] directed to a different embodiment from Figures 4 and 5, which the Petitioners rely on for claim 1" and "the Petitioners do not demonstrate that

the T_reorder timer performs the same steps as the timers in either Figure 4 or 5." PO Resp. 19 (citing Ex. 2006 ¶ 35). Patent Owner's Declarant testifies that "Petitioners do not demonstrate that the T_reorder timer performs the same steps as the timers in either Figure 4 or 5," "[n]or do the Petitioners explain how Figure 6 relates to Figures 4 and 5." Ex. 2006 ¶ 35.

Petitioner responds that "Sachs explains that Figure 6 shows the same RLC receiver from Figures 4 and 5 working both in the acknowledged mode (AM) (at left) and unacknowledged mode (UM) (at right) with the additional improvement of 'at least one additional state variable in the receiver'" and "Sachs therefore explains that Figure 6 is an extension of Figures 4-5 with one additional feature." Pet. Reply 14 (citing Ex. 1003, 14:14–35) (emphasis omitted). Petitioner further responds that it is not relevant that "status information is provided differently in Figure 6" because Petitioner only relies on Figure 6 to demonstrate teachings of the limitation recited in claim 2, "detecting whether at least one data block to be received from a transmitter is missed" and, in any event, Petitioner argues that "Sachs' Figure 6 ***does*** disclose transmitting an ACK" because "[f]igure 6 depicts transmitting a 'STATUS up[]to 18 NACK 11.'" *Id.* (citing Ex. 1003, Fig. 6).

Sachs does not clearly delineate its embodiments. *See generally* Ex. 1003. Figure 4 is described as "[a]n embodiment of the invention by applying the timer T_reorder." Ex. 1003, 12:2–3. Figure 5 is described as "[a]n embodiment of the invention by applying the timer T_ reorder and a stop timer event." *Id.* at 12:4–5. Sachs discloses that, "[i]n the following two embodiment [sic] of the invention are presented." *Id.* at 12:22–23. Sachs discloses

> In the first embodiment a reorder delay timer, T_reorder is introduced in order to delay the reaction of the RLC receiver in

> sending a STATUS report, which triggers also the retransmissions. This embodiment is described in respect to figure 4.
>
> . . . .
>
> In order to achieve a minimum reaction time of the link protocol, the reodering-delay shall preferably be stopped when all outstanding PDUs are received and the sent sequence is re-established. This is can be achieved by stopping the duration of the T_reorder timer, when reordering is finished. This embodiment is shown in figure 5. The structure of the figure 5 is similar to the figure 4. The difference is that the PDUs 3 and 4 are transmitted over the link.
>
> . . . .
>
> In a further embodiment of the invention the algorithm A is simplified. For the reason of the simplification no update of the Xl variable is performed. In the following this algorithm is called algorithm D.

*Id.* at 12:25–29, 14:1–8, 19:29–32.

Sachs appears to refer to Figures 4 and 5 as different embodiments even though they have the same structure and differ in terms of whether "PDUs 3 and 4 are transmitted over the link." *Id.* at 14:1–8. Sachs discloses that, "[t]o completely solve the problem of packet re-ordering[,] the previous scheme can be improved by adding at least one additional state variable in the receiver" and subsequently describes algorithms A, B, C, and D. *Id.* at 14:22–30. Sachs does not disclose that algorithms A, B, C, and D depicted in Figures 6–9 are each a different embodiment, although it does refer to the algorithms as different "implementations." *Id.* at 14:24–25. In Sachs, algorithm D is called a "further embodiment of the invention" that simplifies algorithm A (depicted in Figure 6). *Id.* at 19:29–32. Having reviewed the entirety of Sachs, we determine that the addition of a state variable X1,

accompanied by the description of "completely solv[ing] the problem of packet re-ordering" with a particular implementation, that of algorithm A, supports the finding that Figure 6 is an embodiment that differs from that which is shown in Figures 4 and 5.

Even though Petitioner contends that the RLC receiver shown in Figure 6 is the same as that shown in Figures 4 and 5, Petitioner does not explain how the same sequence of PDUs cited in Figure 6 could have been obtained in Figures 4 or 5 in light of the fact that there is an additional state variable in the receiver of Figure 6 and a different algorithm for packet re-ordering, algorithm A. We disagree with Petitioner that it is not relevant that "status information is provided differently in Figure 6"— Petitioner does not explain whether and how the state variable affects the sequence of the PDUs received, acknowledged, missing, and unacknowledged in Figure 6. Patent Owner highlights this point in an argument set forth for claim 2: "in Figure 6, a 'STATUS up to 6' message is sent after the receipt of PDUs 8 and 9" whereas "[i]n Figure 4, the status message is not limited to PDUs received in order as in Figure 6." PO Resp. 18 (Ex. 1003, Fig. 6; Ex. 2006 ¶ 33).

The fact that Petitioner only cites Figure 6 for teaching the dependent claim limitations does not absolve Petitioner of its burden to show unpatentability by a preponderance of the evidence and to point out its challenge with specificity. Petitioner's citation to column 2, lines 17 through 19 of Sachs is not sufficient because claim 3 has a scope that is different from that of claim 2, and requires something more than showing of "a gap in sequence numbers." *See* Pet. 52 (quoting Ex. 1003, 2:17–19).

Because it is unclear how Petitioner intends to combine Figures 4 and 6 or Figures 5 and 6 and why a POSITA would have been motivated to

combine the differing embodiments, we determine that Petitioner does not sufficiently carry its burden to show unpatentability of claim 3, either by anticipation or obviousness, by a preponderance of the evidence.

*6. Dependent Claims 4 and 9*

Claim 4 depends directly from independent claim 1. Claim 9 depends directly from independent claim 8.

Claims 4 and 9 recite, "wherein the at least one data block is detected as missed when a sequence number (SN) following a SN of a data block with a highest SN among received data blocks is larger than a SN following a last in-sequence received data block."

Petitioner contends that

> Dependent claims 4 and 9 further specify circumstances under which the at least one data block is detected as missed to specify that the sequence number following a data block with a highest sequence number among the received blocks (*e.g.*, SN4 from PDU4, which follows PDU1, which was the highest received sequence number) is larger than a sequence number following a last-in-sequence received data block (*e.g.*, SN2, because PDU1 is the last in-sequence received data block, and 2 follows 1). In other words, a data block is missed when the next in-sequence data block from the currently-received data block is larger than the sequence number that would follow the last in-sequence received data block, *i.e.*, there is a gap in the sequence numbers. Sachs again teaches this detection of a missed data block.

Pet. 55 (citing Ex. 1002 ¶¶ 216–220) (footnote omitted); *see id.* at 55–57 (citing Pet. §§ VIII.C, VIII.D; Ex. 1003, Figures 6–8, 2:15–34, 3:5–16, 12:25–13:9, 14:32–15:9, 15:16–16:2; Ex. 1002 ¶¶ 216–220). Petitioner cites its annotated version of Sachs's Figure 6 for this teaching. *See id.* at 55–56.

*Patent Owner's Response and Petitioner's Reply*

Patent Owner presents substantially the same arguments set forth above with respect to dependent claim 3, and further argues that "Petitioners point to 'SN4' as being greater than 'SN2,' but do not explain how SN2 is 'a last in-sequence received data block' as required by claims 4 and 9, when the PDU2 data block had not been received before PDU4." PO Resp. 20 (citing Ex. 2006 ¶ 37).

Petitioner responds that it

> ***did*** explain how, in this example, SN4 from PDU4 follows PDU1, which was the highest in-sequence number: a data block is missed when the sequence number from the currently-received data block is larger than the sequence number that would follow the last in-sequence received data block, SN4 > SN2, i.e., there is a gap in the sequence numbers. Petitioner also addressed an alternate interpretation in which the "sequence number (SN) following…" is instead interpreted to be SN5.

Pet. Reply 15 (citing Pet. 55–56, 55n.16; Ex. 1002 ¶¶ 217–220). Petitioner further contends that "Patent Owner could be applying its own interpretation to 'a last in-sequence received data block,' for claims 4 and 9, but Patent Owner has not explained that construction and has thus waived any such argument." *Id.* at 15 n.5 (citing Paper 17 (Scheduling Order), 8 ("[A]ny arguments not raised in the response may be deemed waived.")).

For the reasons discussed above in Section III.D.5 with respect to dependent claim 3, we determine that Petitioner does not explain how the same sequence of PDUs cited in Figure 6 could have been obtained in Figures 4 or 5 in light of the fact that there is an additional state variable in the receiver of Figure 6 and a different algorithm for packet re-ordering, algorithm A, is implemented. Petitioner does not explain whether and how

the state variable affects the sequence of the PDUs received, acknowledged, missing, and unacknowledged in Figure 6.

Because it is unclear how Petitioner intends to combine Figures 4 and 6 or Figures 5 and 6 and why a POSITA would have been motivated to combine the differing embodiments, we determine that Petitioner does not sufficiently carry its burden to show unpatentability of claims 4 and 9, either by anticipation or obviousness, by a preponderance of the evidence.

*7. Dependent Claims 5 and 10*

Claim 5 depends directly from independent claim 1 and claim 10 depends directly from independent claim 8.

Claims 5 and 10 recite "wherein the timer is stopped when a sequence number (SN) following a SN of a data block with a highest SN among received data blocks when the timer was started is the same as a SN following the last in-sequence received data block."

According to Petitioner, "this limitation specifies that the timer for detecting an out-of-order receipt of the missed data blocks is stopped when the sequence numbers of the received data blocks 'follows the last in-sequence received data block,' i.e., when the sequence is made complete." Pet. 57–58 (citing Ex. 1002 ¶¶ 219, 221–225). Petitioner quotes the following portion of Sachs:

> In order to achieve a minimum reaction time of the link protocol, the reordering-delay shall preferably be stopped when all outstanding PDUs are received and the sent sequence is re-established. This is can be achieved by stopping the duration of the T_reorder timer, when reordering is finished.

*Id.* at 58 (citing Ex. 1003, 14:1–5). Petitioner contends that "Figure 7 (below) illustrates stopping the timer when SN5, 'a sequence number (SN) following …[,] is the same as a SN following the last in-sequence received

data block,' which is also SN5 under this alternative interpretation." *Id.* at 59 (citing Ex. 1002 ¶ 228).

With respect to Petitioner's annotated Figure 7, Petitioner contends that "SN5 is 'a sequence number (SN) following' SN4 of PDU 4, which is the 'SN of a data block with a highest SN among received data blocks when the timer was started.'" Pet. 60. Petitioner further contends that "Sachs teaches that this (SN 5) is 'the same' as 'a SN following the last in-sequence received data block,' which is, again, SN 5" and that "[i]n short, Figure 7 teaches, yet again, that the timer is stopped when the data blocks detected as missed are received." *Id.* at 60–61 (citing Ex. 1002 ¶ 227); *see id.* at 57 n.17 ("This limitation is met even if the 'sequence number (SN) following . . .' is interpreted as SN5.").

*Patent Owner's Response and Petitioner's Reply*

Patent Owner argues that "Petitioners also rely on Figure 7 of Sachs, which is from a different embodiment" and that "Petitioners refer to 'SN5,' but point to Figure 7 with annotations stating that the timer is stopped when PDU2 is received, not SN5." PO Resp. 21–22 (citing Pet. 60; Ex. 2006 ¶ 40). Patent Owner contends that, accordingly, "Petitioners do not provide an adequate explanation of how Figure 7 alone allegedly meets all of the limitations of claims 5 and 10." *Id.* at 22 (citing Ex. 2006 ¶ 40).

Petitioner responds that

> Patent Owner similarly argues that Petitioner cannot also rely on Sachs' "different" Figure 7 to invalidate claims 5 and 10. Response, 21-22. Again, in presenting this argument, Patent Owner does not dispute Petitioner's proof that Sachs teaches the additional limitation of dependent claims 5 and through Figures 4-5 (and at 14:1-5). And, again, for claims 5 and 10, Petitioner demonstrated that Figure 7 ***also*** teaches stopping the timer. Figure 7 is a further extension of the same teachings in Figures

> 4, 5, and 6. Sachs explains that "[t]he structure of figure 7 corresponds to figure 6. The difference is the duration of the T_reorder timer," which does not change the claimed structures. There is nothing "different" or "incompatible" between Figures 4- 6 and 7. And, crucially, Patent Owner does not dispute that Figure 7 demonstrates stopping a timer when the missing data block is received.

Pet. Reply 16 (citing Pet. 57–61; Ex. 1002 ¶¶ 221–228; Ex. 1003, 17:14–15; *Kennametal*, 780 F.3d at 1381). Petitioner further contends that

> Patent Owner altogether ignores Petitioner's first proposed interpretation for "a SN following the last in-sequence received data block" (Petition, 57-59), and challenges only the alternate interpretation in which it could instead refer to the next in-sequence SN that would arrive after the last in-sequence data block. Patent Owner is free to disagree with this interpretation; its silence as to the first interpretation concedes that Sachs discloses claims 5 and 10.

*Id.* at 16–17 (citing Pet. 59–61; PO Resp. 21–22).

For the reasons discussed above in Section III.D.5 with respect to dependent claim 3, we determine that Petitioner does not explain how the same sequence of PDUs cited in Figure 7 could have been obtained in Figures 4 or 5 in light of the fact that there is an additional state variable in the receiver of Figure 7 and a different algorithm for packet re-ordering, algorithm B. Petitioner does not explain whether and how the state variable affects the sequence of the PDUs received, acknowledged, missing, and unacknowledged in Figure B.

Because it is unclear how Petitioner intends to combine Figures 4 and 7 or Figures 5 and 7 and why a POSITA would have been motivated to combine the differing embodiments, we determine that Petitioner does not sufficiently carry its burden to show unpatentability of claims 5 and 10, either by anticipation or obviousness, by a preponderance of the evidence.

*8. Dependent Claim 6*

Claim 6 directly depends from independent claim 1. Claim 6 recites "wherein the at least one data block comprises a Radio Link Control (RLC) Protocol Data Unit (PDU)."

Petitioner contends that "Sachs [] teaches that the at least one data block comprises a Radio Link Control (RLC) Protocol Data Unit (PDU)." Pet. 61 (citing Ex. 1003, 1:19–2:13 (describing the "so-called Protocol Data Units PDUs" and "the Radio Link Controller RLC"), 2:15–3:16 ("A detailed description of this protocol is to be found in the 3GPP specification '3G TS 25.322, version 4, Universal Mobile Telecommunication System (UMTS). RLC specification'."), 6:7–32, 7:17-34, 12:25–20:20 (discussing RLC PDUs throughout), 16:4–17, 22:1–7, Figures 1–8 ("RLC" and "PDU")). According to Petitioner, "[a] POSITA would have understood Sachs' references to 'PDUs' in an 'RLC receiver' to refer to 'Radio Link Control (RLC) Protocol Data Unit[s] (PDU[s]).'" *Id.* (citing Ex. 1002 ¶¶ 229–232).

Patent Owner does not specifically contest Petitioner's showing with respect to dependent claim 6. *See generally* PO Resp. We have reviewed the cited evidence and testimony and we are persuaded that Sachs discloses the subject matter of the limitation recited in dependent claim 6. Accordingly, we are persuaded that Petitioner establishes unpatentability of claim 6 and anticipated by Sachs by a preponderance of the evidence.

As anticipation is the epitome of obviousness, we are also persuaded that Petitioner establishes unpatentability of claim 6 as obvious in view of Sachs by a preponderance of the evidence. *Realtime Data*, 912 F.3d at 1372–74; *Connell*, 722 F.2d at 1548.

*9. Dependent Claim 7*

Claim 7 directly depends from independent claim 1. Claim 7 recites "wherein the status report further comprises a negative acknowledgement indicating a sequence number (SN) of the at least one data block detected as missed." Petitioner contends that

> Sachs further teaches that the status report further comprises a negative acknowledgement indicating a sequence number (SN) of the at least one data block detected as missed: "A STATUS report including the request for missing PDUs is sent to the sender and this triggers the retransmission. Said request has a form of a negative acknowledgment NACK for the missing PDUs."

Pet. 62 (citing Ex. 1003, 13:19–23, 16:23–27, 17:21–32, Figures 4 (status report with a "NAK(3,4)"), 6 (status report with a "NACK 11"), 7, 8 (same)).

Patent Owner does not specifically contest Petitioner's showing with respect to dependent claim 7. *See generally* PO Resp. We have reviewed the cited evidence and testimony and we are persuaded that Sachs discloses the subject matter of the limitations recited in dependent claim 7. In particular, we are persuaded that Figure 4 of Sachs sufficiently shows a negative acknowledgment (NAK) for missing PDUs with sequence numbers 3 and 4. Figure 4 is the same figure cited in one of Petitioner's theories for its showing for independent claim 1. As such, the portions of Sachs cited for independent claim 1 and dependent claim 7 are not from different embodiments. Accordingly, we are persuaded that Petitioner establishes unpatentability of claim 7 as anticipated by Sachs by a preponderance of the evidence.

As anticipation is the epitome of obviousness, we are also persuaded that Petitioner establishes unpatentability of claim 7 as obvious in view of Sachs by a preponderance of the evidence. *Realtime Data*, 912 F.3d at 1372–74; *Connell*, 722 F.2d at 1548.

### *E. Challenges 3 and 4—Anticipation by Wei and Obviousness Over Wei Alone*

Petitioner contends that claims 1–5 and 7 are unpatentable as anticipated under 35 U.S.C. § 102 over Wei and as obvious under 35 U.S.C. § 103(a) over Wei. Pet. 63–73. For the reasons that follow, we are not persuaded that Petitioner sufficiently establishes by a preponderance of the evidence unpatentability of any of claims 1–5 and 7 with respect either of its anticipation and obviousness challenges based on Wei.

#### *1. Overview of Wei*

Wei relates to "techniques for retransmitting packets by a Radio Link Protocol (RLP) in CDMA communication systems." Ex. 1004, 1:8–11. More broadly, Wei describes techniques "for retransmitting data in any wireless communication system with a first retransmission mechanism in a first sublayer (e.g., RLP) and a second retransmission mechanism in a second sublayer (e.g, HARQ-CF)." *Id.* at 2:50–55. In an embodiment, Wei employs a "delayed NAK RLP retransmission scheme." *Id.* at 10:52. When a receiver RLP determines that there are two missing RLP frames, for example, "instead of immediately sending NAKs at the RLP sublayer to request retransmission of these missing RLP frames, the receiver RLP starts a delayed NAK timer." *Id.* at 11:22–27. "The receiver RLP would then send the NAKs at the expiration of the delayed NAK timer." *Id.* at 11:27–28.

Wei also describes an improvement to the delayed NAK RLP retransmission scheme, which normally uses a conservatively long value for the delayed NAK timer because "the receiver RLP wants to wait for a certain amount of time to gain more confidence in its assessment that this RLP frame is really lost." *Id.* at 11:67-12:3. A "missing frame may still be in the process of being transmitted by the underlying HARQ-CF." *Id.* at 11:65–67. Accordingly, the HARQ-CF can maintain a "dynamic event-driven timer . . . for each RLP frame determined by the receiver RLP to be missing." *Id.* at 12:10–12. "This dynamic timer has a variable duration and its expiration is triggered by events known to the receiver HARQ-CF." *Id.* at 12:12–14. The receiver RLP can send a NAK to a transmitter RLP to request retransmission of a missing RLP frame upon the expiration of the dynamic timer or an RLP fixed timer, whichever happens first. *Id.* at 12:17–21.

*2. Independent Claim 1 and Dependent Claims 2–5 and 7*

*1[pre] "A method of performing automatic repeat request (ARQ) in a wireless communication system, the method performed by a receiver and comprising"*

Petitioner contends that, "[t]o the extent the preamble is limiting, it is taught by Wei," which "teaches the use of ARQ in a wireless communication system performed by a receiver." Pet. 64 (citing Ex. 1004, codes (14) ("RLP retransmission for CDMA communication systems"), (57) (receiver), 1:13–22 ("wireless communication systems" and receiver), 2:4–21 (receiver), 2:24–49 (ARQ), 4:61–65, 19:18–26, claims 1–3, Figs. 6–8 ("Receiver RLP")).

*1[a] "detecting whether at least one data block to be received from a transmitter is missed"*

Petitioner quotes the following disclosures in Wei: "missing RLP frames are first detected (*e.g.*, by a receiver RLP)" and that "the receiver RLP detects for missing RLP frames…." Pet. 64–65 (quoting Ex. 1003, code (57), 12:26–31) (citing *id.* at 1:33–38, 2:8–10, 10:15–17, 10:31–42, 11:65–67, 13:46–54, 13:66–14:3, 16:66–17:1, 18:28–29, Figures 7–8, claims 1, 8, 16, 24; Ex. 1002 ¶ 261).

*1[b] "starting a timer when the at least one data block is detected as missed."*

Petitioner contends that "Wei teaches the use of a dynamic timer that is started when at least one data block (an RLP frame) is detected as missed" and quotes Wei's disclosure of "[a] dynamic timer is then maintained [] for each RLP frame detected to be missing." *Id.* at 65 (citing Ex. 1004, code (57), 2:10–24, 3:15–23, 11:22–28, 11:47–55, 11:65–12:21, 12:31–35, 12:41–46, 13:26–36, 13:50–57, 16:66–17:13, Figs. 6–8, claims 1, 8, 16, 24; Ex. 1002 ¶¶ 262, 263).

*1[c] "stopping the timer when the at least one data block is received from the transmitter while the timer is running, in order to prevent a triggering of a status report before the timer expires"*

Petitioner quotes Wei's disclosure that "[w]hen an once missing RLP frame is received after the dynamic timer for the frame is triggered, the receiver RLP can also send a command to the receiver HARQ-CF to cancel the dynamic timer." *Id.* (quoting Ex. 1004, 13:10–13) (citing *id.* at code (57), 13:10–13, 14:28–31, 15:53–65, Figures 6–8, claims 15, 23, 31).

According to Petitioner, "Wei additionally teaches that receipt of the missing data block (an RLP frame) before the timer expires will prevent the triggering of a status report." *Id.* at 66 (citing Ex. 1004, code (57), 11:23–28 ("[I]nstead of immediately sending NAKs at the RLP sublayer to request

retransmission of these missing RLP frames, the receiver RLP starts a delayed NAK timer for these missing RLP frames. The receiver RLP would then send the NAKs at the expiration of the delayed NAK timer."), 2:16–21, 10:40–52, 11:22–28, 12:17–21). Petitioner contends that "Wei, like Sachs, teaches that stopping the timer 'prevent[s] a triggering of a status report' in the same manner as the '396 patent; a status report is not transmitted while the timer is running." *Id.* (citing Ex. 1002 ¶¶ 264–247).

> *1[d] "transmitting the status report to the transmitter after the timer expires, wherein the status report comprises a positive acknowledgement indicating receipt of at least one received data block"*

Petitioner quotes Wei's disclosure that "the receiver HARQ-CF may or may not provide ACK feedback for each subpacket transmitted for the receiver," and that "[i]f the receiver receives the control message on the F-PDCCH and is also able to recover the HARQ packet based on the subpackets received on the F-PDCH, then it sends an ACK back to the transmitter." Pet. 66–67 (quoting Ex. 1004, 8:43–9:8) (citing Ex. 1004, 4:1–16, 10:58–67, 12:55–67, 4:61–5:2, 9:9–18, 11:8–17, 17:5–38, Figs. 6 (showing the receiver transmitting both ACK and NAK messages), 7–8; Ex. 1002 ¶¶ 268–269). Petitioner contends that "[e]ven if Wei did not expressly disclose this limitation, a POSITA would have understood the well-known use of ACK messages in ARQ systems to transmit status reports comprising a positive acknowledgement (*i.e.*, an ACK) to indicate the successful receipt of at least one received data block." *Id.* at 67 (citing Ex. 1002 ¶¶ 270–271).

*Patent Owner's Response and Petitioner's Reply*

Patent Owner argues that "Wei does not disclose a status report." PO Resp. 23 (citing Ex. 2001 ¶ 58). More particularly, Patent Owner points out that "Petitioners first refer to the delayed NAK timer as the status report in the 'stopping' limitation of claim 1" and argues that Wei's NAK cannot be the "status report" recited in claim 1 because the claimed status report comprises "a positive acknowledgment indicate receipt of at least one received data block." PO Resp. 24 (citing Ex. 1001, 51–53[8]; Pet. 66; Ex. 2001 ¶ 58). Patent Owner further points out that "Petitioners [also] appear to rely on a general discussion of ACK feedback for the element of claim 1 requiring a status report comprising a positive acknowledgement." *Id.* (citing Pet. 66–67; Ex. 2001 ¶ 60). Patent Owner also asserts that "Petitioners apparently do ***not*** rely on the 'indication' message in Figure 7 of Wei, despite discussing it earlier in the Petition" "because the 'indication' is a message sent between receivers and not from the receiver to the transmitter as required by claim 1 of the '396 patent." *Id.* at 25 (citing Ex. 2001 ¶ 60).

Petitioner responds by arguing that a "status report" was a well-known term in the art and "referred to transmission of information that could include an ACK, NACK, both, or something else." Pet. Reply 21 (citing Ex. 1002 ¶¶ 83–85).

*First*, Petitioner argues that

> Wei teaches that, if the dynamic timer expires, an "indication" will be sent to the receiver RLP: "The receiver RLP would interpret the indication to mean the identified missing RLP frames are indeed lost." The receiver RLP then transmits a NACK message (referred to as a "NAK" by Wei, Ex. 1002, ¶248)

[8] Patent Owner does not cite a corresponding column number for lines 51–53.

> notifying the transmitter of the missing data blocks. Wei confirms that the receiver RLP "initiates the recovery of each missing RLP frame" with an expired timer, which a POSITA would understand necessarily requires transmitting a status report.

Pet. Reply 23–24 (citing Ex. 1004, Abstract, 2:19–21, 12:55–67, 9:12–18, claims 1, 8; Pet. 30; Ex. 1002 ¶¶ 247, 248; Ex. 1004, 13:16–18, 18:21–33, Fig. 7 (step 744)). With respect to *this* explanation, Petitioner contends that "Wei discloses transmitting status report information, including a positive acknowledgement, which *could* be sent with a NAK." Pet. Reply 23 (citing Pet. 33 (citing Ex. 1004, 4:61–5:2, 8:62–9:8, 11:8–17, 17:5–38), 66–67 (citing Ex. 1004, 8:43–9:8, 4:1–16, 10:58–67, 12:55–67).

*Second*, Petitioner contends that "Wei further teaches, in Figure 9, transmission of the HARQ-level *combination* ACK/NAK messages from the receiving terminal to the transmitting base station." *Id.* (citing Ex. 1004, Fig. 9, 18:21–33, 18:54–57) (emphasis added). According to Petitioner, "Sachs therefore expressly teaches transmitting ACKs and NAKs together in a single status report." *Id*. at 24.

*Third*, Petitioner argues "a POSITA would have understood at the relevant priority date that a status report *could include* an ACK to communicate the received data blocks to the transmitter." *Id.* (citing Ex. 1002 ¶¶ 83–85, 123). Petitioner contends that "status reports, including ACKs, were required under the then-prevailing 3GPP standard." *Id.* (citing Ex. 1005, 17 ("This status report may contain positive or negative acknowledgements. . . .")).

The parties do not agree about what the status report should encompass. Petitioner argues that a status report could encompass an ACK, NAK, or both. Pet. Reply 20–21 (Ex. 1002 ¶¶ 83–85; Ex. 1032, 17:16–18:7,

83:5–14, 88:1–7, 88:13–20, 89:5–12, 90:15–91:3, 91:13–92:1, 92:9–17). Patent Owner argues that a NAK alone cannot constitute the *claimed* status report. PO Resp. 24. We agree with Patent Owner that a NAK alone cannot constitute the claimed status report because the claimed status report must include "a positive acknowledgement indicating receipt of at least one received data block" as recited in claim 1. Petitioner's arguments about lack of intent to disavow scope from or redefine the claim term status report are inapposite (*see* Pet. Reply 19–22) because as *recited*, the claim term status report requires a positive acknowledgment.

With regard to Petitioner's *first* argument, the fact that a POSITA would have understood that *a* status report *could* have a positive acknowledgment does not show that the element cited by Petitioner to teach the first instance of the *claimed* status report in limitation 1[c], i.e., a NAK disclosed in relation to Wei's delayed NAK timer (Pet. 66 (citing Ex. 1004, Abstract, 2:16–21, 10:40–52, 11:22–28, 12:17–21)), would have been understood by a POSITA to include or be accompanied by a positive acknowledgment, nor does it show why a POSITA *would have* modified the cited NAK to somehow include or be accompanied by a positive acknowledgment as is necessary for its obviousness case. This cited portion of Wei discloses a NAK, not a status report, and Petitioner does not show that the cited NAK inherently discloses a positive acknowledgment as is necessary for its anticipation case.

Petitioner does not show that the NAK disclosed in relation to Wei's delayed NAK timer from column 11 cited for limitation 1[c] includes or is accompanied by Wei's "ACK feedback for each subpacket transmitted for the receiver" that "may or may not be provided by the HARQ-CF timer" in

columns 8 and 9 cited for limitation 1[d]. Petitioner also does not explain any linkage between the NAK from column 11 cited for limitation 1[c] with its assertion that "the receiver transmit[s] both ACK and NAK messages" from Wei's Figure 6 cited for limitation 1[d].

With regard to Petitioner's *second* Reply argument, Patent Owner argues, and we agree, that Petitioner did not cite Figure 9 of Wei and its "combination" ACK/NAK message in its Petition. Sur-Reply 16. As such, we determine this argument is untimely and we do not consider it.

With regard to Petitioner's *third* Reply argument, the fact that the "then-prevailing" 3GPP standard required status reports does not do enough to buttress Petitioner's initial position. Whether Wei would have been understood by a POSITA to have included (in the case of obviousness) or necessarily included (in the case of anticipation) a 3GPP-compliant status report does not cure the Petition's fatal flaw of citing two different, unlinked elements of Wei—a NAK in column 11 for limitation 1[c] and an ACK in columns 8 and 9 for limitation 1[d]—as teaching the claimed status report.

Having reviewed the entirety of the record developed during trial, we maintain our finding that the element cited for the status report in the "stopping" limitation (i.e., a NAK) overlaps with, or has any connection to, the element cited for the status report in the "transmitting" limitation (i.e., an ACK). We further find that Petitioner does not sufficiently explain how the *particular* element cited for the "stopping" limitation in Wei links to, connects with, ties to, includes, or is accompanied by the *particular* element cited for the "transmitting" limitation.

For the foregoing reasons, we are not persuaded that Petitioner establishes unpatentability of independent claim 1 by a preponderance of the

evidence with respect to either of its obviousness or anticipation challenges. Petitioner's challenges to claims 2–5 and 7 do not cure the deficiencies of Petitioner's showing with respect to independent claim 1. As such, Petitioner does not establish unpatentability of dependent claims 2–5 and 7 by a preponderance of the evidence with respect to either of its obviousness or anticipation challenges.

*F. Challenge 5—Obviousness Over Wei and 3GPP TS 25.322*

Petitioner contends that claims 6 and 8–10 are unpatentable as obvious under 35 U.S.C. § 103(a) over Wei and 3GPP TS 25.322. Pet. 73–80. Petitioner contends that "Wei discloses or renders obvious all elements of claims 1-5 and 7 of the '396 patent, as explained in §IX [of the Petition]." Pet. 73. Petitioner relies on Wei in substantially the same manner as set forth in Section III.E and relies on 3GPP TS 25.322 to teach radio interface protocols recited in claims 6 and 8–10. *Id.* For reasons substantially similar to those discussed above in Section III.E.2, we are also not persuaded that Wei teaches or suggests the status report recited in independent claim 8 in Petitioner's challenge based on the combination of Wei and 3GPP TS 25.322. For this reason, we are not persuaded that Petitioner establishes unpatentability of claims 6 and 8–10 as obvious in view of Wei and 3GPP TS 25.322 by a preponderance of the evidence.

## IV. CONCLUSION[9]

In summary:

| **Claims Challenged** | **35 U.S.C. §** | **Reference(s)/ Basis** | **Claims Shown Unpatentable** | **Claims Not Shown Unpatentable** |
|---|---|---|---|---|
| 1–10 | 102 | Sachs | 1, 2, 6, 7, 8 | 3–5, 9, 10 |
| 1–10 | 103(a) | Sachs | 1, 2, 6, 7, 8 | 3–5, 9, 10 |
| 1–5, 7 | 102 | Wei | | 1–5, 7 |
| 1–5, 7 | 103(a) | Wei | | 1–5, 7 |
| 6, 8–10 | 103(a) | Wei, 3GPP TS 25.322 | | 6, 8–10 |
| **Overall Outcome** | | | 1, 2, 6, 7, 8 | 3–5, 9, 10 |

## V. ORDER

For the reasons given, it is:

ORDERED that Petitioner has established by a preponderance of evidence that claims 1, 2, 6, 7, 8 of the ’396 patent are unpatentable as anticipated under 35 U.S.C. § 102 and as obvious under 35 U.S.C. § 103;

ORDERED that Petitioner does not establish by a preponderance of evidence that claims 3–5, 9, and 10 are unpatentable; and

[9] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner’s attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

FURTHER ORDERED because this is a final written decision, the parties to this proceeding seeking judicial review of our Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

CRADLEPOINT, INC., HONEYWELL INTERNATIONAL, INC., SIERRA WIRELESS, INC., TCL COMMUNICATION TECHNOLOGY HOLDINGS LIMITED, TCT MOBILE INTERNATIONAL LIMITED, TCT MOBILE, INC., TCT MOBILE (US) INC., TCT MOBILE (US) HOLDINGS INC., AND THALES DIS AIS DEUTSCHLAND GMBH,
Petitioner,

v.

SISVEL S.P.A.,
Patent Owner.

---

IPR2021-00580
Patent 7,869,396 B2

---

Before BARBARA A. PARVIS, MONICA S. ULLAGADDI, and AARON W. MOORE, *Administrative Patent Judges*.

MOORE, *Administrative Patent Judge*, dissenting.

I respectfully dissent from the decision of the majority determining that Petitioner has shown that claims 1, 2, 6, 7, and 8 of the '396 patent unpatentable as anticipated by, or obvious in view of, Sachs.

At institution, I expressed my view that Petitioner had not shown that Sachs teaches or suggests limitations 1[c] and 8[c], "stopping the timer when

the at least one data block is received from the transmitter while the timer is running, in order to prevent a triggering of a status report before the timer expires," which appear in every challenged claim. I explained that, in the '396 patent, it is the starting, or running, of the timer that prevents the sending of the status report, not the *stopping* of it, and that there would not be a status report to be "prevented" "before the timer expires," because that is what the running of the timer is avoiding.

I suggested that the amendment that added the "in order to prevent a triggering of a status report before the timer expires" language may have mistakenly been applied to the "stopping the timer" limitation, instead of the "starting a timer" limitation, which would have made more sense. As the claim was amended and then issued, however, I would have found that Petitioner had not sufficiently accounted for that limitation, because Petitioner had not shown that Sachs "*stop[s] the timer* when the at least one data block is received from the transmitter while the timer is running, *in order to prevent a triggering of a status report before the timer expires*."

In the Institution Decision, the majority concluded that Petitioner had shown that this limitation is satisfied in Sachs because

> "Sachs' description of this limitation is virtually identical to that of the '396 patent" because the description associated with the '396 patent's Figure 12, "which illustrates stopping the timer JT at point (2), does not disclose any active 'preventing' process beyond the fact that a status report is not sent."

Decision 14–15 (quoting Pet. 42). I find it insufficient, however, to compare the patent's disclosure to the prior art. Our focus must be on the claim language. The majority considered an argument by Patent Owner about the "prevent a triggering of a status report" portion of 1[c]/8[c] (*see id*. at 16–

17), but did not address my concerns about "stopping the timer . . . in order to prevent a triggering of a status report before the timer expires."

In the Response, Patent Owner argued that Petitioner relies on "both Figures 4 and 5 of Sachs for limitation 1[c] and 8[c]" but that "Figure 4 does not disclose stopping a timer at all" and "Figure 5 discloses stopping a timer, but only when reordering is finished." PO Resp. 16. With respect to Figure 5, Patent Owner asserted that "the T_reorder timer is directed to delaying a reordering procedure, not the triggering of a status report as in the '396 patent." *Id*. Patent Owner also asserted that "the dissent opinion acknowledged [that] 'the Petition fails to account for [limitations 1[c] and 8[c]].'" *Id*. at 17 (citing Inst. Dec. 28). That was somewhat misleading, because the point of the dissent was *not* that Sachs discloses delaying a reordering procedure instead of a status report. Instead, the point was that the claims require "stopping the timer . . . in order to prevent a triggering of a status report before the timer expires," and that Petitioner had not shown how or why the *stopping* of the Sachs timer prevents anything before the timer expires.

In the Reply, Petitioner characterizes limitations 1[c]/8[c] as "inartful," but "respectfully submits that the *starting and running* of the timer delays the transmission of the status report, which is either sent if the timer expires or stopped if the timer is stopped." Pet. Reply 8–9 (emphasis added). This may be true, but the 1[c]/8[c] limitation recites "stopping" the timer, not "the starting and running of the timer."

Petitioner continues that "even under an alternative interpretation in which the starting or running of the timer prevents transmission of the status report, Sachs discloses the use of a timer in the same manner as the '396

claims and as depicted in Figures 12 and 13." Pet. Reply 9. Again, however, these claim limitations are not directed to "starting or running" the timer, but instead require that "stopping the timer" has a particular consequence. A proper invalidity analysis does not compare the patent's disclosure to the prior art; instead, Sections 102 and 103 require us to correlate the "claimed invention" to the prior art, where the "claimed invention," is "the subject matter defined by a claim in a patent or an application for a patent." 35 U.S.C. § 100(j).

Petitioner then "addresses a POSITA's reasonable interpretation of this limitation in light of the '396 patent and file history." Pet. Reply 9. I would find that the Reply is too late to start claim construction where the Petition asserted that "all claim terms should be accorded their plain and ordinary meaning" and Patent Owner then "agree[d] that the claims terms should be given their plain and ordinary meaning." Pet. 34; PO Resp. 10. But I also would find Petitioner's arguments insufficient to support a construction that would remedy the problem, because Petitioner focuses on "triggering," concluding that "[i]t is the timer that temporarily prevents this request from being transmitted (while running) or averts the transmission altogether (when stopped)." Reply 10–11. This *still* fails to address the problem that the plain language of the claims recites that "stopping the timer . . . in order to prevent a triggering of a status report before the timer expires."

The majority's Final Written Decision tracks the Institution Decision, again relying on similarities between Sachs and the patent's disclosure. *See* Final Written Decision ("FWD") 13–15. But I do not see where the majority

confronts the "stopping the timer . . . in order to prevent a triggering of a status report before the timer expires" issue.

Indeed, it is unclear how "stopping the timer" could possibly "prevent" the sending of a status report "before the timer expires." The whole point of the timer is that status reports are not sent while it is running. *See, e.g.*, Ex. 1001, 14:28–34 ("When a gap is generated in the buffer of the RLC entity, the timer is activated at once. When data corresponding to the gap is not received until the timer expires, it is judged that the gap is generated due to the reception failure and the status report information may be transmitted to the transmitter."). There are only two possibilities when the timer is started. First, if the missing block is received while the timer is running, the timer is stopped. Second, if the missing block is not received while the timer is running, the timer will expire. In neither case, however, does the stopping (or expiring) of the timer "prevent a triggering of a status report." Again—and as Petitioner acknowledges—it is the starting or running of the timer that prevents the triggering of the status report. *See* Reply 8–9 ("the starting and running of the timer delays the transmission of the status report, which is either sent if the timer expires or stopped if the timer is stopped"). The claims are basically nonsensical.

This is a problem that might have been fixed by claim construction (though that would have amounted to a substantial rewrite of the claims) or by amendment of the patent, but we have neither here.

The parties both dance around the "stopping the timer" issue. I assume Petitioner does so because the Petition does not sufficiently account for that language, and that Patent Owner does so because it is problematic for infringement and/or creates written description or enablement problems.

Nevertheless, *our* task is to determine whether Petitioner has shown, by a preponderance of the evidence, that the challenged claims are unpatentable under 35 U.S.C. § 103.

It is true that Sachs has a timer, that blocks are received while the timer is running, that the timer stops, and that a status report is sent. But that is not enough. Neither the parties nor the majority even attempt to explain how Sachs discloses "stopping the timer . . . while the timer is running, in order to prevent a triggering of a status report before the timer expires" as required by all claims. For this reason, I would find that Petitioner has not met its burden of proving that claims 1, 2, 6, 7, 8 are unpatentable in view of Sachs.

PETITIONER:

Kourtney Mueller Merrill
Amanda Tessar
Roderick O'Dorisio
PERKINS COIE LLP
merrill-ptab@perkinscoie.com
tessar-ptab@perkinscoie.com
odorisio-ptab@perkinscoie.com

John Hutchins
Chunhsi Mu
Wesley Jones
BANNER & WITCOFF, LTD.
jhutchins@bannerwitcoff.com
amu@bannerwitcoff.com
wjones@bannerwitcoff.com

Meredith Addy
Robert Hart
Gregory Gulliver
ADDYHART P.C.
meredith@addyhart.com
robert@addyhart.com
gbgulliver@addyhart.com

Benjamin Weed
Brian Bozzo
Erik Halverson
K&L GATES LLP
bejamin.weed.ptab@klgates.com
brian.bozzo@lkgates.com
erik.halverson@klgates.com

Jeremy Peterson
Bradford Cangro
PV LAW LLP
jeremy.peterson@pvuslaw.com
bradford.cangro@pvuslaw.com

Jacob Baron
Allison Lucier
HOLLAND & KNIGHT LLP
jacob.baron@hklaw.com
allison.lucier@hklaw.com

PATENT OWNER:

Timothy Devlin
DEVLIN LAW FIRM LLC
td-ptab@devlinlawfirm.com

US007869396B2

(12) **United States Patent**
**Chun et al.**

(10) **Patent No.: US 7,869,396 B2**
(45) **Date of Patent: Jan. 11, 2011**

(54) **DATA TRANSMISSION METHOD AND DATA RE-TRANSMISSION METHOD**

(75) Inventors: **Sung Duck Chun**, Anyang-si (KR); **Young Dae Lee**, Anyang-si (KR); **Sung Jun Park**, Anyang-si (KR)

(73) Assignee: **LG Electronics, Inc.**, Seoul (KR)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 133 days.

(21) Appl. No.: **12/158,646**

(22) PCT Filed: **Jan. 3, 2007**

(86) PCT No.: **PCT/KR2007/000022**

§ 371 (c)(1),
(2), (4) Date: **Jun. 20, 2008**

(87) PCT Pub. No.: **WO2007/078142**

PCT Pub. Date: **Jul. 12, 2007**

(65) **Prior Publication Data**

US 2008/0298322 A1 Dec. 4, 2008

**Related U.S. Application Data**

(60) Provisional application No. 60/815,722, filed on Jun. 21, 2006, provisional application No. 60/797,402, filed on May 2, 2006, provisional application No. 60/784,976, filed on Mar. 22, 2006, provisional application No. 60/757,063, filed on Jan. 5, 2006.

(30) **Foreign Application Priority Data**

Dec. 22, 2006 (KR) ...................... 10-2006-0132469

(51) **Int. Cl.**
***H04W 4/00*** (2009.01)

(52) **U.S. Cl.** ...................................................... **370/328**

(58) **Field of Classification Search** ................. 370/231, 370/328, 352, 346, 394, 473, 241, 282, 321; 714/749; 455/67.11, 452.2, 455, 464
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,659,756 A 8/1997 Hefferon et al.

(Continued)

FOREIGN PATENT DOCUMENTS

AU 2007-212916 8/2007

(Continued)

OTHER PUBLICATIONS

Hua Xu et al., Performance Analysis on the Radio Link Control Protocol of UMTS System, Jul. 31, 2001, IEEE Publication, pp. 2026-2030 (http://ieeexplore.ieee.org/stamp/stamp.jsp?tp=&arnumber=1040574&userType=inst).*

(Continued)

*Primary Examiner*—Diane Mizrahi
(74) *Attorney, Agent, or Firm*—Lee, Hong, Degerman, Kang & Waimey

(57) **ABSTRACT**

A method which can reduce loss in data transmission is provided. A data block is prepared in a high-level layer and the data block is transmitted in a low-level layer. Status report information associated with reception or non-reception of the data block is received through the low-level layer. When a receiver fails to receive data transmitted from a transmitter, the transmitter can rapidly recognize the reception failure and can retransmit the data.

**10 Claims, 8 Drawing Sheets**



U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,828,677 | A | 10/1998 | Sayeed et al. | |
| 6,088,342 | A | 7/2000 | Cheng et al. | |
| 6,317,430 | B1 | 11/2001 | Knisely et al. | |
| 6,330,448 | B1 | 12/2001 | Otsuka et al. | |
| 6,381,229 | B1 | 4/2002 | Narvinger et al. | |
| 6,480,525 | B1 | 11/2002 | Parsa et al. | |
| 6,571,102 | B1 | 5/2003 | Hogberg et al. | |
| 6,597,668 | B1 | 7/2003 | Schafer | |
| 6,597,675 | B1 | 7/2003 | Esmailzadeh et al. | |
| 6,643,275 | B1 | 11/2003 | Gustafsson et al. | |
| 6,728,225 | B1 | 4/2004 | Ozluturk | |
| 6,795,412 | B1 | 9/2004 | Lee | |
| 6,907,015 | B1 | 6/2005 | Moulsley et al. | |
| 6,947,394 | B1 * | 9/2005 | Johansson et al. | 370/282 |
| 6,950,420 | B2 | 9/2005 | Sarkkinen et al. | |
| 6,965,580 | B1 | 11/2005 | Takagi et al. | |
| 7,075,971 | B2 | 7/2006 | Parsa et al. | |
| 7,430,206 | B2 * | 9/2008 | Terry et al. | 370/394 |
| 7,436,801 | B1 | 10/2008 | Kanterakis | |
| 7,496,113 | B2 | 2/2009 | Cai et al. | |
| 7,664,059 | B2 * | 2/2010 | Jiang | 370/282 |
| 2001/0024956 | A1 | 9/2001 | You | |
| 2002/0009129 | A1 | 1/2002 | Choi et al. | |
| 2002/0021698 | A1 | 2/2002 | Lee et al. | |
| 2002/0021714 | A1 | 2/2002 | Seguin | |
| 2002/0032884 | A1 | 3/2002 | Kobata et al. | |
| 2002/0044527 | A1 | 4/2002 | Jiang et al. | |
| 2002/0071480 | A1 | 6/2002 | Marjelund | |
| 2002/0090004 | A1 | 7/2002 | Rinchiuso | |
| 2002/0093940 | A1 | 7/2002 | Toskala et al. | |
| 2002/0160744 | A1 | 10/2002 | Choi et al. | |
| 2002/0181436 | A1 | 12/2002 | Mueckenheim et al. | |
| 2002/0187789 | A1 | 12/2002 | Diachina et al. | |
| 2002/0191559 | A1 | 12/2002 | Chen et al. | |
| 2003/0076812 | A1 | 4/2003 | Benedittis | |
| 2003/0103476 | A1 | 6/2003 | Choi et al. | |
| 2003/0149371 | A1 | 8/2003 | Shiga et al. | |
| 2003/0223393 | A1 | 12/2003 | Lee et al. | |
| 2003/0236085 | A1 | 12/2003 | Ho | |
| 2004/0008658 | A1 | 1/2004 | Dahlman et al. | |
| 2004/0014452 | A1 | 1/2004 | Lim | |
| 2004/0028078 | A1 | 2/2004 | Beckmann et al. | |
| 2004/0077357 | A1 | 4/2004 | Nakada | |
| 2004/0114606 | A1 | 6/2004 | Haddad | |
| 2004/0117860 | A1 | 6/2004 | Yi et al. | |
| 2004/0157602 | A1 | 8/2004 | Khawand | |
| 2004/0185860 | A1 | 9/2004 | Marjelund et al. | |
| 2004/0198369 | A1 | 10/2004 | Kwak | |
| 2004/0202140 | A1 | 10/2004 | Kim et al. | |
| 2004/0208160 | A1 | 10/2004 | Petrovic et al. | |
| 2005/0014508 | A1 | 1/2005 | Moulsley et al. | |
| 2005/0020260 | A1 | 1/2005 | Jeong et al. | |
| 2005/0025039 | A1 | 2/2005 | Hwang et al. | |
| 2005/0026623 | A1 | 2/2005 | Fisher | |
| 2005/0041573 | A1 | 2/2005 | Eom et al. | |
| 2005/0157696 | A1 | 7/2005 | Yamamoto | |
| 2005/0185608 | A1 | 8/2005 | Lee et al. | |
| 2005/0249141 | A1 | 11/2005 | Lee et al. | |
| 2005/0250500 | A1 | 11/2005 | Xu | |
| 2005/0260997 | A1 | 11/2005 | Korale et al. | |
| 2005/0271025 | A1 | 12/2005 | Guethaus et al. | |
| 2005/0281212 | A1 | 12/2005 | Jeong et al. | |
| 2005/0288026 | A1 | 12/2005 | Byun et al. | |
| 2006/0025079 | A1 | 2/2006 | Sutskover et al. | |
| 2007/0140115 | A1 | 6/2007 | Bienas et al. | |
| 2007/0147326 | A1 | 6/2007 | Chen | |
| 2007/0206531 | A1 | 9/2007 | Pajukoski et al. | |
| 2008/0095105 | A1 | 4/2008 | Sundberg et al. | |
| 2009/0175241 | A1 * | 7/2009 | Ohta et al. | 370/331 |
| 2010/0014430 | A1 | 1/2010 | Oka | |
| 2010/0034095 | A1 * | 2/2010 | Ho et al. | 370/241 |
| 2010/0105334 | A1 * | 4/2010 | Terry et al. | 455/67.11 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0617875 | | 12/1997 |
| EP | 1041850 | | 4/2000 |
| EP | 1009184 | | 6/2000 |
| EP | 1041850 | | 10/2000 |
| EP | 1261222 | | 11/2002 |
| EP | 1361514 | | 11/2003 |
| EP | 1392074 | | 2/2004 |
| EP | 1496639 | | 1/2005 |
| EP | 1557968 | | 7/2005 |
| EP | 1599063 | | 11/2005 |
| EP | 1599063 | A1 | 11/2005 |
| EP | 1605724 | | 12/2005 |
| EP | 1684538 | | 7/2006 |
| KR | 1020010081040 | A | 8/2001 |
| KR | 10-2001-0111637 | | 12/2001 |
| KR | 1020010111634 | | 12/2001 |
| KR | 1020010111637 | | 12/2001 |
| KR | 1020010111637 | A | 12/2001 |
| KR | 1020020003233 | A | 1/2002 |
| KR | 1020030008324 | A | 1/2003 |
| KR | 1020040048675 | | 6/2004 |
| KR | 1020040064867 | | 7/2004 |
| KR | 1020040089937 | | 10/2004 |
| RU | 2168278 | | 5/2001 |
| RU | 2191479 | | 10/2002 |
| RU | 2232469 | | 7/2004 |
| RU | 2232477 | | 7/2004 |
| RU | 2237380 | | 9/2004 |
| RU | 2270526 | | 2/2006 |
| TW | 407407 | | 10/2000 |
| TW | 552815 | | 9/2003 |
| TW | 586283 | | 5/2004 |
| TW | 589818 | | 6/2004 |
| TW | 590340 | | 6/2004 |
| TW | 592412 | | 6/2004 |
| TW | 200536318 | | 11/2005 |
| WO | 84/02021 | A1 | 5/1984 |
| WO | 99-44383 | | 9/1999 |
| WO | 99-63713 | | 12/1999 |
| WO | 99/63713 | A1 | 12/1999 |
| WO | 02-03720 | | 1/2002 |
| WO | 02-39760 | | 5/2002 |
| WO | 0239760 | A2 | 5/2002 |
| WO | 0247417 | A1 | 6/2002 |
| WO | 02/075442 | | 9/2002 |
| WO | 02-102110 | | 12/2002 |
| WO | 03007636 | A1 | 1/2003 |
| WO | 03-017691 | | 2/2003 |
| WO | 03017691 | A2 | 2/2003 |
| WO | 03-043259 | | 5/2003 |
| WO | 03/043259 | | 5/2003 |
| WO | 03043259 | A1 | 5/2003 |
| WO | 03056723 | A1 | 7/2003 |
| WO | 03-096571 | | 11/2003 |
| WO | 2004-034656 | | 4/2004 |
| WO | 2004034656 | A2 | 4/2004 |
| WO | 2004045234 | | 5/2004 |
| WO | 2004-075442 | | 9/2004 |
| WO | 2004-089030 | | 10/2004 |
| WO | 2004/089030 | | 10/2004 |
| WO | 2005-055472 | | 6/2005 |
| WO | 2005074312 | A1 | 8/2005 |
| WO | 2005088886 | A1 | 9/2005 |
| WO | 2005-099125 | | 10/2005 |
| WO | 2005-125125 | | 12/2005 |

OTHER PUBLICATIONS

Ericsson, "E-UTRA Random Access," TSG-RAN WG1 #43, R1-051445, Nov. 7, 2005.

Huawei: "Further Considerations on Multiplexing Method of Shared Control Channel in Uplink Single-Carrier FDMA", 3GPP TSG-RAN WG1, R1-051430 [online], Nov. 7, 2005 [retrieved on Jul. 24, 2008]. Retrieved from the Internet: http://www.3gpp.org/ftp/TSG_RAN/WG1_RL1/TSGR1_43/Docs/R1-051430.zip> pp. 1-6.

NTT Docomo et al.: :Multiplexing Method of Shared Control Channel in Uplink Single-Carrier FDMA Radio Access, 3GPP TSG-RAN WG1, R1-051143 [online], Oct. 10, 2005 [retrieved on Jul. 24, 2008]. Retrieved from the Internet: //www.3gpp.org/ftp/tsg_ran/wg1_rl1/TSGR1_42bis/Docs/R1-051143.zip> pp. 1-8.

Philips: "Evolved Paging Indicators for LTE", 3GPP TSG-RAN WG2, R2-052985 [online], Nov. 7, 2005 [retrieved on Aug. 25, 2008]. Retrieved from the Internet: //www.3gpp.org/FTP/tsg_ran/WG2_RL2/TSGR2_49/Documents/R2-052985.zip> pp. 1, 2.

Sarkar, S. et al. Common-Channel Soft Handoff in cdma2000—The Paging Channel. IEEE Transactions on Microwave Theory and Techniques. Jun. 2000, vol. 48, No. 6, pp. 938 to 950, XP011037998, ISSN 0018-9480. abstract, section IV.

NTT Docomo, et al.: "Paging Channel Structure for E-UTRA Downlink", 3GPP TSG-RAN WG1, R1-060034 [online], Jan. 23, 2006 [retrieved on Aug. 25, 2008]. Retrieved from the Internet: www.3gpp1.org/ftp/tsg_ran/WG1_RL1/TSGR1_AH/LTE_AH_January-06/Docs/R1-060034.zip> pp. 1-5.

Motorola: "Paging Channel Design for E-UTRA", 3GPP TSG-RAN WG1, R1-061712 [online], Jun. 27, 2006 [retrieved on Aug. 25, 2008]. Retrieved from the Internet: //www.3gpp1.org/ftp/tsg_ran/WG1_RL1/TSGR1_AH/LTE_AH_June-06/Docs/R1-061712.zip> pp. 1-3.

LG Electronics Inc.: "Framing in the MAC entity", 3GPP TSG-RAN WG2, R2-061012, Mar. 27-31, 2006.

LG Electronics Inc.: "HARQ and ARQ Operation", 3GPP TSG-RAN WG2, R2-060106, Jan. 9-13, 2006.

F.A. Zdarsky et al., "Handover in Mobile Communication Networks: Who is in Control Anyway?," Proceedings of the 30th EUROMICRO Conference, Aug. 2004, XP-10723593A.

LG Electronics Inc., "Framing in the MAC Entity," 3GPP TSG-RAN WG2 #52, R2-061012, Mar. 2006.

LG Electronics Inc., "HARQ and ARQ Operation," 3GPP TSG-RAN WG2 #50, R2-060106, Jan. 2006.

R.T. Derryberry et al., "On CDMA 2000 Evolution—Reverse High-Speed Data Physical Layer Enhancements in CDMA 2000 1xEV-DV," IEEE Communications Magazine, Apr. 2005, vol. 43, No. 4, pp. 41-47, XP-001228792.

J. Chung et al., "Packet Synchronization and Identification for Incremental Redundancy Transmission in FH-CDMA Systems," Third IEEE International Symposium on Personal, Indoor, and Mobile Radio Communications, Oct. 1992, pp. 292-295, XP-010107082.

H. Xu et al., "Performance Analysis on the Radio Link Control Protocol of UMTS System," IEEE Publication, Jul. 2001, pp. 2026-2030.

* cited by examiner

[Fig. 1]




[Fig. 2]




[Fig. 3]



[Fig. 4]


300
350
TRANSMITTER
Tx RLC
Tx HARQ
RECEIVER
Rx HARQ
Rx RLC
RLC PDU
S100
1st TX
S110
NACK
NACK
S120
S130
2nd TX
NACK
NACK
S140
Lth TX
S150
NACK
S170
TRANSMISSION FAILURE
NACK
S160
S190
RLC PDU (ARQ RETRANSMISSION)
S180

[Fig. 5]


400
450
TRANSMITTER
Tx RLC
Tx HARQ
RECEIVER
Rx HARQ
Rx RLC
RLC PDU
S200
1st TX
S210
NACK
NACK
S220
S230
2nd TX
NACK
NACK
S240
Lth TX
S250
ACK
S255
RLC PDU
S260
NACK
STATUS REPORT INFORMATION
S270
STATUS REPORT INFORMATION
S280
S275

[Fig. 6]


500
550
TRANSMITTER
RECEIVER
Tx RLC
Tx HARQ
Rx HARQ
Rx RLC
STATUS REQUEST INFORMATION
S310
S320
STATUS REPORT INFORMATION
STATUS REPORT INFORMATION
S330
S340

[Fig. 7]


600
650
TRANSMITTER
RECEIVER
Tx RLC
Tx HARQ
Rx HARQ
Rx RLC
STATUS REQUEST INFORMATION
STATUS REQUEST INFORMATION
S420
S430
S410
STATUS REPORT INFORMATION
STATUS REPORT INFORMATION
S440
S450

[Fig. 8]



700
750
TRANSMITTER
RECEIVER
Tx RLC
Tx HARQ
Rx HARQ
Rx RLC
RLC PDU
S500
1st TX
S510
NACK
NACK
S520
2nd TX
S530
NACK
NACK
S540
Lth TX
S550
S555
NACK
S560
STATUS
REPORT
INFORMATION
ACK
STATUS
REPORT
INFORMATION
S570
S575
S580

[Fig. 9]


850
RECEIVER
Rx RRC
Rx RLC
Rx HARQ
S600
S610
800
TRANSMITTER
Tx HARQ
Tx RLC
Tx RRC
1st TX
Nth TX
. . .
TRANSMISSION FAILURE
S630

[Fig. 10]


TRANSMITTER
RLC SDU0
RLC SDU1
RLC SDU2
RLC SDU3
RLC PDU0
RLC PDU1
RLC PDU2
RLC PDU3
RLC PDU4
o
o
×
o
o
PDU2 missing
RECEIVER
RLC PDU0
RLC PDU1
RLC PDU3
RLC PDU4
RLC SDU0
RLC SDU3

[Fig. 11]



[Fig. 12]


JT : HARQ Jitter Timer
Rx RLC
Rx MAC
TIME
ARQ
HARQ
PDU1
PDU3
PDU4
PDU2
PDU5
PDU7
PDU8
JT
JT
1
2
3
4

[Fig. 13]


:Successful RX
:UnSuccessful RX
:Status Report
TIME
TRANSMITTER
SDU1
SDU2
PDU1
PDU2
PDU3
PDU4
PDU5
PDU2
DT
DT
JT
PT
PT
RT
1
2
3
4
5
6
7
8
9
PDU1
PDU3
PDU4
PDU5
SDU2
RECEIVER

# DATA TRANSMISSION METHOD AND DATA RE-TRANSMISSION METHOD

This application is a national stage application of PCT/KR2007/000022, filed on Jan. 3, 2007, which claims the benefit and right of priority to U.S. Provisional Application No. 60/757,063, filed on Jan. 5, 2006, U.S. Provisional Application No. 60/784,976, filed on Mar. 22, 2006, U.S. Provisional Application No. 60/797,402, filed on May 2, 2006, U.S. Provisional Application No. 60/815,722, filed on Jun. 21, 2006 and Korean Application No. 10-2006-0132469, filed on Dec. 22, 2006, the contents of which are hereby incorporated by reference herein in their entirety.

## TECHNICAL FIELD

The present invention relates to wireless communication, and more particularly, to a data transmission method and a data retransmission method which can reduce loss in data transmission.

## BACKGROUND ART

A 3GPP (3-rd Generation Partnership Project) mobile communication system based on a WCDMA (Wideband Code Division Multiple Access) radio access technology has been widely spread all over the world. An HSDPA (High Speed Downlink Packet Access) which can be defined as a first evolution step of the WCDMA provides a radio access technology having a high competitive power in a mid-term future for the 3GPP. However, since requirements and expectations of users and providers have increased more and more and competitive development of the radio access technology has been made more and more, a new technological evolution of the 3GPP is required to enhance a high competitive power in the future.

The 3GPP entered into a project called "Evolved UTRA and UTRAN" from the end of 2004 for the purpose of development of a radio transmission technology which can provide a high-quality service and reduce cost. The project of 3G long term evolution (hereinafter, referred to as LTE) aims at expansion of a coverage, improvement of system capacity, decrease in cost of users and providers and improvement in service quality. The 3G LTE defines as high-level requirements decrease in cost per bit, enhancement in service availability, flexible utilization of frequency bands, open interface with a simple structure and appropriate power consumption of by user equipments.

In any communication system, data can be lost in a physical channel. With the development of technologies, the probability that data are not transmitted well from a transmitter to a receiver in the physical channel is lowered, but does not disappear completely. Particularly, in case of user equipments spaced apart from a base station, the data loss rate is high. Important signaling data or control signals need be subjected to more special management for the purpose of reliability of the communication systems.

One of techniques used to reduce the loss of data is an ARQ (Automatic Repeat Request) method. Generally, the ARQ method is performed by a high-level layer. Lower-level layers perform HARQ (Hybrid ARQ), thereby reducing the loss of data. The HARQ uses a FEC (Forward Error Correction) and the ARQ together to correct an error of data by the use of the FEC and to retransmit the data by the use of the ARQ.

When a receiver fails to receive data at the time of retransmission, the reception failure should be rapidly reported to a transmitter. This is because it is possible to reduce the time for



correction of an error and the time for solving an obstacle to data transmission by allowing the transmitter to rapidly recognize the data reception failure. As the transmitter recognizes more rapidly the reception failure, the time for retransmission is more reduced.

## DISCLOSURE OF INVENTION

### Technical Problem

There is a need for technologies for enhancing reliability of transmission by efficiently using the ARQ of the high-level layer and the HARQ of the low-level layer.

### Technical Solution

An advantage of some aspects of the invention is to provide a data transmission method and a data retransmission method which can retransmit data, which are not received by a receiver, while efficiently using radio resources.

In an aspect of the invention, a data block is prepared in a high-level layer and the data block is transmitted in a low-level layer. Status report information associated with reception or non-reception of the data block is received through the low-level layer.

In another aspect of the invention, a RLC (Radio Link Control) PDU (Protocol Data Unit) is prepared in a RLC layer and the RLC PDU is transmitted using a HARQ (Hybrid Automatic Repeat Request) in a physical layer. Status report information associated with reception or non-reception of the RLC PDU is received. Whether the RLC PDU should be retransmitted is determined on the basis of the status report information.

In still another aspect of the invention, a data block is retransmitted a data block through an HARQ by a preset number of times in a physical layer. A reception of a NACK (Not ACKnowledgement) signal is reported to a RLC layer when receiving the NACK signal by the maximum allowable number of times. Whether the data block should be retransmitted is determined.

## ADVANTAGEOUS EFFECTS

When a receiver does not receive data transmitted from a transmitter, the transmitter can rapidly confirm the reception failure and retransmit the data. By transmitting status report information from the receiver to the transmitter through a physical layer, it is possible to relatively rapidly retransmit data. By providing operations of RLC entities for allowing data to arrive at the receiver without any error, it is possible to more rapidly transmit data and to enhance the QoS (Quality of Service).

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram illustrating a wireless communication system.

FIG. **2** is a block diagram illustrating a control plane of a radio interface protocol.

FIG. **3** is a block diagram illustrating a user plane of the radio interface protocol.

FIG. **4** is a flowchart illustrating a data transmission method according to an exemplary embodiment of the invention.

FIG. **5** is a flowchart illustrating a data transmission method according to another exemplary embodiment of the invention.

FIG. **6** is a flowchart illustrating an example of transmission and reception of status report information.

FIG. **7** is a flowchart illustrating another example of transmission and reception of status report information.

FIG. **8** is a flowchart illustrating a data transmission method according to another exemplary embodiment of the invention.

FIG. **9** is a flowchart illustrating a data transmission method according to another exemplary embodiment of the invention.

FIG. **10** is a block diagram illustrating a data transmission method according to another exemplary embodiment of the invention.

FIG. **11** is a block diagram illustrating a handover according to an exemplary embodiment of the invention.

FIG. **12** is a diagram illustrating an example of a data transmission method according to an exemplary embodiment of the invention.

FIG. **13** is a diagram illustrating an example of a data transmission method according to an exemplary embodiment of the invention.

## MODE FOR THE INVENTION

Hereinafter, exemplary embodiments of the invention will be described in detail with reference to the attached drawings.

FIG. **1** is a block diagram illustrating a wireless communication system. The wireless communication system may have a network structure of an E-UMTS (Evolved-Universal Mobile Telecommunications System). The E-UMTS may be a long term evolution (LTE) system. The wireless communication system is widely disposed to provide a variety of communication services of voices, packet data and the like.

Referring to FIG. **1**, the E-UMTS network can be roughly classified into an E-UTRAN (Evolved-UMTS Terrestrial Radio Access Network) and a CN (Core Network). The E-UTRAN includes eNode-B **20** and an AG (access gateway) **30** which is located at the end of the network and connected to an external network.

A UE (User Equipment) **10** may be fixed or movable and can be called various terminologies such as a mobile station (MS), a user terminal (UT), a subscriber station (SS) and a wireless device.

The eNode-B **20** generally means a fixed station communicating with the UE **10** and can be called various terminologies such as a base station (BS), a base transceiver system (BTS) and an access point (AP). One or more cells may exist in one eNode-B **20**. An interface for transmitting a user traffic or a control traffic may be used between the eNode-Bs **20**.

The AG **30** is also called MME/UPE (Mobility Management Entity/User Plane Entity). The AG **30** may be divided into a portion for processing a user traffic and a portion for processing a control traffic. The AG for processing the user traffic and the AG for processing the control traffic can communicate with each other by the use of a new interface.

The CN may include the AG **30** and a node for registering for other UEs **10**. An interface for distinguishing the E-UTRAN and the CN from each other may be used.

Layers of a radio interface protocol between the UE and the network can be classified into an L1 layer (first layer), an L2 layer (second layer), and an L3 layer (third layer) on the basis of three low-level layers of an open system interconnection (OSI) model widely known in the communication systems. A physical layer belonging to the first layer provides an information transfer service using a physical channel and a RRC (Radio Resource Control) layer located in the third layer serves to control radio resources between the UE and the network. The RRC layer interchanges an RRC message between the UE and the network. The RRC layer can be distributed into the eNode-B and network nodes such as the AG or can be located locally in the eNode-B or the AG.



The radio interface protocol horizontally includes a physical layer, a data link layer, and a network layer. The radio interface protocol vertically includes a user plane for transmitting data and information and a control plane for transmitting a control signal.

FIG. **2** is a block diagram illustrating a control plane of the radio interface protocol. FIG. **3** is a block diagram illustrating a user plane of the radio interface protocol. FIGS. **2** and **3** illustrate a structure of the radio interface protocol between the UE and the E-UTRAN based on a 3GPP radio network standard.

Referring to FIGS. **2** and **3**, the physical layer as the first layer provides an information transfer service to a high-level layer by the use of a physical channel. The physical layer is connected to a MAC (Medium Access Control) layer as a higher-level layer through a transport channel. Data are transmitted between the MAC layer and the physical layer through the transport channel. Data are transmitted between different physical layers, that is, between a transmission-side physical layer and a reception-side physical layer, through a physical channel.

The MAC layer of the second layer provides a service to a RLC (Radio Link Control) layer as a higher-level layer through a logical channel. The RLC layer of the second layer supports the data transmission with reliability. The function of the RLC layer may be embodied by a functional block in the MAC layer and in this case, the RLC layer may not exist.

A PDCP (Packet Data Convergence Protocol) layer of the second layer performs a head compression function of reducing a head size of an IP packet containing unnecessary control information with a relatively large size in order to efficiently transmit packets in a radio interval having a small bandwidth at the time of transmitting an IP (Internet Protocol) packet such as IPv4 or IPv6.

The RRC layer located at the lowermost of the third layer is defined in only the control plane. The RRC layer controls the logical channel, the transport channel, and the physical channel associated with the configuration, re-configuration and release of the radio bearers (RB). The RB means a service provided from the second layer so as to transmit data between the UE and the E-UTRAN.

A downlink transport channel for transmitting data from the network to the UE can include a broadcast channel (BCH) for transmitting system information and a downlink shared channel (SCH) for transmitting a user traffic or a control message. The traffic or the control message of the downlink multicast or the broadcast service may be transmitted through the downlink SCH or through a particular downlink MCH (Multicast Channel). An uplink transport channel for transmitting data from the UE to the network can include a random access channel (RACH) for transmitting an initial control message and an uplink SCH (Shared Channel) for transmitting a user traffic or a control message.

The RLC layer has basic functions of guarantee of QoS (Quality of Service) of the RBs and transmission of data. Since the RB service is a service which is provided to a higher-level layer from the second layer in the radio protocol, the entire second layer affects the QoS and the affection of the RLC layer is the largest. The RLC layer has independent RLC entity for each RB so as to guarantee the QoS specific to the RB and three RLC modes of a unacknowledged mode (UM), an acknowledged mode (AM) and a transparent mode (TM) so as to support a variety of QoS. Two modes, that is, the UM

not including an acknowledgement to transmitted data and the AM including the acknowledgement, will be described below.

The UM RLC layer adds a PDU (Protocol Data Unit) header having a sequence number to each PDU and thus informs a receiver of a lost PDU. For this reason, in the user plane, the UM RLC layer takes charge of transmission of broadcast/multicast data or transmission of real-time packet data such as voices (for example, VoIP) or streaming of a packet service domain. In the control plane, the UM RLC layer takes charge of transmission of an RRC message not requiring the acknowledgement among the RRC messages transmitted to a specific UE or a specific UE group in a cell.

Similarly to the UM RLC layer, the AM RLC layer adds a PDU header having a sequence number at the time of constituting a PDU, but a receiver transmits the acknowledgement to the PDU transmitted from a transmitter unlike the UM RLC layer. This is designed to allow the receiver to request the transmitter for retransmission of the PDU which is not received by the receiver. The AM RLC layer guarantees error-free data transmission through retransmission and thus the AM RLC takes charge of transmission of non-real-time packet data such as TCP/IP of the packet service domain mainly in the user plane and can take charge of transmission of RRC message requiring the acknowledgement.

In view of directionality, the UM RLC layer is used in a uni-directional communication but the AM RLC is used in a bi-directional communication due to a feedback from the receiver. Since the bi-directional communication is mainly used for a point-to-point communication, the AM RLC layer uses only a specific logical channel. In view of a structure, one RLC entity of the UM RLC layer has only one of transmission and reception, but one RLC entity of the AM RLC layer includes both of transmission and reception.

The complexity of the AM RLC results from the ARQ function. The AM RLC layer has a retransmission buffer in addition to a transmission/reception buffer so as to manage the ARQ, and performs a variety of functions of utilization of a transmission/reception window for a flow control, polling of allowing a transmitter to request a receiver of a peer RLC entity of status information, status report of allowing the receiver to report its buffer status to the transmitter of the peer RLC entity and piggyback of inserting the status PDU into the data PDU so as to enhance the efficiency of data transmission. In addition, the functions of the AM RLC layer include a reset PUD requesting the opposite AM RLC entity to reset all the operations and parameters when the AM RLC entity finds out an fatal error in the course of operation and a reset ACK PDU used in acknowledgement of the reset PDU. In order to support the functions, the AM RLC requires a variety of protocol parameters, status variables and timers. The PDUs used for report of the status information or control of the data transmission by the AM RLC layer, such as the status PDU and the reset PDU are called control PDUs. The PDUs used for transmission of user data are called data PDUs.

Radio resources in one cell include uplink radio resources and downlink radio resources. The eNode-B takes charge of assignment and control of the uplink radio resources and the downlink radio resources. The eNode-B determines when a UE uses a radio resource, what a UE uses a radio resource and what radio resource a UE uses. For example, the eNode-B may determine that frequencies of 100 MHz to 101 MHz are assigned to the UE for 0.2 seconds in 3.2 seconds for the downlink data transmission. Then, the base station informs the corresponding UE of the de-termination details so as to allow the corresponding UE to receive the downlink data. Similarly, the eNode-B determines when a UE uses a radio resource, what a UE uses a radio resource and what radio resource a UE uses so as to transmit uplink data. The eNode-B transmits such information to the corresponding UE. In this way, the eNode-B can dynamically manage the radio resources.

A conventional UE continuously used one radio resource during a call connection. This is irrational in consideration of the fact that many recent services are based on IP packets. Most packet services do not continuously create packets during the call connection, but there are many intervals where no data is transmitted. It is not efficient that a radio resource is continuously assigned to a UE. A method of assigning a radio resource to a UE only when service data exist can be used to solve the above-mentioned problem.

The RLC entity constitutes a RLC PDU in accordance with the size of the radio resource determined by the MAC. The RLC entity located in the eNode-B constructs data with the size determined by the MAC entity and sends the RLC PDU to the MAC entity. The RLC entity located in the UE constructs the RLC PDU in accordance with the size of a radio resource determined by a lower-level layer, that is, the MAC entity. The RLC entity located in the UE constructs data with the size determined by the MAC entity and sends the RLC PDU to the MAC entity.

The MAC entity located in the UE receives information on the total amount of radio resources from the eNode-B. The MAC entity receives information indicating what amount of radio resources the MAC entity can use at the next transmission time from the eNode-B. On the contrary, the MAC entity located in the eNode-B determines utilization of all of the uplink radio resources and the downlink radio resources. The MAC entity of the eNode-B determines what amount of radio resources should be assigned to the UE at the next transmission interval and sends the determination result to the MAC entities of the UEs. The UEs determine what amount of data should be transmitted through the logical channels or by the RLC entities in consideration of data stored in their buffers and priorities thereof. Each RLC entity determines the size of the RLC PDU to be transmitted to the MAC entity. Similarly, the MAC entity located in the eNode-B determines what amount of data should be assigned to the respective RLC entities in consideration of the amount of downlink data of the respective UEs and the priorities of the data and sends the determination result to the respective RLC entities. The respective RLC entities construct a RLC PDU in accordance with the determination result and transmit the constructed RLC PDU to the MAC entity.

The PDU is a basic data unit used for data communication between layers. The PDU is a data which is transmitted from a corresponding layer to a different layer. A RLC PDU, a MAC PDU and the like are examples of the data used by the layers. An SDU (Service Data Unit) is a data unit from a different layer to the corresponding layer.

FIG. **4** is a flowchart illustrating a data transmission method according to an exemplary embodiment of the invention. Tx RLC denotes a RLC entity in a transmitter **30** and Tx HARQ denotes a lower-level layer of the RLC layer for performing the HARQ in the transmitter **300**. Rx RLC denotes a RLC entity in a receiver **350** and Rx HARQ denotes a lower-level layer of the RLC layer for performing the HARQ in the receiver **350**. The HARQ is mainly performed in the physical layers. The HARQ operation may be performed using the MAC PDU and the ARQ operation is at a level higher than the HARQ operation.

Referring to FIG. **4**, the RLC PDU is transmitted to the Tx HARQ from the Tx RLC (S**100**). The RLC PDU is transmitted to the MAC layer and can be converted into one or more

MAC PDUs containing header information. The MAC PDU serves as a data block to be transmitted from the physical layer through the HARQ. The Tx HARQ transmits a data block to the Rx HARQ (S**110**). When no error is detected from the received data block, the Rx HARQ transmits an ACK (Acknowledgement) signal to the Tx HARQ and sends the data block to the Rx RLC as a higher-level layer. For clarity, it is assumed that an error is detected from the data block received by the Rx HARQ.

When an error is detected from the data block, the Rx HARQ transmits an NACK (Not Acknowledgement) signal to the Tx HARQ (S**120**). The NACK signal serves as a retransmission request signal in the HARQ. The Tx HARQ transmits a retransmission data block to the Rx HARQ (S**130**). The retransmission data block may be equal to or different from the data block before the retransmission, depending on the HARQ method. When no error is detected in the second transmission, the Rx HARQ transmits the ACK signal to the Tx HARQ and sends the data block to the Rx RLC as a higher-level layer. Here, it is assumed that an error is detected in the second transmission and the Rx HARQ transmits the NACK signal to the Tx HARQ (S**140**).

In this way, the transmission may be repeated L times (S**150**). L denotes the maximum allowable number of iteration. When an error is detected in the L-th transmission, the Rx HARQ transmits the NACK signal to the Tx HARQ (S**160**).

When receiving the N-th NACK signal, the Tx HARQ reports transmission failure to the Tx RLC (S**170**). The Tx RLC to which the transmission failure is reported sends the RLC PDU to the Tx HARQ again and starts the retransmission (S**180**).

The Tx RLC sends the RLC PUD to the Tx HARQ (S**180**). The Tx HARQ retransmits the data block to the Rx HARQ (S**190**).

When the transmitter **300** transmits a MAC PDU by the allowable number of iteration and receives the NACK signal from the receiver **350** as many, the information is reported directly to the Tx RLC, not through the Rx RLC. Since the information does not pass through the RLC entity of the receiver **350**, it is possible to check the necessity of retransmission more quickly. When the transmitter **300** starts directly new HARQ transmission in response to the NACK signal transmitted from the receiver **350**, the receiver **350** can more rapidly recognize a reception error.

On the other hand, the transmitter **300** retransmits a specific RLC PDU several times (N times) but may receive a response indicating that the specific RLC PDU is not received by the receiver **350**. When the RLC PDU is transmitted N times, the transmission is not performed any more and other data is transmitted. When the Tx RLC has transmitted the RLC PDU N times and received a negative response in response thereto, the Tx RLC can inform to the receiver **350** that the data is not transmitted any more, without retransmitting the data. If the receiver **350** does not know that the transmission of data has been abandoned, the request for retransmitting the data may be transmitted to the transmitter **300**.

When a certain condition occurs and the transmitter **300** does not transmit a specific data block any more, the transmitter **300** may inform the receiver **350** of the fact. At this time, the transmitter **300** can inform the receiver **350** of the fact by the use of a header of a data block or a control data block. The data block may be a RLC PDU or a MAC PDU. The Rx LRC stops the waiting for the data block when receiving information indicating that a data block is not transmitted from the transmitter **300**. At this time, the receiver **350** can operate as if it received the data block. Alternatively, the receiver **350** may operate as if the data block was deleted. The receiver **350** may advance an window or reconstruct data regardless of the existence of the data block.

FIG. **5** is a flowchart illustrating a data transmission method according to another exemplary embodiment of the invention.

Referring to FIG. **5**, the RLC PDU is sent from the Tx RLC to the Tx HARQ (S**200**). The Tx HARQ transmits a data block to the Rx HARQ (S**210**). When an error is detected from the data block, the Rx HARQ transmits a NACK signal to the Tx HARQ (S**220**). The Tx HARQ transmits a retransmission data block to the Rx HARQ (S**230**). An error is detected in the second transmission and the Rx HARQ transmits the NACK signal to the Tx HARQ (S**240**). In this way, the transmission of the data block can be repeated the maximum allowable number of times L (S**250**).

An error is not detected in the final transmission and the data block is sent to the Rx RLC (S**255**). The Rx HARQ transmits the ACK signal to the Tx HARQ (S**260**). In step S**260**, the Tx HARQ may recognize the ACK signal as the NACK signal due to an influence of a physical channel. If the Tx RLC to which the failure is reported retransmits the RLC PDU, it may waste the radio resources.

In order to prevent the waste of radio resources, the Rx RLC constructs status report information and sends the status report information to the Rx HARQ (S**270**). The Rx HARQ sends the status report information to the Tx HARQ (S**275**). The status report information is information which is transmitted from the receiver **450** to the transmitter **400** and includes information on a data block received by the receiver **450** and a data block not received by the receiver **450**. The status report information may be constructed by the RLC layer or by the MAC layer. The receiver **450** can allow only the information on the data block not received by the receiver **450** to be included in the status report information. Since the data loss in the physical layer is very small by using the HARQ, it may not be efficient that the receiver **450** transmits all the information on the data block received by the receiver **450** and the data block not received by the receiver **450**. Additionally, when the receiver **450** should also transmit information on the data block successfully received by the receiver **450** in response to a request from the transmitter **400**, the receiver **450** can transmit the data block having the largest sequence number among the data blocks sequentially received.

The status report information is reported to the Tx RLC (S**280**). The Tx RLC checks the status report information and then transmits the corresponding RLC PDU. It is important to the ARQ method that when the receiver **450** does not receive the data transmitted from the transmitter **400**, the transmitter **400** accurately and rapidly recognizes the failure. The Tx RLC can accurately and rapidly recognize whether the data should be retransmitted, from the status report information transmitted through the physical layer.

The transmitter **400** should transmit an appropriate data block after receiving the status report information from the receiver **450**. The Tx RLC does not transmits the RLC SDU sent from the higher-level entity as it is, but reconstructs the RLC PDU with the size required by the lower-level entity and sends the reconstructed RLC PDU to the lower-level entity. For example, the RLC SDU with the size of 1000 bytes can be divided into several RLC PDUs. The receiver **450** may not receive a part of the RLC PDUs of the RLC SDU. For example, the receiver **450** may not receive 100 bytes among 1000 bytes. In this case, it causes the waste of radio resources that the transmitter **400** retransmits the entire RLC SDU. The

receiver **450** sends information on the RLC PDUs not received by the receiver **450** to the transmitter **400** and the transmitter **400** then transmits the corresponding RLC PDUs. When the radio resources are not sufficient, the transmitter **400** can transmit RLC sub-PDU into which the RLC PDU is divided.

The status report information is transmitted and received using the physical layer so as to allow the transmitter **400** and the receiver **450** to rapidly exchange the ARQ information. The status report information can be transmitted using a channel defined by the physical layer, not by the level of the RLC PDU or the MAC PDU. When receiving the status report information, the physical layer sends the received status report information to a higher-level RLC entity. When it is necessary to transmit status report information, the RLC entity sends the status report information directly to the physical layer and the physical layer can send the status report information using a physical channel other than the channel through which data are transmitted.

The status report information can be transmitted through a channel through which scheduling information indicating the assignment of physical resources in the physical layer is transmitted. The status report information may be information on a data block received or not received by the RLC entity of the receiver. Alternatively, the status report information may be information on a data block not to be transmitted by the RLC entity of the transmitter or information on a data block abandoned by the transmitter. When it is informed that a specific data block is not transmitted from the transmitter any more, the RLC of the receiver **450** can stop the waiting of the RLC PDU and process the data blocks stored in its buffer.

The receiver **450** can add the status report information to a head portion of a data block. The data block may be a RLC PDU or a MAC PDU. The status report information may be information on the data blocks not received by the receiver **450**. The receiver **450** may not allow the status report information to include information on the data blocks received by the receiver.

When the RLC entity or the logical channel is particularly mapped with the HARQ process in order to reduce the overhead of the data blocks in the high-level layers, several fields can be omitted. For example, when RB 1 is mapped with HARQ process 1 in one to one, a TSN or a logical channel identifier can be omitted from the data block transmitted to HARQ 1.

The receiver uses the physical layer to more rapidly and effectively send the status report information. When a data block not received by the receiver exists in the time interval received by the receiver, the receiver may inform the transmitter of the fact by using a signaling through the physical channel. For example, when the receiver transmits signals to the receiver through a physical control channel every time interval, the receiver can inform the transmitter whether the receiver receives the data transmitted from the transmitter in the previous time interval through the physical channel. When the receiver informs the transmitter that the receiver does not receive the data block in the previous time interval through the physical channel, the transmitter can perform the retransmission of the data block. At this time, the information transmitted from the receiver to the transmitter indicates in what time interval the receiver fails to receive the data block. When the receiver fails to receive the data block transmitted from the transmitter, the receiver may inform the transmitter of the information on the time interval when the reception failure occurs.

In an exemplary embodiment, the information on the time interval transmitted from the receiver to the transmitter can include information on the reception success and failure of the receiver for all the transmission from the transmitter in the time interval, which is set in a constant size by the receiver, or occurrence time information thereof. In another exemplary embodiment, the information on the time interval transmitted from the receiver to the transmitter can include information on the reception failure of the receiver for all the transmission from the transmitter in the time interval, which is set in a constant size by the receiver, or occurrence time information thereof. In still another exemplary embodiment, the information on the time interval transmitted from the receiver to the transmitter can include information on the reception success and failure of the receiver for the transmission from the transmitter or occurrence time information thereof. In still another exemplary embodiment, the information on the time interval transmitted from the receiver to the transmitter can include information on the reception failure of the receiver for the transmission from the transmitter or occurrence time information thereof.

When the transmitter receives the information on the reception failure or the time information thereof, the transmitter can make an appointment of retransmission of the corresponding data regardless of the reception of the status report information from the receiver. The transmission of the information on the reception failure or the time information thereof can be performed by a physical layer or a MAC entity. A physical layer or a MAC layer of the transmitter having received the information on the reception failure or the time information thereof transmitted from the receiver may inform the RLC layer of the information. The RLC entity of the transmitter having received the information on the reception failure or the time information thereof transmitted from the receiver may retransmit the corresponding RLC PDU or RLC SDU and reconstruct the RLC PDU as needed.

FIG. **6** is a flowchart illustrating an example of transmission and reception of the status report information. The status report information can be transmitted to the transmitter in a state where it is arbitrarily or previously set by the receiver. Alternatively, in order to more rapidly check the status report information, the transmitter may request for the transmission of the status report information through status request information.

Referring to FIG. **6**, the Tx HARQ transmits status request information to the Rx HARQ (S**310**). The status request information request the receiver for transmitting the status report information. The status request information allows the transmitter **500** and the receiver **550** to more rapidly exchange the status report information. The status request information is information indicating that the receiver **550** should rapidly construct and transmit the status report information. When receiving the status request information, the Rx HARQ informs the Rx RLC of the fact (S**320**). The Rx RLC constructs and sends the status report information to the Rx HARQ (S**330**). The Rx HARQ transmits the status report information (S**340**).

When a predetermined condition is satisfied, the physical layer of the transmitter **500** can transmit the status request information through a physical channel different from the physical channel through which data are transmitted. For example, when the physical layer performs the retransmission the same number of times as the maximum number of times of HARQ retransmission set in the data block transmitted by the physical layer, the physical layer can set and transmits the status request information.

The status report information or the status request information can be transmitted through a control information

transport channel which is used in the physical layer to transmit the scheduling information.

FIG. **7** is a flowchart illustrating another example of transmission and reception of the status report information.

Referring to FIG. **7**, the Tx RLC requests for the status request information (S**410**). The status request information may be requested by a higher-level layer as well as the physical layer. When the buffer of the RLC entity is empty, for example, when the final RLC PDU has been transmitted, the RLC entity can request for the status request information so as to receive the status report information from the receiver **650**. The Tx HARQ transmits the status request information to the Rx HARQ (S**420**). When receiving the status request information, the Rx HARQ informs the Rx RLC of the fact (S**430**). The Rx RLC constructs and sends the status report information to the Rx HARQ (S**440**). The Rx HARQ transmits the status report information (S**450**).

FIG. **8** is a flowchart illustrating a data transmission method according to another exemplary embodiment of the invention.

Referring to FIG. **8**, the RLC PDU is sent from the Tx RLC to the Tx HARQ (S**500**). The Tx HARQ transmits a data block to the Rx HARQ (S**510**). When an error is detected from the data block, the Rx HARQ transmits an NACK signal to the Tx HARQ (S**520**). The Tx HARQ transmits the retransmission data block to the Rx HARQ (S**530**). An error is detected in the second transmission and the Rx HARQ transmits the NACK signal to the Tx HARQ (S**540**). In this way, the transmission can be repeated by L times which is the maximum allowable number of times (S**550**).

When an error is detected in the final transmission, the Rx RLC is requested for constructing the status report information (S**555**). The Rx RLC constructs and sends the status report information to the Rx HARQ (S**570**). When an error is detected and the Rx HARQ transmits the NACK signal, the Tx HARQ may recognize the NACK signal as the ACK signal (S**560**). The Rx HARQ transmits the status report information to the Tx HARQ (S**575**). The status report information is reported to the Tx RLC (S**580**). Accordingly, even when an error occurs from the ACK/NACK signal, the RLC can accurately judge whether the retransmission should be performed on the basis of the status report information.

Independently of the status report information, the physical layer can transmit particular information to more effectively transmit the ACK/NACK signals between the HARQ. When the transmitter performs the final HARQ process of a specific data block, the transmitter can transmit particular information indicating that the final HARQ of the specific data block is being transmitted, through the physical layer.

FIG. **9** is a flowchart illustrating a data transmission method according to another exemplary embodiment of the invention. It relates to a method of allowing the RLC entity to cope with an emergency.

Referring to FIG. **9**, the Tx RLC transmits a RLC PDU to the receiver **850** (S**600**). When the first transmission fails, the Tx RLC performs the retransmission. The retransmission can be repeated by N times which is the maximum allowable number of times (S**610**). When the N-th transmission fails, the Tx RLC informs the Rx RRC of the failure (S**630**).

When the case where the transmitter **800** transmits a specific data block but does not receive an acknowledgement from the receiver **850** is repeated a predetermined number of times or more, the RLC layer may inform a higher-level layer of resetting a communication condition. When the RRC is informed by the RLC that it transmits a data block a predetermined number of times or more but does not receive an acknowledgement from the opposite party, the RRC solve this problem by using the RRC signaling of the higher-level layer. The RRC signaling means that the transmitter and the receiver transmit an RRC message to each other. In this case, the RRC can reset the RLC.

When transmitting the specific data block several times but not receiving an acknowledgement from the receiver **850**, the Tx RLC may stop the transmission of the data block. Tx RLC may inform the Tx RRC as a higher-level layer of this fact, and waits for an instruction therefrom. Alternatively, when recognizing an abnormal operation in the transmission of the specific data block, the Tx RLC may not process such a situation, but inform the RRC as a higher-level layer of the situation and comply with an instruction therefrom.

FIG. **10** is a block diagram illustrating a data transmission method according to another exemplary embodiment of the invention.

Referring to FIG. **10**, the transmitter sequentially transmits RLC PDU0, RLC PDU1, RLC PDU2, RLC PDU3, and RLC PDU4 and the receiver receives successfully RLC PDU0 and RLC PDU1 but fails to receive RLC PDU2. Since failing to receive RLC PDU2, the receiver loads the information on RLC PDU2 to the status report information.

RLC PDU2 includes a part of RLC SDU1 and a part of RLC SDU2. When the receiver transmits the status report information based on the information of the SDU, the receiver should transmit at least two information pieces, that is, information pieces on RLC SDU0 and RLC SDU1. On the contrary, when the receiver transmits the status report information based on the information of the PDU, the receiver can transmit only one information piece, that is, the information on the RLC PDU2. Accordingly, by transmitting the status report information based on the information of the PDU, it is possible to reduce the amount of data to be transmitted.

The PDU can be expressed in various ways. For example, the PDU can be expressed as what portion of the SDU is addressed by the data included in the PDU or as sequence number assigned to each PDU. In order to allow the transmitter and the receiver to easily manage the PDUs, the status report information can be managed based on the sequence numbers.

FIG. **11** is a block diagram illustrating a handover.

Referring to FIG. **11**, a source eNode-B **910** denotes an current eNode-B and a target eNode-B **920** denotes a new base station after the handover. When the source eNode-B **910** and the target eNode-B **920** have different information associated with the status report information of a UE **900** or the target eNode-B **920** does not have the latest status report information, unnecessary transmission may cause. The transmission of new data may be delayed due to the unnecessary transmission, thereby deteriorating the QoS. When a handover occurs, the UE **900** retransmits the SDUs, for which no acknowledgement is received from the source eNode-B to the target eNode-B **920**.

The UE **900** can reconstruct the RLC SDU into the RLC PDU and transmit the re-constructed RLC PDU to the target eNode-B **920**. Alternatively, the source eNode-B **910** can transmit the latest status report information to the target eNode-B **920** and the target eNode-B **920** can transmit the latest status report information to the UE **900**.

The SDU which is transmitted from the eNode-B to the AG in the course of the handover can be classified into two kinds, that is, SDU which the source eNode-B **910** transmits to the AG **930** and SDU which the target eNode-B **920** transmits to the AG **930**. When the handover does not occur, the eNode-B rearranges the SDU received from the UE, but when the handover occurs, both eNode-Bs transmit the SDU to the AG **930** and thus any eNode-B cannot rearrange the SDU. The AG

**930** should check all the SDUs transmitted from the source eNode-B **910** and the target eNode-B **920** and rearrange the SDUs. Right after the handover, the target eNode-B **920** transmits the SDU to the AG **930** every when restoring the SDUs, for a predetermined time, that is, until the handover is completed.

The target eNode-B **920** can transmit to the AG **930** the RLC SDUs received successfully itself by the use of the time information of the handover. The time information of the handover can be received from the source eNode-B **910**.

The target eNode-B **920** can transmit the RLC SDU successfully received from the UE **900** to the AG **930** at once for a predetermined time after the handover is made. The time information can be used to determine how long the target eNode-B **920** transmits the RLC SDU successfully received to the AG **930**. The time information may be valid from the time point when the instruction for the handover is received from the source eNode-B **910**. Alternatively, the time information may be valid from the time point when the target eNode-B **920** receives a message associated with the handover from the UE **900**.

For a predetermined time from the time point when the UE **900** accesses the target eNode-B **920**, the target eNode-B **920** may not rearrange but transmit the RLC SDU successfully received from the UE **900** to the AG **930** at once. The target eNode-B **920** may receive the time information from the source eNode-B **910** and not rearrange but transmit the RLC SDU successfully received from the UE **900** to the AG **930** at once until the time point instructed by the time information. After the predetermined time, the target eNode-B **920** may rearrange and transmit the successfully received RLC SDU to the AG **930**.

When receiving the RLC SDU having a sequence number smaller than the sequence number designated by the source eNode-B **910**, the target eNode-B **920** can transmit the received RLC SDU to the AG **930** at once. The UE **900** transmits the sequence number information at the time of accessing the target eNode-B **920** and the target eNode-B **920** can transmit the received RLC SDU to the AG **930** at once when receiving the RLC SDU having a sequence number smaller than the sequence number. The UE **900** can inform the target eNode-B **920** of the largest sequence number of the sequence numbers of the RLC SDUs which have been transmitted to the source eNode-B **910** at the time of first accessing the target eNode-B **920**.

On the other hand, the optimization process may be carried out in the downlink direction. In a new cell, the UE **900** transmits a handover completion message to the target eNode-B **920**. In the course, the target eNode-B **920** transmits a response message to the handover completion message. The UE **900** informs the target eNode-B **920** of the largest sequence number of the sequence numbers of the SDUs successfully and continuously received by the UE **900** for the downlink data successfully received by the UE **900**. The target eNode-B **920** can newly transmit only the SDUs having a sequence number larger than the acquired sequence number to the UE **900**. It is possible to reduce the burden of the UE **900** which classifies and rearranges the SDUs received from the target eNode-B **920** and the source eNode-B **910**.

Hereinafter, operation of the ARQ and the HARQ is described.

The HARQ with an N-channel SAQ (Stop-And-Wait) is advantageous for a higher transmission rate. In the HARQ, while one process performs the transmission and then waits for a response thereto, another process performs the transmission. By reducing idle time in the transmission, it is possible to enhance the transmission rate. However, since the radio conditions are often changed, the qualities of radio intervals to be actually experienced may be different from each other between continuous processes. Accordingly, the process having started the transmission does not always finish the transmission earlier. Therefore, the receiver should be able to perform the rearrangement and thus includes a buffer for performing the rearrangement.

The ARQ entity, that is, the RLC entity operating in the AM mode, includes a buffer. This is because all the portions of the SDU should be stored in the buffer of the receiver until all the PDUs including a specific portion of the SDU arrive. If a gap occurs in the buffer of the receiver, it means that a specific RLC PDU is not received. If a gap occurs in the buffer of the HARQ, it also means that a specific MAC PDU is not received. Since the RLC PDUs constitute the MAC PDUs, the gap in the RLC buffer and the gap in the HARQ buffer are associated with each other. It is possible to perform the buffer management in comprehensive consideration of two gaps. The rearrangement in the HARQ and the RLC PDUs received by the RLC can be simultaneously considered using only one buffer.

The MAC PDUs are decomposed as soon as being received and then are sent to the RLC entities. In order for the RLC entity to solve the gap generated due to the N-channel SAW in the MAC, the RLC entity should check whether the gap generated in the RLC buffer is due to the reception failure or the inversion of transport order generated due to the N-channel SAW. The buffer of the RLC entity can use a timer. When a gap is generated in the buffer of the RLC entity, the timer is activated at once. When data corresponding to the gap is not received until the timer expires, it is judged that the gap is generated due to the reception failure and the status report information may be transmitted to the transmitter.

FIG. **12** is a diagram illustrating an example of a data transmission method according to an exemplary embodiment of the invention, where a MAC layer (Rx MAC) and a RLC layer (Rx RLC) in the receiver are shown.

Referring to FIG. **12**, in ①, the ARQ entity, that is, the RLC entity, receives PDU3 from the HARQ as a lower-level layer, that is, the MAC layer. Since PDU2 having a sequence number smaller than that of PDU3 does not exist, the receiver checks that the gap is generated due to the inversion of transport order of the HARQ by the use of the HARQ jitter timer JT.

In ②, the RLC entity receives PDU2 before the HARQ jitter timer JT expires, and the HARQ jitter timer JT stops.

In ③, similarly to ①, since the ARQ entity received PDU6 having a sequence number smaller than that of PDU7, the HARQ jitter timer JT is activated.

In ④, although the HARQ jitter timer JT expires, the RLC entity cannot receive PDU6. The receiver judges that the reception of PDU6 fails and transmits the status report information associated therewith to the transmitter.

When receiving the status report information indicating that the receiver does not receive a certain PDU from the receiver, the transmitter retransmits the corresponding PDU. A timer may be set in each data block so as to prevent a deadlock. When the timers set in the SDUs expire, the pieces of the SDUs are not transmitted any more even when the reception failure is reported from the receiver.

When receiving a data block having a sequence number outside the current window, the receiver adjusts the boundary of the window. The operation of the receiver uses the timer and the reception window.

FIG. **13** is a diagram illustrating an example of a data transmission method according to an exemplary embodiment

of the invention, where RLCs serving as an AM in the transmitter and the receiver are shown.

Referring to FIG. **13**, in ①, SDU1 arrives at the buffer of the transmitter and a discard timer DT is activated. In ②, SDU2 arrives at the buffer of the transmitter and a discard timer DT is activated. The discard timers DT serve to define the maximum delay time set in the RLC entities.

In ③, the receiver receives PDU3 and recognizes that PDU2 having a sequence n umber smaller than that of PDU3 dose not arrive yet. In order to check whether the reception failure is generated due to the inversion of transfer order of the HARQ, the receiver starts the HARQ jitter timer JT.

In ④, when the HARQ jitter timer JT expires, the receiver reports to the transmitter that it does not receive PDU2. At the same time, in order to prevent the report from being lost, a periodic timer PT for PDU2 is activated.

In ⑤, the transmitter receives the report transmitted from the receiver. Since the discard timer DT for SDU1 does not expire yet, the transmitter retransmits PDU2.

In ⑥, the discard timer DT for SDU1 expires. The pieces of SDU1 are not transmitted any more. At this time, the transmitter may inform the receiver that the discard timer DT for SDU1 expires and thus it does not transmit the pieces of SDU1 any more. It is possible to prevent waste of radio resources by preventing an unnecessary retransmission request.

In ⑦, the periodic timer PT for PDU2 expires. Since the receiver does not receive PDU2 hitherto, the receiver transmits the status report information for PDU2 again. The periodic timer PT may be activated again at the same time of transmitting the status report information.

In ⑧, since the transmitter receives the status report information transmitted from the receiver again but the transmitter discards SDU1 due to the expiration of the discard timer DT, PDU2 is not retransmitted any more.

In ⑨, a release timer RT for SDU2 expires in the receiver. The release timer RT is activated when the successfully reconstructed SDU cannot be sent to a higher-level layer because an SDU having a sequence number smaller than that thereof does not arrive at the receiver. For example, the receiver successfully receives SDU2 by receiving a part of PDU3, PDU4, and PDU5, the receiver does not complete the reception of SDU1 having a sequence number smaller than that of SDU2 because not receiving PDU2. At the time of receiving SDU2, the release timer RT is activated. The release timer RT is used to prevent a certain SDU from staying in the buffer of the receiver too long. When the release timer RT expires, the receiver sends succeeded SDU2 to a higher-level layer and does not wait for failed SDU1 or PDUs associated the failed SDU (PDU2) any more. Since not waiting PDU2 any more, the periodic timer PT is also stopped.

It is possible to manage the retransmission request by the use of only the buffer of the RLC layer without using the buffer of the MAC layer.

The ARQ used here may be a NACK based system. The NACK based system is effective when data are steadily transmitted. More fine operations are required in consideration of transmission of packets or user data transmitted intermittently or the final SDU or PDU of a certain data flow. The NACK based system can be used when certain data is not received and the reception failure is checked by the receiver.

The receiver transmits the status report information as information on data not received. When the transmission of data is intermittent, that is, when the size of data is very small, the receiver may not know the transmission of data itself and the receiver cannot thus transmit the status report information. In this case, the receiver needs to report the transmitter



that the receiver receives the data successfully. The transmitter also needs to request the receiver to transmit the status report information. In an exemplary embodiment, a PDU may contain a command for requesting the receiver to transmit the status report information. In another exemplary embodiment, for the purpose of more rapid transmission, the transmitter may directly command the receiver to transmit a report through a physical channel through which the scheduling information is transmitted.

The receiver should transmit the status report information to the transmitter as soon as it receives the request for the status report information. When not receiving the status report information within a predetermined time, the transmitter can automatically retransmit the data. When the timer is used, the retransmission can be performed regardless of the status report information.

The present invention can be embodied in hardware, software, or combinations thereof. Examples of the hardware can include an ASIC (Application Specific Integrated Circuit), a DSP (Digital Signal Processing), PLD (Programmable Logic Device), an FPGA (Field Programmable Gate Array), a processor, a controller, a micro processor, other electronic units, and combinations thereof, which are designed to perform the above-mentioned functions. In software, the invention can be embodied by modules for performing the above-mentioned functions. The software can be stored in a memory unit and executed by a processor. As the memory unit or processor, means well known to those skilled in the art can be employed.

Although the embodiments of the present invention have been described in detail with reference to the attached drawings, it should be understood by those skilled in the art that the invention can be modified and changed in various forms without departing from the technical spirit and scope of the invention. Accordingly, the invention is not limited to the above-mentioned embodiments, but includes all the embodiments without departing from the scope of the appended claims.

The invention claimed is:

**1**. A method of performing automatic repeat request (ARQ) in a wireless communication system, the method performed by a receiver and comprising:

detecting whether at least one data block to be received from a transmitter is missed;

starting a timer when the at least one data block is detected as missed;

stopping the timer when the at least one data block is received from the transmitter while the timer is running, in order to prevent a triggering of a status report before the timer expires; and

transmitting the status report to the transmitter after the timer expires, wherein the status report comprises a positive acknowledgement indicating receipt of at least one received data block.

**2**. The method of claim **1**, wherein the at least one data block is detected as missed when a sequence number (SN) of a currently received data block is larger than a SN of a previously received data block.

**3**. The method of claim **1**, wherein the at least one data block is detected as missed when a sequence number (SN) following a SN of a data block with a highest SN among received data blocks is larger than a lowest SN of the at least one data block to be received.

**4**. The method of claim **1**, wherein the at least one data block is detected as missed when a sequence number (SN) following a SN of a data block with a highest SN among received data blocks is larger than a SN following a last in-sequence received data block.

**5**. The method of claim **1**, wherein the timer is stopped when a sequence number (SN) following a SN of a data block with a highest SN among received data blocks when the timer was started is the same as a SN following the last in-sequence received data block.

**6**. The method of claim **1**, wherein the at least one data block comprises a Radio Link Control (RLC) Protocol Data Unit (PDU).

**7**. The method of claim **1**, wherein the status report further comprises a negative acknowledgement indicating a sequence number (SN) of the at least one data block detected as missed.

**8**. A receiver for performing automatic repeat request (ARQ) in a wireless communication system, the receiver comprising a Radio Link Control (RLC) entity, wherein the RLC entity is configured to:

detect whether at least one data block to be received from a transmitter is missed;

start a timer when the at least one data block is detected as missed;

stop the timer when the at least one data block is received from the transmitter while the timer is running, in order to prevent a triggering of a status report before the timer expires; and

transmit the status report to the transmitter after the timer expires, wherein the status report comprises a positive acknowledgement indicating receipt of at least one received data block.

**9**. The receiver of claim **8**, wherein the at least one data block is detected as missed when a sequence number (SN) following a SN of a data block with a highest SN among received data blocks is larger than a SN following a last in-sequence received data block.

**10**. The receiver of claim **8**, wherein the timer is stopped when a sequence number (SN) following a SN of a data block with a highest SN among received data blocks when the timer was started is the same as a SN following the last in-sequence received data block.

* * * * *