Nos. 2023-1059, 2023-1085, 2023-1086, 2023-1089, 2023-1125

# United States Court of Appeals for the Federal Circuit

SIERRA WIRELESS, INC., HONEYWELL INTERNATIONAL INC., TCL COMMUNICATION TECHNOLOGY HOLDINGS LIMITED, TCT MOBILE INTERNATIONAL LIMITED, TCT MOBILE, INC., TCT MOBILE (US) INC., TCT MOBILE (US) HOLDINGS, INC., TELIT CINTERION DEUTSCHLAND GMBH F/D/B/A THALES DIS AIS DEUTSCHLAND GMBH,

*Appellants,*

v.

SISVEL S.P.A.,

*Cross-Appellant.*

On Appeal from the USPTO Patent Trial and Appeal Board in *Inter Partes* Review No. IPR2021-00580

## PRINCIPAL AND RESPONSE BRIEF OF CROSS-APPELLANT SISVEL S.P.A.

Timothy Devlin
tdevlin@devlinlawfirm.com
Neil A. Benchell
nbenchell@devlinlawfirm.com
Nadiia Loizides
nloizides@devlinlawfirm.com
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
(302) 449-9010

*Attorneys for Cross-Appellant SISVEL S.p.A.*

July 24, 2023

Relevant claims of U.S. Patent No. 7,869,396 ("'396 patent") include:

1. A method of performing automatic repeat request (ARQ) in a wireless communication system, the method performed by a receiver and comprising:

> detecting whether at least one data block to be received from a transmitter is missed;
>
> starting a timer when the at least one data block is detected as missed;
>
> stopping the timer when the at least one data block is received from the transmitter while the timer is running, in order to prevent a triggering of a status report before the timer expires; and
>
> transmitting the status report to the transmitter after the timer expires, wherein the status report comprises a positive acknowledgement indicating receipt of at least one received data block.

8. A receiver for performing automatic repeat request (ARQ) in a wireless communication system, the receiver comprising a Radio Link Control (RLC) entity, wherein the RLC entity is configured to:

> detect whether at least one data block to be received from a transmitter is missed;
>
> start a timer when the at least one data block is detected as missed;
>
> stop the timer when the at least one data block is received from the transmitter while the timer is running, in order to prevent a triggering of a status report before the timer expires; and
>
> transmit the status report to the transmitter after the timer expires, wherein the status report comprises a positive acknowledgement indicating receipt of at least one received data block.

Appx209-210.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-1059, 2023-1085, 2023-1086, 2023-1089, 2023-1125

**Short Case Caption** Sierra Wireless, Inc. v. Sisvel S.p.A.

**Filing Party/Entity** Sisvel S.p.A.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/24/2023

Signature: /s/ Timothy Devlin

Name: Timothy Devlin

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Sisvel S.p.A. | | Sisvel International S.A. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| Stephanie Berger (Devlin Law Firm) | Jorge Espinosa (Gray Robinson, P.A.) | |
| Andrew DeMarco (Devlin Law Firm) | Francesca Russo (Gray Robinson, P.A.) | |
| Peter A. Mazur (Devlin Law Firm) | Robert R. Jimenez (Gray Robinson, P.A.) | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS


CERTIFICATE OF INTEREST ........ i
TABLE OF AUTHORITIES ........ vii
TABLE OF ABBREVIATIONS ........ x
STATEMENT OF RELATED CASES ........ 1
JURISDICTIONAL STATEMENT ........ 2
STATEMENT OF THE ISSUES ........ 3
STATEMENT OF THE CASE ........ 3
I. THE PARTIES ........ 3
II. TECHNOLOGY BACKGROUND ........ 4
A. Radio Interface Protocol Layers ........ 4
B. PDUs and SDUs Are Data Packets Transmitted in 4G/LTE Systems ........ 6
C. ARQ and HARQ Are Techniques to Reduce Data Loss ........ 7
D. The RLC Layer Can Use the Acknowledged Mode (AM) or Unacknowledged Mode (UM) ........ 7
III. THE SACHS REFERENCE ........ 9
A. Sachs's T_reorder Timer ........ 9
B. Four Relevant Embodiments ........ 10
1. Sachs's Figure 4 Embodiment ........ 12
2. Sachs's Figure 5 Embodiment ........ 13
3. Sachs's Figure 6 Embodiment ........ 14
4. Sachs's Figure 7 Embodiment ........ 17
IV. THE '396 PATENT ........ 18
A. Background ........ 18
B. Claims at Issue ........ 21
V. PROCEDURAL HISTORY ........ 22
A. Appellants' IPR Petition ........ 22
B. Sisvel's Preliminary Response ........ 23
C. Institution Decision ........ 24
D. Sisvel's Response After Institution ........ 24

E. Appellants' Reply ....................25

F. Sisvel's Sur-Reply ....................27

G. Final Written Decision ....................28

SUMMARY OF THE ARGUMENT ....................31

ARGUMENT ....................35

I. STANDARD OF REVIEW ....................35

II. THE BOARD'S DECISION UPHOLDING CLAIMS 3-5, 9, AND 10 SHOULD BE AFFIRMED ....................36

A. The Board Applied the Correct Anticipation Standard ....................37

1. Figures 4 and 5 do not describe the same system ....................37

2. The Board correctly determined that Sachs's Figures 6 and 7 were different embodiments than Figures 4 and 5....................44

3. Sachs's summary explains its collective teachings across its figures as distinct embodiments. ....................47

4. The Board correctly determined that Sachs's different embodiments required proof of combinability and motivation to combine. ....................49

B. The Board Did Not Violate the APA ....................50

1. The Board adequately considered and properly rejected Appellants' obviousness arguments leading to upholding claims 3-5, 9, and 10. ....................50

2. The Board properly analyzed dependent claim 3. ....................55

3. The Board properly analyzed dependent claims 4 and 9 ....................57

4. The Board properly analyzed dependent claims 5 and 10 ....................59

C. The Board Correctly Gave Weight to Sisvel's Expert Because He Exceeded the Level of Expertise Required of a POSITA....................62

III. CLAIMS 1, 2, and 6-8 SHOULD HAVE BEEN UPHELD AS VALID OVER SACHS ....................65

A. The Board Erroneously Invalidated Claims 1-2 and 6-8....................65

1. The majority's conditionality framework was legally erroneous ....................65

2. The majority's legally erroneous conditionality framework warrants reversal because Sachs does not teach or suggest element 1[c] ....................68

3. The majority's invalidation of claim 8 must be reversed because the majority's conditionality framework cannot apply to that claim under any circumstances. ....................72

B. APJ Moore Correctly Concluded that Appellants Did Not Meet Their Burden in Showing that Sachs Anticipates or Obviates Any of the Claims Invalidated by the Majority ....................74

CONCLUSION ....................75

CERTIFICATE OF COMPLIANCE ....................756

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ariosa Diagnostics v. Verinata Health, Inc.*,
805 F.3d 1359 (Fed. Cir. 2015) .......... 33, 43, 62

*BlephEx, LLC v. Myco Indus.*,
24 F.4th 1391 (Fed. Cir. 2022) .......... 44

*Chamberlain Grp. v. Techtronic Indus. Co.*,
935 F.3d 1341 (Fed. Cir. 2019) .......... 32

*Chemours Co. FC, LLC v. Daikin Indus.*,
4 F.4th 1370 (Fed. Cir. 2021) .......... 36

*Cooter & Gell v. Hartmarx Corp.*,
496 U.S. 384 (1990) .......... 36

*Enplas Display Device Corp. v. Seoul Semiconductor Co.*,
909 F.3d 398 (Fed. Cir. 2018) .......... 42

*Ex parte Schulhauser*, No. 2013-007847,
2016 WL 6277792 (P.T.A.B. Apr. 28, 2016) .......... 35, 65, 66, 73

*Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. De C.V.*,
865 F.3d 1348 (Fed. Cir. 2017) .......... 35, 36

*Hytera Communs. Co. v. Motorola Sols.*, Inc.,
841 F. App'x 210 (Fed. Cir. 2021) .......... 65, 66

*In re Magnum Oil Tools Int'l, Ltd.*,
829 F.3d 1364 (Fed. Cir. 2016) .......... 51, 58

*In re Stepan Co.*,
868 F.3d 1342 (Fed. Cir. 2017) .......... 54, 55

**Page(s)**

*Intelligent Bio-Systems, Inc. v. Illumina Cambridge, Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) ........ *passim*

*Kyocera Senco Indus. Tools, Inc. v. ITC*,
22 F.4th 1369 (Fed. Cir. 2022) ........ 63

*Lincoln Nat'l Life Ins. Co. v. Transamerica Life Ins. Co.*,
609 F.3d 1364 (Fed. Cir. 2010) ........ 34, 66

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
545 F.3d 1359 (Fed. Cir. 2008) ........ 42, 43, 71

*Noelle v. Lederman*,
355 F.3d 1343 (Fed. Cir. 2004) ........ 66

*Omega Patents, LLC v. CalAmp Corp.*,
920 F.3d 1337 (Fed. Cir. 2019) ........ 62

*Plexxikon Inc. v. Novartis Pharm. Corp.*, No. 17-cv-04405-HSG,
2020 U.S. Dist. LEXIS 51894 (N.D. Cal. Mar. 25, 2020) ........ 63

*Qiagen N. Am. Holdings, Inc. v. Handylab, Inc.*,
U.S. App. LEXIS 32391 (Fed. Cir. Oct. 29, 2021) ........ 52, 57

*SEB S.A. v. Montgomery Ward & Co.*,
594 F.3d 1360 (Fed. Cir. 2010) ........ 63

*Shinseki v. Sanders*,
556 U.S. 396 (2009) ........ 62

*Victaulic Co. v. Iancu*,
753 F. App'x 895 (Fed. Cir. 2018) ........ 48

**Page**

**Statutes**

28 U.S.C. § 1295 .......... 2

35 U.S.C. § 141 .......... 2

35 U.S.C. §142 .......... 2

35 U.S.C. § 144 .......... 2

35 U.S.C. § 314 .......... 2

37 C.F.R. § 90 .......... 2

5 U.S.C. § 706 .......... 62

**Other Sources**

MPEP 608.01 .......... 22

# TABLE OF ABBREVIATIONS

## *The Parties*

| | |
|---|---|
| Appellants | Appellants collectively |
| Sisvel | Sisvel S.p.A. |

## *Defined Terms*

| | |
|---|---|
| ’396 patent | U.S. Patent No. 7,869,396 |
| 3GPP | 3rd Generation Partnership Project |
| ACK | Acknowledgement signal |
| AM | Acknowledged mode |
| ARQ | Automatic Repeat Request |
| Board *or* PTAB | The U.S. Patent and Trademark Office’s Patent Trial and Appeal Board |
| Challenged Claims | Claims 1-10 of the ’396 patent |
| FEC | Forward Error Correction |
| FWD | The Board’s Final Written Decision from September 12, 2022 (Appx1) |
| HARQ | Hybrid ARQ |
| IPR | *Inter partes* review |
| JT | Jitter timer |
| MAC | Medium Access Control |
| NACK | Not Acknowledgement signal |
| OSI | Open Systems Interconnection |
| PDU | Protocol data unit |
| QoS | Quality of Service |
| R*x* | Receiver *x* |
| RLC | Radio Link Control layer |
| SDU | Service data unit |
| SN | Sequence number |
| T*x* | Transmitter *x* |
| UE | User equipment |
| UM | Unacknowledged mode |

## STATEMENT OF RELATED CASES

These appeals concern the Final Written Decision (the "FWD") issued by the United States Patent and Trademark Office ("PTO") Patent Trial and Appeal Board ("PTAB" or the "Board") in IPR No. IPR2021-00580 finding claims 1, 2, and 6-8 of U.S. Patent No. 7,869,396 (the "'396 patent") unpatentable as anticipated and obvious and upholding claims 3-5, 9, and 10.

No other appeal in or from the same proceeding in the PTAB was previously before this Court or any other appellate Court. Except for the following matters that also concern the '396 patent, there are no other cases known to counsel to be pending in this or any other tribunal that will directly affect or be directly affected by this Court's decision in this appeal:

*Sisvel Int'l SA v. Honeywell Int'l, Inc.*, 1:20-cv-00652 (D. Del.);

*3G Licensing SA v. TCL Commc'n Tech. Holdings Ltd.*, 1:20-cv-00654 (D. Del.);

*Sisvel Int'l SA v. VeriFone, Inc.*, 1:20-cv-00656 (D. Del.);

*Sisvel Int'l SA v. Xirgo Techs., LLC*, 1:20-cv-00659 (D. Del.); and

*Sisvel Int'l SA v. HMD Am., Inc.*, 1:20-cv-22051 (S.D. Fla.).

## JURISDICTIONAL STATEMENT

The Board issued its FWD on September 12, 2022, under its jurisdiction to conduct IPR proceedings pursuant to 35 U.S.C. § 314. Appellants filed a notice of appeal under 35 U.S.C. §§ 141-142 and 37 C.F.R. § 90.2 on October 26, 2022. Sisvel S.P.A. ("Sisvel") filed a timely notice of cross-appeal pursuant to 35 U.S.C. §§ 141-44 and 319 on November 2, 2022. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141(c).

## STATEMENT OF THE ISSUES

1. Did the Board commit arbitrary and capricious error by rejecting Appellants' improper argument that claims 3-5, 9, and 10 of the '396 patent were anticipated by a hypothetical combination of elements that was never actually disclosed in the Sachs reference but stitched together by Appellants from cherry-picked portions of distinct embodiments separately disclosed in that reference?

2. Did the Board violate the APA when it correctly held that Sachs does not render obvious claims 3-5, 9, and 10 of the '396 patent and when Appellants relied on their anticipation assertions and failed to make non-conclusory obviousness or motivation-to-combine arguments?

3. Did the Board commit abuse of discretion when it correctly gave weight to Sisvel's expert Regis J. Bates, who had decades of relevant practical experience, as well as teaching and publication credentials showing that his level of expertise exceeded that of a POSITA in the '396 patent's technology?

4. (Cross-Appeal) Did the majority err in invalidating claims 1, 2, and 6-8 of the '396 patent?

## STATEMENT OF THE CASE

### I. THE PARTIES

Sisvel is a world leader in fostering the development and management of intellectual property, including in the wireless 3GPP cellphone arena. Sisvel is also

a well-known contributor to policy discussions with government bodies on intellectual property matters.

Appellants make and sell cellular products that use Sisvel's patented technology, including the inventions of the '396 patent.

## II. TECHNOLOGY BACKGROUND

In any wireless communication system, including 4G/LTE, data can be lost in a physical channel. Appx202 at 1:49-54. The '396 patent relates to data transmission and retransmission methods in 4G/LTE wireless communication networks aimed at reducing data loss. Appx202 at 1:16-20. Specifically, the '396 patent teaches how to counteract data loss by using status reports confirming receipt or loss of data packets during Automatic Repeat Requests ("ARQ") and Hybrid Automatic Repeat Requests ("HARQ") procedures. Appx202 at 2:11-13; Appx202 at 2:44-46; Appx209 (claim 1). A short overview of relevant technologies, including radio interface protocol layers, data packets, ARQ and HARQ, is provided below.

### A. Radio Interface Protocol Layers

4G/LTE wireless communication networks divide service areas into small geographic regions or "cells." Appx203 at 3:47-48. User equipment ("UE") operating within a cell uses that cell's fixed base station, also known as a base transceiver system and an access point. Appx203 at 3:47-49; Appx194 at fig.2 (identifying the base station as eNode-B). UE may be fixed or movable and can be

called various terminologies such as a mobile station, a user terminal, a subscriber station, and a wireless device. Appx203 at 3:40-43.

Radio interface protocols support data transmission in 4G/LTE networks between the access network and UE. Appx203 at 3:59-63. Conceptually, radio interface protocols may be presented as a protocol stack:




[Fig. 3]

Appx194 at fig.3; *see also* Appx203 at 4:10-11.

At the bottom of the stack is the physical layer, which provides an information transfer service to a higher-level layer by using a physical channel. Appx203 at 4:16-18. Data is transmitted between different physical layers (that is, between a transmission-side physical layer and a reception-side physical layer) through a physical channel as well. Appx203 at 4:20-25.

The physical layer is connected to a Medium Access Control ("MAC") layer above it through a transport channel. Appx203 at 4:18-20. Data is transmitted

between the MAC layer and the physical layer through a transport channel. Appx203 at 4:20-22.

The MAC layer provides a service to a Radio Link Control ("RLC") layer as a higher-level layer through a logical channel. Appx204 at 4:26-28. The RLC layer supports reliable data transmission and guarantees Quality of Service ("QoS") for data transmissions. Appx203 at 4:28-29.

Lastly, the Radio Resource Control ("RRC") layer controls the logical channel, the transport channel, and the physical channel associated with the configuration, re-configuration, and release of the radio bearers ("RB"). Appx203 at 4:40-43.

### B. PDUs and SDUs Are Data Packets Transmitted in 4G/LTE Systems

4G/LTE wireless communications systems can be used to transmit data packets. Appx203 at 3:32-33. A Protocol Data Unit ("PDU") is a basic data unit used for data communication between layers. Appx3152 (¶41). A RLC PDU, a MAC PDU, and the like are examples of data exchanged by layers. Appx204 at 6:48-53.

A Service Data Unit ("SDU") is a data unit passed down from a higher layer to a given layer. Appx204 at 6:48-53. As Appellants' expert Dr. Kakaes explained:

> Upon performing the layer-specific processing, *e.g.*, adding the layer-specific overhead, the processed data is referred to as a PDU and is passed to the lower layer.

> Thus, for example, the RLC receives an SDU from a higher layer, forms one or more RLC-PDUs, which it passes to the MAC, wherein the MAC now calls the data blocks MACSDU(s), which it (the MAC) processes and forms into MAC-PDUs that are passed to the physical layer for eventual transmission.

Appx1153 n.7.

### C. ARQ and HARQ Are Techniques to Reduce Data Loss

One of techniques used to reduce the loss of data in a 4G/LTE system is an Automatic Repeat Request ("ARQ") method. Appx202 at 1:58-59. Generally, the ARQ method is performed by high-level layers, including RLC. Appx202 at 1:59-60. Lower-level layers, including MAC, perform Hybrid Automatic Repeat Request ("HARQ") to reduce the loss of data. Appx202 at 1:60-62. The HARQ uses Forward Error Correction ("FEC") and ARQ together for data error correction and data retransmission. Appx202 at 1:62-64. Including status report information in the ARQ/HARQ process allows for more rapid and efficient transmission and retransmission of lost data. Appx202 at 1:65-2:5; Appx202 at 2:17-20; Appx202 at 2:43-52; Appx3153 (¶ 42).

### D. The RLC Layer Can Use the Acknowledged Mode (AM) or Unacknowledged Mode (UM)

The RLC layer has an independent RLC entity for each RB in order to guarantee the Quality of Service, or QoS, specific to that RB. Appx203 at 4:58-59. To support a variety of QoS, the telecommunication technology employs three RLC

modes: (1) the unacknowledged mode ("UM"); (2) the acknowledged mode ("AM"); and (3) the transparent mode. Appx203 at 4:63-67. Relevant here are AM and UM.

The UM RLC layer adds a PDU header with a sequence number to each PDU. This helps alert a receiver of a lost PDU. Appx204 at 5:4-6. Similar to the UM RLC layer, the AM RLC layer adds a PDU header with a sequence number at the time of forming a PDU. Appx204 at 5:14-18. Unlike the UM RLC layer, an AM RLC receiver additionally transmits an acknowledgement of the PDU receipt back to the transmitter. Appx204 at 5:16-18. This allows the receiver to request the transmitter for retransmission of the PDU that was lost. Appx204 at 5:18-20.

To manage the ARQ, the AM RLC layer has a retransmission buffer in addition to a transmission/reception buffer. Appx204 at 5:35-44. The AM RLC layer also performs a variety of other functions, including managing a transmission/reception window for a flow control, allowing a transmitter to request a receiver of a peer RLC entity for status information, allowing the receiver to report its buffer status to the transmitter of the peer RLC entity, and inserting the status PDU into the data PDU to enhance the efficiency of data transmission. Appx204 at 5:36-49. To support these and other functions, the AM RLC requires a variety of protocol parameters, status variables and timers. Appx204 at 5:49-51.

## III. THE SACHS REFERENCE

Appellants challenged the ’396 patent as anticipated or obvious based on three references (“Sachs,” “Wei,” and “TS25.322”). Appx244. Appellants appeal from the Board’s decision upholding claims 3-5, 9, and 10 of the ’396 patent based on the Sachs reference only. *See* Principal Brief at 16 [hereinafter BB]. Sisvel cross-appeals from the Board’s decision invalidating claims 1, 2, and 6-8 based solely on Sachs. Unless relevant to the issues on appeal, only Sachs is discussed below.

### A. Sachs’s T_reorder Timer

Sachs is an International Patent Application, Publication No. WO 02/091659, titled “Reordering Procedure for Data Packets in a Communication System.” Appx1265. It is directed to a procedure for reordering of data packets in a Universal Mobile Telecommunication System (“UMTS”) 3G cellular network.[1] Appx1268 at 2:5-10; Appx1269 at 3:7-9; Appx1288 at 22:9; Appx3153-3154 (¶ 43).

Sachs relies only on ARQ, or Automatic Repeat Request, and not HARQ, or Hybrid Automatic Repeat Request, to detect a missing data packet. Appx1292 at fig.2; Appx1268 at 2:15-17; Appx1270 at 4:2-9; Appx1272 at 6:34-7. Sachs also discloses sending a status report only *after* reordering of the data packets is completed. The status report in Sachs is generated by the RLC layer. Appx1292 at fig.2; Appx3155 (¶ 46).

[1] UMTS is also referred to in Sachs as WCDMA. Appx1268 at 2:7-10.

Important to these appeals is a function in Sachs called a "T_reorder" timer. Sachs relies on the T_reorder timer to delay reordering and discarding of received data packets. *See, e.g.*, Appx1294 at fig.4; Appx1295 at fig.5; Appx1265 at Abstract ("[T]he received entity . . . delays a triggering of a reordering procedure[.]"); Appx1274 at 8:25-31; Appx1275 at 9:11-15; Appx1277 at 11:19-21. Sachs ties the T_reorder timer to the reordering procedure and discloses that the T_reorder timer is stopped when reordering is finished as shown in Figure 5. Appx1280 at 14:1-5; Appx3154-3155 (¶ 44).

**B. Four Relevant Embodiments**

Sachs discloses at least six distinct embodiments, Appx1277-1278, four of which—depicted in Sachs's Figures 4 through 7, respectively—are relevant here because Appellants relied on these embodiments below, *e.g.*, Appx282-283; Appx285; Appx295. Each of these embodiments represents not simply different modes of the same invention, but different, non-combinable systems. For instance, in the embodiment shown in Figure 4 the T_reorder timer expires, and the RLC entity sends a status report containing both positive acknowledgement ("ACK") and negative acknowledgement ("NACK"). Appx1294. In contrast, under the embodiment in Figure 5 the T_reorder timer is stopped when reordering of PDUs is finished, Appx1280 at 14:10-12, and no status report is sent, although all packets are ultimately received, Appx1295.

Embodiments in Figures 6 and 7 are significantly more complex than the embodiments in Figures 4 and 5. Each utilizes a unique algorithm to delay packet reordering (algorithms A and B, respectively) and includes additional elements, such as STATUS triggers and state variables X1, not present in either Figure 4 or Figure 5's embodiments. *E.g.*, Appx1296-1297. Each of algorithms A and B uses a unique protocol for delaying packet reordering based on a variety of factors, including, for example, when status triggers are received, whether PDUs arrive in the correct order or out of sequence, whether any T_reorder timer is active, whether the exemplary systems operate in AM or UM. Under algorithm A, if T_reorder is active, the received status trigger is stored and a status report is delayed until T_reorder expires. Appx1282 at 16:6-8. In contrast, under algorithm B status reports for status triggers received during running of the T_reorder timer are sent when T_reorder is stopped. Appx1283 at 17:17-19.

Additionally, neither the embodiment in Figure 4, nor the embodiment in Figure 5 is suitable for use when data packets are reordered regularly because this would lead to high delays in responding to the sender. Appx1280 at 14:14-18. In contrast, the embodiments in Figures 6 and 7 are both suitable for use in situations when data packet reordering occurs frequently because algorithms A and B help counteract high delays in responding to the sender. Appx1280 at 14:14-18. However, because the T_reorder timer is stopped under the embodiment in Figure

7, using the exemplary system in Figure 7 results in a faster reaction for informing the sender about lost data packets compared to the embodiment in Figure 6. Appx1283 at 17:28-30.

### 1. Sachs's Figure 4 Embodiment

Sachs's Figure 4 (reproduced below) illustrates how the T_reorder timer can function in AM:



Figure 4

Appx1294.

The left side of Figure 4 shows the sequence of the transmitted PDUs. Appx1278 at 12:30-32. The arrows represent the receiving sequence at the RLC receiver depending on time. Appx1278 at 12:32-34. PDUs 5 and 6 are received

first, followed by PDUs 1 and 2 and so on. Appx1278 at 12:34-35. PDUs 3 and 4 are not transmitted correctly. Appx1294.

On the right side the duration of the reorder-delay timer T_reorder is shown. Appx1279 at 13:1-2. Under this embodiment, the T_reorder timer is started by receiving the PDUs 5 and 6, because the PDUs 1 and 2 are expected. Appx1279 at 13:3-6. With starting the T_reorder timer, the reaction of the RLC receiver is delayed until no more packets are reordered, *i.e.*, until the maximum delay is reached, which is registered with expiring of the set T_reorder timer. Appx1279 at 13:1-9. Upon expiry of the T_reorder timer, the RLC entity sends a status report containing both positive acknowledgement ("ACK") and negative acknowledgement ("NACK"). Appx1294.

### 2. Sachs's Figure 5 Embodiment

Figure 5 of Sachs (reproduced below) illustrates a different embodiment where *all* packets are received, albeit out of order:




Figure 5

Appx1295.

The RLC receiver starts the T_reorder timer when it receives PDUs 5 and 6. Appx1280 at 14:8-10. When PDUs 3 and 4 are received and reordering (*i.e.*, reshuffling of the PDUs in the buffer) is finished, the T_reorder timer is stopped. Appx1280 at 14:10-12. No status report is sent under this embodiment, although all packets are ultimately received. Appx1295.

### 3. Sachs's Figure 6 Embodiment

To further delay packet reordering, Sachs introduces four algorithms A through D in embodiments covered by Figures 6 through 9, respectively. *E.g.*, Appx1278. Each of these algorithms utilizes additional state variables. Appx1280

14:22-24. Relevant here are Sachs's algorithms A and B because they appear in Figures 6 and 7 on which Appellants relied below. Appx285; Appx295.

The left column of Figure 6 (reproduced below) shows how algorithm A functions in AM with integrated STATUS messages:




Figure 6

Appx1296.

Under algorithm A, whenever new PDUs are received in the RLC receiver buffer such that a block of in-sequence PDUs starting at the current value of X1 is formed, the state variable X1 is set to the largest sequence number of this block. Appx1281 at 15:17-20. In Figure 6, X1 is initially set to 1. Appx1281 at 15:20-21. When PDU 4 is received out of order, the T_reorder timer is started and X1 is set to 4. Appx1281 at 15:21-24. While the T_reorder timer is active, the X1 is not updated whenever a PDU with a sequence number smaller than the current X1 value arrives. Appx1281 at 15:24-26. Thus, X1 does not change after receiving PDUs 2 and 3. When a PDU is received that is both in-sequence and higher than X1, X1's value is switched to the highest sequence number among the PDUs received so far. Appx1281 at 15:28-31. For example, X1 is updated to 5 when PDU 5 arrives. Appx1281 at 15:31-32.

In AM, a STATUS trigger only leads to an instantaneous transmission of a STATUS message when *no* T_reorder is active. Appx1282 at 16:4-6. If T_reorder is active, the received STATUS trigger is stored and the STATUS report is delayed until T_reorder expires. Appx1282 at 16:6-8. Whenever the sequence of the PDUs in the RLC receiver buffer is re-established, all in-sequence PDUs from beginning of the buffer are delivered to the higher layer and removed from the receiver buffer. Appx1281-1282 at 15:33–16:2. The STATUS message reports only sequence numbers up to X1, Appx1282 at 16:4-9, and carries positive acknowledgments for

the received PDUs and/or negative acknowledgments for the missing PDUs, Appx1281 at 15:6-9.

### 4. Sachs's Figure 7 Embodiment

The embodiment in Sachs's Figure 7 (reproduced below) uses algorithm B. Appx1283 at 17:11-12.




Figure 7

Appx1297.

Under Algorithm B, the T_reorder timer is started with receipt of an out-of-order PDU. Appx1283 at 17:19-21. The T_reorder timer is stopped when on reception of a PDU, all PDUs in the receiver buffer have been received in-sequence up to Xl. Appx1283 at 17:15-17. The STATUS reports for STATUS triggers received during T_reorder are sent when T_reorder is stopped. Appx1283 at 17:17-19. With the stopping of the timer a faster reaction of the link layer is achieved, even if the T_reorder timer lasts the whole set duration. Appx1283 at 17:23-24, 17:26-30.

## IV. THE '396 PATENT

### A. Background

A data block may either be received or lost during data transmission in a 4G/LTE network. *E.g.*, Appx202 at 2:20-24; Appx202 at 1:49-50. The '396 patent claims data transmission and retransmission methods reducing data loss in these networks.[2] *See* Appx209 (claim 1); Appx191 at Abstract; Appx202 at 1:17-20; Appx202 at 1:40-48; Appx203 at 3:30-31; Appx3152 (¶ 40). Relevant here, the '396 patent teaches the use of status report information on a data block (that is either received by the RLC entity or lost) and various timers to accomplish that goal. Appx206 at 9:22-25; Appx206 9:34-36; Appx3152 (¶ 40).

[2] LTE is now referred to as 4G/LTE.

Specifically, the ’396 patent teaches that when a data block is detected as missing and a gap occurs in the RLC buffer, a timer is activated. Appx208 at 14:28-30; Appx3152 (¶ 41). If data corresponding to the missing data block is not received before the timer expires, it is concluded that a reception failure caused the gap and status report information is sent to the transmitter. Appx208 at 14:30-34; Appx208 at 14:38-54; Appx209 at 15:8-14; Appx3152-3153 (¶¶ 41-42). When a receiver transmits status report information to the transmitter through a physical layer, the transmitter can rapidly confirm the reception failure and retransmit the data. Appx202 at 2:44-49.

The ’396 patent discloses use of various timers, including jitter timers (“JT”), discard timers, periodic timers, and release timers. *See, e.g.*, Appx204 at 5:50-51; Appx209 at 15:3-4; Appx209 at 15:15-16; Appx209 at 15:36; Appx3152 (¶ 41). A status report can contain information about numerous data blocks, including blocks not received by the receiver. Appx206 at 9:34-36; Appx3153 (¶ 42). The RLC entity generates a status report at the RLC layer of the protocol stack shown in Figure 2 of the ’396 patent. Appx202 at 2:26-33; Appx3153 (¶ 42). The status report is transmitted using a HARQ in a physical layer. Appx202 at 2:26-40; Appx206 at 9:14-19.

Figure 12 the ’396 patent shows an exemplary embodiment using JT. Appx203 at 3:16-18.




[Fig. 12]

Appx200. The embodiment in Figure 12 illustrates how timers operate in a system comprising a MAC layer ("Rx MAC") and a RLC layer ("Rx RLC") in the receiver. Appx208 at 14:34-37. At step 1, the ARQ entity, *i.e.*, the RLC entity, receives PDU3 from the HARQ as a lower-level layer, *i.e.*, the MAC layer. Appx208 at 14:38-40. Since PDU2 having a sequence number smaller than that of PDU3 is not present, the receiver checks whether the gap was generated due to the inversion of transport order of the HARQ by using the HARQ JT. Appx208 at 14:40-44. At step 2, the RLC entity receives PDU2 before the HARQ JT expires, and the HARQ JT stops. Appx208 at 14:45-46.

At step 3, since the ARQ entity received PDU6 having a sequence number smaller than that of PDU7, the HARQ jitter timer JT is activated. Appx208 at 14:47-49. At step 4, although the HARQ JT expires, the RLC entity cannot receive PDU6. Appx208 at 14:50-51. The receiver judges that the reception of PDU6 fails and

transmits the status report information associated with it to the transmitter. Appx208 at 14:51-54.

### B. Claims at Issue

Appellants challenged claims 1-10 of the '396 patent (the "Challenged Claims") as anticipated and obvious. Out of these, claims 1 and 8 are independent. Claim 8 is a system claim that largely tracks claim 1, a method claim that reads:

> 1. [pre] A method of performing automatic repeat request (ARQ) in a wireless communication system, the method performed by a receiver and comprising:
>
> [1[a]] detecting whether at least one data block to be received from a transmitter is missed;
>
> [1[b]] starting a timer when the at least one data block is detected as missed;
>
> [1[c]] stopping the timer when the at least one data block is received from the transmitter while the timer is running, in order to prevent a triggering of a status report before the timer expires; and
>
> [1[d]] transmitting the status report to the transmitter after the timer expires, wherein the status report comprises a positive acknowledgement indicating receipt of at least one received data block.

Appx209 (claim 1) (brackets indicating individual elements added).

As claim 1 demonstrates, the claims at issue in these appeals relate to starting a timer when at least one data block is detected as missing and stopping the timer when the at least one data block is received. Appx209 (claim 1). Stopping the timer prevents triggering a status report, and the timer's expiry triggers transmitting the status report with positive acknowledgement, *i.e.*, ACK, to the transmitter. Appx209

(claim 1). In contrast to Sachs, the timer in claim 1 of the ’396 patent is *not* tied to delaying the reordering procedure, and stopping the timer in the ’396 patent is *not* premised on finishing the reordering. *Compare* Appx209 (claim 1), *with* Appx1295 at fig.5.

## V. PROCEDURAL HISTORY

### A. Appellants’ IPR Petition

Appellants’ IPR Petition asserted five grounds of invalidity against claims 1-10, but only two are directly relevant to these appeals—invalidity in view of Sachs based on anticipation (Ground I) and obviousness (Ground II). *See* Appx43; Appx244.[3]

Appellants’ Ground I arguments relied on Sachs’s discrete embodiments illustrated in separate Figures 4 through 7. Importantly, Appellants did not argue in the Petition that Sachs’s separate Figures 4, 5, 6, and 7 constituted or described the same embodiment. Instead, the Petition contained a single conclusory statement that Figures 5 of Sachs teaches the same embodiment as Figure 4. Appx277. Appellants also argued that elements 1[c] and 1[d] were conditional and that they were required to show only that Sachs teaches or suggests one of them. Appx275 n.11.

[3] Appellants do not appeal the Board’s adverse decision (*see* Appx43) on Ground III, IV, and V. Sisvel cross-appeals from the Board’s decision invalidating claims 1, 2, and 6-8 based solely on Sachs.

Appellants did not separately argue Ground II (obviousness based on Sachs), instead relying on the same arguments as in Ground I (anticipation based on Sachs), *e.g.*, Appx277, attorney argument that Sachs allegedly rendered the '396 patent obvious, *e.g.*, Appx277, and conclusory testimony of their expert Dr. Kakaes, *see, e.g.*, Appx1185. Neither Appellants, nor Dr. Kakaes provided any analysis of a POSITA's motivation to combine background knowledge with Sachs to arrive at the inventions of the '396 patent. Appellants also asserted that all terms should be given their plain and ordinary meaning. *See* Appx269-270.

**B. Sisvel's Preliminary Response**

In its Preliminary Response supported by an expert declaration from Mr. Bates (*see* Appx3134-3184), Sisvel explained that Sachs could not invalidate any of the Challenged Claims because it disclosed a different process than the methods and actions performed by the receiver in the '396 patent. Appx357-360; Appx353-355. Specifically, Sisvel explained that Sachs does not teach or suggest independent claims 1 and 8 because, among other things, the expiry of Sachs's timer does not trigger a status report as in the '396 patent because Sachs's T_reorder timer is directed to delaying a reordering procedure. Appx357-359 (citing, in part, Appx3157-3159 (¶¶ 52-56)). By contrast, in the '396 patent, reordering occurs at a later time and at a higher level such as an access gateway. Appx358-359 (citing Appx3158-3159 (¶¶ 54-55); Appx194 at fig.1).

Regarding Ground II, Sisvel explained that Appellants' obviousness allegations were insufficient because they relied only on conclusory statements and unsupported general conclusions. For instance, Sisvel highlighted how Appellants did not explain why a POSITA would be motivated to modify Sachs's T_reorder timer to arrive at the timer of the '396 patent. Appx360.

Sisvel also did not dispute Appellants' position that, for purposes of this IPR proceedings as Appellants presented their Petition, all terms should be given their plain and ordinary meaning. *See* Appx352-353.

### C. Institution Decision

Two members of the Board voted to institute IPR. *See* Appx421. APJ Moore dissented from institution, reasoning, *inter alia*, that Sachs did not teach or suggest the limitation "stopping the timer when the at least one data block is received from the transmitter while the timer is running, in order to prevent a triggering of a status report before the timer expires," which appears in every claim. *See* Appx422-424.

### D. Sisvel's Response After Institution

Sisvel's post-institution Response was supported by a second expert declaration from Mr. Bates (*see* Appx3198-3216) and, relevant here, detailed how Sachs's T_reorder timer does not perform elements 1[c] or 1[d] of claim 1 or identical elements in claim 8 of the '396 patent. Appx512-513; Appx514-517. As Sisvel explained, Appellants failed to provide any evidence—or even argue—that

any one embodiment in Sachs would meet every limitation of claims 1 and 8. Appx515-516. Sisvel further clarified that Sachs's Figure 4 does not disclose stopping a timer at all, while Figure 5 discloses stopping a timer, but only when reordering is finished. Appx515-516 (citing Appx3211 (¶¶ 28-29)). Sisvel also highlighted how, unlike in the '396 patent, Sachs teaches performing a reordering procedure *before* any other actions are taken—including *stopping* the T_reorder timer. Appx516 (citing Appx3211 (¶ 29)). And Sisvel also pointed out that Appellants could not rely on Sachs's Figures 6 and 7 to challenge dependent claims of the '396 patent because Figures 6 and 7 are different from and incompatible with Figures 4 and 5 at least because status information is provided differently in Figures 6 and 7 and Appellants never explained how Figures 6 or 7 alone met the limitations in the dependent Challenged Claims 1 and 8 or how those figures related back to Sachs's Figures 4 and 5. *See* Appx517-521 (citing Appx3212-3215 (¶¶ 32-40)). Additionally, Sisvel objected to the majority's conditionality framework for several reasons. *See* Appx513-514.

### E. Appellants' Reply

Appellants provided new and untimely arguments in their Reply. For instance, for the first time in the IPR proceedings, Appellants suggested in their Reply that Figures 4 through 7 of Sachs constituted descriptions of the same embodiment. Appx626-627. Appellants also newly asserted—albeit only through

conclusory attorney argument—that a POSITA would "at once envisage" a hypothetical embodiment composed of amalgamated elements from Sachs's Figures 4 through 7 of Sachs arranged (conveniently) as claimed in the '396 patent. Appx628-629; Appx631.

Particularly relevant here, Appellants also effectively admitted in their Reply that the Sachs's T_reorder timer stops when reordering is finished. Indeed, while facially denying that Sachs's T_reorder timer was tied to a reordering procedure, as show below, when Appellants reproduced Figure 5 of Sachs in their Reply, they retained and partially highlighted the words "stop timer when reordering is finished":




Figure 5

Appx621 (blue and red graphics added by Appellants); *compare also, e.g.*, Appx1265, *with* Appx621 *and* Appx276-277.

### F. Sisvel's Sur-Reply

When responding to Appellants' Reply, Sisvel reemphasized how Appellants failed to show that all of the limitations in Sachs were arranged or combined in the same way as recited in the Challenged Claims as is required for anticipation. Appx660-661. For instance, Sisvel explained how Appellants' argument that Sachs's Figures 4 through 7 all describe the same embodiment was contradicted by Sachs's disclosures characterizing each of these figures as a separate embodiment and teaching use of additional state variables in Figures 6 and 7's embodiments. Appx661 (citing Appx1278 at 12). Sisvel also stressed that Appellants could not rationally argue that Sachs's T_reorder timer was not tied to the reordering procedure when Sachs's Figure 5 includes the express instruction to "stop timer when reordering is finished." Appx662. And Sisvel highlighted how Appellants provided only attorney argument in support of their belated argument that a POSITA would "at once envisage" the claimed methods. Appx662. Similarly, Sisvel pointed out that Appellants could not introduce a new and unsupported argument that the timer in the '396 patent is purportedly used to *delay* the transmission of a status report or that Figures 4, 5, and 6 of Sachs disclose "the same" RLC receiver. Appx663; Appx665-666.

Further, Sisvel showed that Sachs did not teach or suggest dependent claims of the '396 patent and highlighted the differences between processes disclosed in

Sachs's Figures 6 and 7 and the '396 patent. Appx664-668. For example, Sisvel explained that Appellants alleged that Sachs's Figure 6 disclosed transmitting a positive acknowledgement ACK, but in support of this statement Appellants cited only to a portion of Figure 6 that discloses a negative acknowledgement NACK. Appx666 (citing Appx629). Moreover, Sisvel explained, the NACK that Appellants cited in Figure 6 of Sachs is sent only at the end of the process shown in Figure 6. Appx666 (citing Appx629).

### G. Final Written Decision

The Board unanimously agreed that Appellants failed to show that claims 3-5, 9, and 10 of the '396 patent were invalid under Grounds I and II and that *none* of the Challenged Claims were invalid under Grounds III through V. Appx43. Just two members of the Board concluded that Sachs anticipated and/or obviated claims 1, 2, and 6-8 under Grounds I and II. Appx43.

In their decision, the Board adopted Appellants' definition of a POSITA, but noted that the outcome would not change if it adopted Sisvel's definition. Appx8 ("A POSITA at or about the time of the alleged invention (January 5, 2006) would have had a degree in electrical engineering or a similar discipline, with at least three years of relevant industry or research experience, including experience designing or implementing wireless radio systems for data transmission and retransmission."). Sisvel proposed that a POSITA in the relevant art would have a bachelor's degree in

electrical engineering, computer sciences, or telecommunications, along with three to five or more years of practical experience in the field. Appx352. Under Sisvel's definition, a combination of more experience in the field and less education or more education and less experience in the field would also suffice. Appx352 (citing Appx3147 (¶ 27)). The Board also found that no claim construction was necessary. Appx9.[4]

The majority concluded that elements 1[c] and 1[d] were conditional elements in the method of claim 1 and so Appellants only needed to show that Sachs taught either elements 1[a], 1[b], and 1[c] *or* elements 1[a], 1[b], and 1[d] in a single embodiment. Appx16. The majority declined to rule whether Sachs's Figure 4 and 5 constitute a single embodiment and found that Figure 5 shows the combination of elements 1[a], 1[b], and 1[c], while Figure 4 showed the combination of 1[a], 1[b], and 1[d]. Appx19. The majority also declared that Sachs's T_reorder "timer is stopped when and because the missing PDUs are received[.]" Appx18.

APJ Moore dissented to the invalidation of claims 1, 2, and 6-8. *See* Appx45-50. As he explained, Appellants failed to meet their burden of proving those claims

[4] The majority in the Institution Decision held that it was not necessary to construe any terms to resolve the institution question. Appx404. In its Response after the institution, Sisvel again asserted that all terms should be given their plain and ordinary meaning. Appx509. But Appellants then impermissibly introduced a new claim construction of element 1[c] in their Reply. *See* Appx624-626.

invalid over Sachs because Sachs does not teach or suggest "stopping the timer. . . in order to prevent a triggering of a status report before the timer expires," as required by the plain and ordinary language of element 1[c]—a construction that Appellants requested to control the interpretation of the claims here for purposes of their Petition and that, as APJ Moore correctly point out, Appellants could not belatedly change in their Reply. *See* Appx48; Appx50.

By contrast, the entire panel upheld Challenged Claims 3-5, 9, and 10 after concluding that Sachs's embodiments in Figures 6 and 7 are different from Figures 4 and 5. Appx24-26. As the Board explained regarding Figure 6, having reviewed "the entirety of Sachs," the addition of state variable X1, accompanied by the disclosure that algorithm A completely solves the problem of packet reordering, supported the finding that Figure 6 is an embodiment that differs from what is shown in Figures 4 and 5. Appx25-26; *see also* Appx31 (explaining that they arrive at the same conclusion regarding Figure 7 for the same reasons). The Board also faulted Appellants for failing to explain how the algorithms in Figures 6 and 7 would affect Sachs's Figures 4 and 5, or why a POSITA would be motivated to combine any of the embodiments disclosed in those figures. Appx26-27; Appx30-31.

## SUMMARY OF THE ARGUMENT

### I. APPELLANTS' AFFIRMATIVE APPEALS

Appellants' appeals from the Board's decision holding that Sachs did not anticipate or obviate claims 3-5, 9, and 10 of the '396 patent should be denied, and the Board's holding affirmed. Appellants identify three purported errors in the Board's decision, none of which have merit.

*First*, Appellants cannot show that the Board applied the wrong anticipation analysis when it declined to determine whether Sachs's Figures 4 and 5 constituted the same embodiment and found that Sachs's Figures 6 and 7 were separate, discrete embodiments, different from Figures 4 and 5. Sachs's own disclosures—both in the summary and portions discussing Figures 4 through 7—show that these figures are properly viewed as separate embodiments. Additionally, Appellants forfeited any argument that these figures disclose the same system because they failed to present it in the Petition, which contains only a single conclusory statement (not supported by testimony of Appellants' expert Dr. Kakaes) that Figures 4 and 5 show the same embodiment.

Appellants' argument that the Board failed to consider combinability of Sachs's different disclosures and embodiments is also without merit. Appellants argue that Sachs is sufficiently clear in disclosing combinability of different embodiments such that a POSITA would "at once envisage" the claimed

combination. *See, e.g.*, *Chamberlain Grp. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1350 (Fed. Cir. 2019). This argument was also forfeited because Appellants first made it in their Reply below.

Even if it was not forfeited, Sachs treats Figures 4 through 7 as mutually exclusive alternatives and is devoid of any explanations on how to combine them. Further, Appellants failed to explain how a POSITA would combine various non-combinable features in those figures, such as, for example, algorithms A and B used in Figures 6 and 7, respectively, that are not present in either Figure 4 or 5, and that cause different delays of reordering procedures.

Appellants' argument that they were not required to show motivation to combine Sachs's Figures 4 through 7 apparently confuses combinability of elements relevant for anticipation with an obviousness inquiry into motivation to combine. Regardless, this argument fails for the reasons discussed above.

*Second*, Appellants are incorrect that the Board failed to analyze obviousness of claims 3-5, 9, and 10 of the '396 patent. It was Appellants that failed to make separate obviousness arguments throughout the IPR proceeding and instead impermissibly attempted to rely on unsupported one-liners that Sachs renders these claims obvious for the same reasons that it purportedly anticipates them—or worse, on string citations devoid of any argument or explanations whatsoever. *See, e,g.*, Appx289. The Board explained in great detail what exactly Appellants failed to

explain in connection with any of these claims, including how the same sequence of PDUs cited in Figure 6 could have been obtained in Figures 4 or 5 in light of the additional state variable X1 and different algorithm A; and whether and how X1 affects the sequence of the PDUs received, acknowledged, missing, and unacknowledged. *See* Appx28-29; Appx31.

*Third*, Appellants cannot show that the Board violated the APA when it gave weight to Sisvel's expert Mr. Bates. Appellants take issue with the fact that Mr. Bates does not have a formal degree in electrical engineering, but ignore the fact that Mr. Bates exceeds the level of expertise required of a POSITA in the '396 patent's technology because of his practical experience in the wireless telecommunications field in the past 50 years, and publication and teaching credentials. Appellants also cannot show that the Board's consideration of Mr. Bates's testimony harmed them. *See Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359, 1365 (Fed. Cir. 2015).

## II. SISVEL'S CROSS-APPEAL

The majority's holding invalidating claims 1, 2, and 6-8 should be vacated or reversed, and each of the grounds advanced in Sisvel's cross-appeal is an alternative basis for affirmance of the Board's decision for the respective claims challenged by Appellants in their affirmative appeal.

*First*, the majority's decision invalidating claims 1-2 and 6-8 was based on the Board's misunderstanding and/or misapplication of conditionality principles. The Board erroneously held that Appellants only needed to show that Sachs taught either a combination of elements 1[a], 1[b], and 1[c], *or* 1[a], 1[b], and 1[d] because elements 1[c] and 1[d] were purportedly conditional alternatives for practicing the claimed method. Appx16-17. That conflicts with this Court's precedent. *See Lincoln Nat'l Life Ins. Co. v. Transamerica Life Ins. Co.*, 609 F.3d 1364, 1370 (Fed. Cir. 2010) (patent challenger "required to prove" single prior art system "is configured" to practice each and every step of a claimed method, even conditional steps). The same is required even under the Board's own caselaw—were it to apply (and it does not)—because the claimed methods read more akin to one method in which the method would appear incomplete after the first supposed conditional step and two optional outcomes must each be performed in response to alternative conditions.

Because the Board's conditionality framework does not apply, vacatur at minimum is required, but reversal is warranted because, absent conditionality, all elements of the claims must be taught by Sachs (*i.e.*, *both* elements 1[c] and 1[d]). The record does not support a finding that element 1[c] is taught by Sachs. Sachs itself and expert testimony from both sides demonstrate that, unlike the timer in element 1[c] of claim 1 that is stopped when a data block is received, the T_reorder

timer in Sachs is stopped only after missing data blocks are received *and* a reordering procedure is finished. Indeed, Sachs's T_reorder timer is directed to a different purpose altogether—delaying a reordering procedure.

In addition, even if the Board's conditionality framework were applied to the method claims here, it could not apply to claim 8, a system claim. That result is dictated even under the PTAB precedent the Board applied here (*Ex parte Schulhauser*, Appeal No. 2013-007847, 2016 WL 6277792 (P.T.A.B. Apr. 28, 2016), which recognizes that prior art must disclose all steps a method, conditional or not, claimed in a system programed to perform that method.

*Second*, the majority's decision invalidating claims 1, 2, and 6-8 should be reversed because, as the dissent explained, Appellants did not even attempt to show that Sachs disclosed "stopping [a] timer . . . to prevent a triggering of a status report before the timer expires," as required under the plain and ordinary meaning of the claims advanced by Appellants in their Petition and unchallenged by Sisvel for purposes of determining whether that Petition established invalidity of the Challenged Claims. Appx50; Appx209.

## ARGUMENT

### I. STANDARD OF REVIEW

The Board's legal determinations are reviewed *de novo* and its factual findings for substantial evidence. *See Honeywell Int'l Inc. v. Mexichem Amanco Holding*

*S.A. De C.V.*, 865 F.3d 1348, 1353 (Fed. Cir. 2017). "Substantial evidence requires more than a 'mere scintilla'"—it "must be enough such that a reasonable mind could accept the evidence as adequate to support the conclusion." *Chemours Co. FC, LLC v. Daikin Indus*., 4 F.4th 1370, 1374 (Fed. Cir. 2021), *cert. denied*, 142 S. Ct. 1418 (2022). A decision based on legal error is also not supported by substantial evidence, and therefore it constitutes an abuse of discretion. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990).

## II. THE BOARD'S DECISION UPHOLDING CLAIMS 3-5, 9, AND 10 SHOULD BE AFFIRMED

The Board correctly found that Appellants failed to prove that claims 3-5, 9, and 10 were unpatentable over Sachs. Its opinion in that respect was well-reasoned and amply supported by expert testimony, Sachs's disclosure, and this Court's precedent. *See, e.g.*, Appx25-26 (the Board explaining that the addition of state variable X1, accompanied by the disclosure that algorithm A to completely solve the problem of packet reordering, supported the finding that Sachs's Figure 6 depicts an embodiment different from Figures 4 and 5); Appx26, Appx29, Appx31 (explaining that Appellants' theory that Sachs anticipated the Challenged Claims because a POSITA would "at once envisage" the claimed combinations is rejected because Appellants failed to explain how they intended to combine Sachs's Figures 4 through 7); Appx22-27 (discussion of the parties' arguments and evidence on claim 3).

Appellants advance three primary theories to argue that the Board's decision was an abuse of discretion. First, they assert that the Board misapplied the anticipation standard because it refused to consider Figures 4, 5, 6, and 7 of Sachs together. BB at 40. Second, they argue that the Board violated the APA because it failed to consider Appellants' evidence purportedly showing that Sachs obviates claims 3-5, 9 and 10. BB at 52. Third, Appellants argue that the Board violated the APA because it gave weight to Sisvel's expert Mr. Bates who, according to Appellants, was not a POSITA. BB at 62. None of these arguments have merit.

## A. The Board Applied the Correct Anticipation Standard

Appellants argue that the Board misapplied the anticipation standard because "it failed to consider the full scope of Sachs' teachings and instead artificially quarantined Sachs' disclosures into at least each of the scenarios in Figures 4, 5, 6, and 7." BB at 40. But the Board correctly found that Sachs's Figures 6 and 7 depicted embodiments different from Figures 4 and 5 and applied the correct anticipation standard in its analysis of claims 3-5, 9 and 10.

### 1. Figures 4 and 5 do not describe the same system.

The Board correctly found that "Sachs appears to refer to Figures 4 and 5 as different embodiments . . . .'" Appx25. Because neither figure on its own shows all the elements of claim 1 or other Challenged Claims, Appellants argue that factual finding was erroneous and that Figures 4 and 5 they must be different descriptions

of the same inventive system. BB at 45. That argument was forfeited, though, and not supported by either Sachs's disclosure or expert testimony.

As an initial matter, Appellants forfeited their argument that Figures 4 and 5 of Sachs describe the same embodiment because it appears only once in the Petition—in the form of a single conclusory sentence saying: "Figure 5 (above right) teaches the same embodiment except that, in this example, all of the missing data blocks (1-4) are received before the timer expires." Appx277. Such skeletal and undeveloped presentation is not adequate to present an argument in an IPR (or preserve an issue for appeal). *See Intelligent Bio-Systems, Inc. v. Illumina Cambridge, Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016) ("[T]he initial petition [must] identify 'with particularity' the 'evidence that supports the grounds for the challenge to each claim.'").

In any event, even if this was somehow properly presented and preserved, Appellants cannot show that Figures 4 and 5 describe the same system for at least three reasons.

*First*, Sachs expressly refers to and describes Figures 4 and 5 as separate discrete systems with different structures. Indeed, Sachs makes clear that Figures 4 and 5 describe "*two* embodiment[s]," with Figure 4 disclosing a "*first* embodiment" that is "applying the timer T_reorder[]" and Figure 5 disclosing a "embodiment of the invention" wherein "*this* embodiment" is "applying the timer T_reorder *and a*

*stop timer event*[.]" Appx1278 at 12:2-5, 12:22-29; Appx1280 at 14:1-2 (emphasis added). Including a "stop timer event" in addition to the basic T_reorder is a critical distinction between the embodiments because it allows to "achieve a minimum reaction time of the link protocol." Appx1280 at 14:1-2.

*Second*, Sachs expressly refers to and describes the systems in Figures 4 and 5 as distinct concepts with different and incompatible functionality. For instance, the Figure 4 embodiment does not disclose stopping a timer at all. *See* Appx1294 at fig.4; Appx3211 (¶ 28). So when the T_reorder timer expires in that Figure 4 system, both a positive acknowledgement ACK *and* negative acknowledgement NACK are transmitted to the MAC entity. *See* Appx1294 at fig.4 ("STATUS (Ack 15, Nack (3-4))"). In contrast, the embodiment in Sachs's Figure 5 discloses stopping a timer, but only when reordering is finished. Appx1295 at fig.5; Appx3211 (¶ 28); Appx1280 at 14:2-5 ("[T]he reordering-delay shall preferably be stopped . . . . This is [sic] can be achieved by stopping the duration of the T_reorder timer, when reordering is finished."). That means all PDUs are ultimately received by the RLC entity in the Figure 5 system, but *no status report containing positive or negative acknowledgement ACK/NACK is sent to the transmitter*. *See* Appx1295 at fig.5 (unlike in fig.4, showing no "STATUS" arrow pointing back to the transmitter).

*Third*, Sachs expressly teaches that *different* sequences of PDUs are transmitted in distinct systems disclosed in Figures 4 and 5. Figure 4 shows

transmission of the following pairs: 5, 6→1, 2→7, 8→9, 10→13, 14→11, 12. Appx1294. Figure 5 shows 5, 6→1, 2→7, 8→3, 4→9, 10→11, 12, with the T_reorder timer stopping after arrival of PDUs 3 and 4 and completion of reordering. Appx1295.

Appellants' responses to these clear and dispositive teachings in Sachs are unavailing for at least five reasons.

*First*, Appellants claim that both Figures 4 and 5 refer to the same system because both disclose "the ***same*** use of a delay timer in the ***same*** ARQ RLC system." BB at 46 (emphasis original). As an initial matter, the fact that the two systems share a couple similarities does not mean they are the same system. Just because all cars have four wheels does not mean that all cars are the same make and model. And the reason that Appellants could point to just *two* similarities is because the systems depicted in Figures 4 and 5 are so starkly different. In any event, the two similarities that Appellants identified do not even exist. The "use" of the delay timers in the Figure 4 system and the Figure 5 system is hardly the "same"—in the Figure 5 system, the T_reorder timer is stopped; in the Figure 4 system, the timer expires. Appx1294-1295. Stopping a timer and letting it expire is not the same use of that timer, as Appellants effectively admit when they assert that the T_reorder timer "can be stopped ***or*** expired." BB at 43 (emphasis original). Nor do the systems of Figure 4 and 5 use the "same ARQ RLC system." Appellants identify one passage from

Sachs in support of that claim, which reads: "The structure of the figure 5 is similar to the figure 4." BB at 46 (quoting Appx1279 at 14:6-12). As Mr. Bates explained, as a matter of basic grammar and logic and as understood by a POSITA in this context, "'[s]imilar' does not mean 'same'" here because "obviously if Sachs is saying they're similar, he's making a distinction that they're *not* the same." Appx3113 (134:5-12); *see also* Appx3116.

*Second*, Appellants attempt to draw spurious distinctions between the terms "scenario," "example," "system," and "embodiment" to confuse the record. Appellants assert that Sisvel's expert Mr. Bates purportedly "admitted that Figures 4 and 5 are 'examples' of the same system." BB at 46 n.13. But that was not Mr. Bates's testimony. Mr. Bates clearly stated that Sachs disclosed his purported invention wherein there were "two separate embodiments" that would "use a timer or not." Appx3113 (133:16, 134:5-6). Indeed, when specifically asked whether "there is a teaching of *one* system," Mr. Bates did *not* respond in the affirmative—he responded simply that there was "a teaching of a system that is receiving the data using the RLC protocol" (a response that rejected the premise of the question altogether). Appx3113 (134:21–135:1). And Mr. Bates unequivocally explained that Sachs expressly stated that there were "two different ways of implementing" in Figures 4 and 5 that were "not the same." Appx3113 (134:6-7, 134:12). That is

hardly an admission of "examples" of the "same system" in the context Appellants desire.

Indeed, even the MPEP 608.01 explains that an embodiment is "an *example* of *the* invention." MPEP 608.01(p) (emphasis added). That does not mean that each "example" (singular) of "the invention" (also singular) all describe the same single disclosed system that can be considered as one combined invention for § 102 purposes without modification—it means each is a distinct example (alone, by itself) of an invention. *See Enplas Display Device Corp. v. Seoul Semiconductor Co.*, 909 F.3d 398, 405 (Fed. Cir. 2018) ("Prior art that must be modified to meet the disputed claim limitation does not anticipate the claim.").

*Third*, Appellants assert that the Board "apparently agree[d] that each element of the challenged claims is found in Sachs." BB at 41. Appellants do not direct the Court to such a finding, nor is it supported by the record. Even if Sachs disclosed every element of the Challenged Claims across its various embodiments, though, that is not enough for anticipation. "[T]he [prior art] reference must clearly and unequivocally disclose the claimed [invention] or direct those skilled in the art to the [invention] *without any need for picking, choosing, and combining* various disclosures not directly related to each other by the teachings of the cited reference." *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008) (finding

that the district court erred in combining several protocols with "slight differences" in arriving at the anticipation verdict) (emphasis added).

*Fourth*, Appellants argue that, even if Figures 4 and 5 depict different embodiments, the Board failed to consider whether a POSITA would be able to "at once envisage" the combined disclosures of those figures. BB at 47. Yet again, Appellants' argument was forfeited. This new argument was first introduced in Appellants' Reply brief below, which was too late to preserve it. *See Intelligent Bio-Systems*, 821 F.3d at 1369. Regardless, even if preserved (which it was not), Appellants' "envisage" argument fails on its merits too because Appellants provided no evidence in support and never explained how a POSITA would combine these discrete disclosures. For example, Appellants never explained whether or not the resulting system would send a status report, at what point, and what kind of acknowledgement it would contain (ACK, NACK, or both).

*Fifth*, Appellants' argument fails as a procedural matter. Appellants have not even attempted to show (and thus forfeited any potential argument) that any supposed error in this regard was "material to the bottom-line result given other portions of the agency's ruling"—*i.e.*, was not harmless error. *See Ariosa*, 805 F.3d at 1365 (Fed. Cir. 2015). Nor could Appellants have shown such harm even if they had tried (and properly preserved the point, which they did not). The Board reasoned that elements 1[c] and 1[d] of claim 1 of the '396 patent are mutually exclusive.

Appx16. The Board then (erroneously) concluded that Appellants sufficiently showed that limitations 1[a], 1[b], and 1[c] are performed in Figure 5 of Sachs, while limitations 1[a], 1[b], and 1[d] are performed in Figure 4 of Sachs. Appx19. Therefore, the existence of elements 1[c] and 1[d] together in one same system (*i.e.*, the combination of Figures 4 and 5 advocates for on appeal) was not relevant to the Board's holding challenged by Appellants on appeal.

#### 2. The Board correctly determined that Sachs's Figures 6 and 7 were different embodiments than Figures 4 and 5.

The Board correctly found that Figures 6 and 7 of Sachs were different embodiments from each other and from Figures 4 and 5. Appx25-26. Appellants' argument to the contrary is wrong and contradicted by Sachs's own disclosure and expert testimony. *See* BB at 48.

As an initial matter, Appellants forfeited any argument that Figures 6 and 7 constitute the same embodiment(s) as in Figures 4 or 5 of Sachs because Appellants failed to make this argument below. *See, e.g.*, Appx628-629. At most, Appellants' Reply brief contained only conclusory assertions that a POSITA would be able to "at once envisage" the claimed arrangement. *E.g.*, Appx629. This is not enough to preserve the issue or show anticipation. *See, e.g.*, *BlephEx, LLC v. Myco Indus.*, 24 F.4th 1391, 1401 (Fed. Cir. 2022) (finding the district court properly rejected the combinability argument from the appellant's reply brief supported only by attorney argument).

In any event, Appellants argument also lacks merit for two distinct reasons. *First*, Figures 6 and 7 contain numerous differences distinguishing them from each other and from Figures 4 and 5, as is evident from Sachs's own disclosures and Appellants' admissions. For instance, Sachs's Figure 6 introduces algorithm A, and Sachs's Figure 7 introduces algorithm B to delay reordering. Appx1280. Both algorithms use state variables X1 but in a different manner resulting in different delays and frequencies of status report transmissions. Neither algorithm is used in Figures 4 or 5. In systems depicted in Figures 6 and 7 PDUs are also transmitted and received individually, while in systems depicted in Figures 4 and 5, PDUs are transmitted and received in pairs, as even Appellants' expert Dr. Kakaes confirmed. Appx1294-1297; Appx1212 (¶225).

And Sachs's specification clearly distinguishes algorithm A from algorithm B and from figures 4-5:

> *To completely solve the problem of packet re-ordering the previous scheme* can be improved by adding at least one additional state variable in the receiver. *Four different implementations* are suggested in the following. The algorithms *A and B use one additional state variable. The algorithm B also stops the timer when all received PDUs are in-sequence*, like it was described above.

Appx1280 at 14:22-30 (emphasis added). While Sachs does say that the structure in Figure 7 corresponds to Figure 6, in the very same paragraph Sachs explains the crucial differences between the two: "However the reaction for informing the sender

about the lost data packets *is faster in comparison to the algorithm A*." Appx1283 at 17:28-30 (emphasis added).

Appellants even effectively admit that Figures 6 and 7 are directed to distinct embodiments. Appellants concede that these figures are configured differently from each other and from Figures 4 and 5 because they each have "an additional feature" lacking in either Figure 4 or 5. BB at 48-49 & 24-25. Indeed, Appellants also admit that state variables provide additional efficiencies not available in embodiments from Figures 4 and 5 and that "[t]he state variable decides the trigger for reordering the received data blocks by identifying the sequence number of the highest received PDU from which any gaps are determined." BB at 25 & 26. And Appellants admit that Figure 7 differs from Figure 6 in duration of the delay timer T_reorder timer. BB at 27.

*Second*, while Appellants added a conclusory statement about a POSITA "at once envisage[ing]" a system that would combine (all or some of) Sachs's Figures 4 through 7, BB at 50-51, they failed to explain how a POSITA would do that or what results that would achieve. It is unclear whether the resulting system(s) would still contain the state variable X1 and utilize algorithms A or B, or neither. It is equally unclear whether the resulting system(s) would send a status report of any kind and when that would take place. For example, Figure 4 of Sachs shows sending a single status report containing both ACKs and NACKs. Appx1294. In Figure 6 utilizing

algorithm A, status reports are sent periodically following status report triggers, although they are delayed through use of the state variable X1. Appx1296. However, in Figure 6, "status report upto 10" does not contain a NACK for PDU 11, even though PDU 11 was lost before receipt of the corresponding status report trigger. NACK for PDU 11 is sent with the status report "upto 18." Appx1296; *see also* Appx1282 at 16:23-27 (explaining that NACKs are delayed).

#### 3. Sachs's summary explains its collective teachings across its figures as distinct embodiments.

Appellants argue that the Board erred in its anticipation analysis because it failed to consider that Sachs's summary discloses the use of timer that can be stopped or expire and additional state variables from Figures 6 and 7. BB at 43-44. While Sachs's summary discloses use of a delay parameter for delaying a reordering procedure, *e.g.*, Appx1274 at 8:30-31, nowhere does Sachs's summary explain that its Figures 4, 5, 6, and 7 constitute the same embodiment or how to combine the individual embodiments in those figures.

On the contrary, Sachs throughout repeatedly refers to Figures 4, 5, 6, and 7 as separate, discrete embodiments. *See, e.g.*, Appx1278 at 12:2-3; Appx1278 at 12:4-5; Appx1278 at 12:25-29; Appx1278 at 12:22-23; Appx1280 at 14:1-2; Appx1280 at 14:24-25 (calling algorithms A through D "four different implementations," where algorithm A is shown in Figure 6 and algorithm B is shown in Figure 7); Appx1285 at 19:29-32 (calling algorithm C "a further embodiment").

Sachs also explains numerous differences between Figures 4, 5, 6, and 7. For instance, it explains that Figures 6 and 7 use different algorithms A and B with state variables X1. Appx1280 at 14:25-26. Sachs underscores that Algorithms A and B can further reduce undesired effects of packet re-ordering compared to Figures 4 and 5. Appx1280 at 14:22-24.

Contrary to Appellants' argument, Sachs's general summary also does not "teach[] as a ***single*** disclosure that the timer can be stopped ***or*** expired[.]" BB at 43 (emphasis original). In support of their averment, Appellants quote an excerpt from Sachs's general disclosure (*see* BB at 43-44 (quoting Appx1275-1276 at 9:11–10:4)), but the quoted portion speaks of different embodiments—one in which a request for retransmission is delayed until after the timer expires, Appx1275 at 9:28-32, and another in which the timer is stopped and the transmitter does not have to wait until the timer expires for an acknowledgement that data packets were received correctly, Appx1275-1276 at 9:34–10:4.

Appellants' attempt (BB at 42-43) to rely on *Victaulic Co. v. Iancu*, 753 F. App'x 895 (Fed. Cir. 2018) is also misplaced. There, the summary of the reference in question expressly disclosed a plurality of segments and expressly taught various combinations of multiple segments. *Id.* at 900. As explained above, there is no such express teaching here.

### 4. The Board correctly determined that Sachs's different embodiments required proof of combinability and motivation to combine.

When deciding whether Sachs anticipated or rendered obvious claims 3-5, 9, and 10 of the '396 patent (and ultimately holding that it did not), the Board correctly found that "it is unclear *how* Petitioner intends to combine Figures 4 and 6 or Figures 5 and 6 and *why* a POSITA would have been motivated to combine the differing embodiments . . . ." Appx26-27 (claim 3) (emphasis added). Appellants now argue that the Board erred in holding that Appellants should have shown motivation to combine because the Board failed to consider "whether Sachs 'expressly contemplates' use of the claimed features together or would otherwise 'at once envisage' their use together." BB at 50.

Appellants confuse the issue of combinability (*i.e.*, *how* they intend to combine Sachs's various embodiments) relevant to anticipation with motivation to combine (*i.e.*, *why* a POSITA would have been motivated to combine those embodiments) relevant to obviousness. The quote from the FWD with which Appellants take issue explains both the Board's anticipation and obviousness reasoning because Appellants chose to concatenate Grounds I (anticipation based on Sachs) and II (obviousness based on Sachs). As explained above, *see supra* Argument.II.A, and will be explained below in connection with dependent claims, *see infra* Argument.II.B, Appellants forfeited any arguments that a POSITA would

envisage use of different embodiments in Sachs together, or that Sachs would purportedly contemplate use of the claimed features together. Appellants' fourth attempt at making this same failed argument fares no better.

### B. The Board Did Not Violate the APA

Appellants argue that the Board violated the APA because the Board failed to explain its reasoning and failed to consider Appellants' evidence from Sachs's Figures 4, 5, 6, and 7. BB at 52. But it was Appellants'—not the Board's—burden to show obviousness of the Challenged Claims, and Appellants failed to meet it. Appellants failed to make specific element-by-element arguments supported by specific reasoning in support of their conclusory allegations of obviousness and failed to provide any substantial evidence that a POSITA would be motivated to combine various excerpts and embodiments in Sachs with each other or with background knowledge to arrive at the inventions claimed in the '396 patent.

#### 1. The Board adequately considered and properly rejected Appellants' obviousness arguments leading to upholding claims 3-5, 9, and 10.

Appellants argue that the Board erred in its obviousness analysis because it (1) failed to provide any substantive analysis of its denial for Ground II; (2) failed to consider whether a POSITA would "'at once envisage' the claimed combination of Sachs' full disclosures"; and (3) disregarded evidence regarding a POSITA's own background knowledge. BB at 53. These arguments each miss their mark.

*First*, the Board did not fail to provide any substantive analysis of its rejection of Ground II. The Board correctly rejected Appellants' obviousness arguments after thoroughly considering the Petition and Appellants' other evidence and sufficiently explained its conclusions. For example, the Board reasoned that Appellants failed to meet their burden with claims 4 and 5 for because Appellants failed to explain how the same sequence of PDUs cited in Figure 6 could have been obtained in Figures 4 or 5 in light of the additional state variable X1 and different algorithm A; whether and how X1 affects the sequence of the PDUs received, acknowledged, missing, and unacknowledged in Figure 6; how Appellants intended to combine various figures; and why a POSITA would have been motivated to combine them. Appx28-29; *see also* Appx31.

The Board's determination that Appellants failed to meet their burden in this respect was correct because Appellants could not satisfy their burden of proving obviousness by employing "mere conclusory statements." *See In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016). Here, Appellants provided no separate obviousness arguments based on Sachs (Ground II) in the Petition. Instead, the Petition focused on anticipation, and Appellants' analysis of how Sachs allegedly anticipates each element of the Challenged Claims was accompanied by unsupported, conclusory statements that the Challenged Claims were obvious for the same reasons. *See, e.g.*, Appx279 ("Sachs therefore teaches all elements of claim 1,

which is thus unpatentable for anticipation or, if any limitation is found to not be expressly disclosed, obviousness."); *see also* Appx271; Appx273; Appx274; Appx277; Appx279-284; Appx286-288; Appx289-290; Appx292; Appx296-298. In support of these conclusory statements, Appellants cited to equally conclusory statements of their expert, Dr. Kakaes. *See, e.g.*, Appx1185 (conclusory statement regarding alleged obviousness on element 1[c]).

Indeed, Appellants continued to rely on these "mere conclusory statements" throughout the IPR. And while it would have been improper for Appellants to introduce new obviousness and motivation to combine arguments in their Reply or oral argument, *see Qiagen N. Am. Holdings, Inc. v. Handylab, Inc.*, U.S. App. LEXIS 32391, at *8 (Fed. Cir. Oct. 29, 2021), Appellants did not even attempt to introduce such arguments after Sisvel pointed out these deficiencies in its Preliminary Response, Appx360, and Response after Institution, Appx521-522. Instead, Appellants continued to parrot the same language from the Petition and rely on conclusory attorney averments that that Sachs renders obvious all the Challenged Claims because "anticipation is the epitome of obviousness." Appx632-633; *see also* Appx618; Appx627.

The Board's decision was also reasonable because Sachs's Figure 6 uses algorithm A, state variable X1, and status triggers that are not present in either Figure 4 or 5 of Sachs. *See* Appx1294-1296. Among other things, these additional elements

determine when a status report is sent and influence the sequence of PDUs obtained in the receiver in Sachs's Figure 6. Appx1281 at 15:6-9; Appx1282 at 16:4-9. This is because the receiver sends a status report in response to a status trigger, Appx1281 at 15:6-9, and because when the timer is running the status message reports only sequence numbers up to X1, Appx1282 at 16:8-9, which in turn allows the transmitter to resend the missing data packets, Appx1280 at 14:14-24. Thus, the Board correctly concluded that Appellants failed their burden to show how the same sequence of PDUs cited in Figure 6 could have been obtained in Figures 4 or 5 in light of the additional state variable X1 and different algorithm A and whether and how X1 affected the sequence of the PDUs in Sachs's Figure 6. Appx28-29. Because of these additional elements in Figure 6 that are not present in either Figure 4 or 5 of Sachs, the Board also correctly concluded that Appellants had the burden to explain how to combine these three figures, which it did not meet. *See* Appx28-29.

*Second*, the Board did not fail to consider whether a POSITA would "'at once envisage' the claimed combination of Sachs' full disclosures." BB at 53. The Petition is devoid of any assertions that a POSITA would "at once envisage" the claimed combination, and conclusory statements in Appellants' Reply below are insufficient because even Appellants cannot explain how a POSITA would combine Figures 4, 5, 6, and 7 of Sachs. Appx627; Appx629.

*Third*, there is no meritorious basis for Appellants' argument that the Board should have considered the evidence of obviousness based on Sachs combined with the knowledge of a POSITA. BB at 53-56; *see also id.* at 3. Below, Appellants failed to provide any explanation as to how or why a POSITA would be motivated to combine various portions of Sachs's disclosure with each other and with his own expertise to arrive at the inventions of the '396 patent, which is exactly what Sisvel stated in its Preliminary Response and Response. Appx360; Appx521-522.

Appellants now argue that Dr. Kakaes provided sufficient evidence of obviousness based on Sachs because he testified that (1) identifying gaps in a sequence of integers would have been obvious to a POSITA because it only requires the ability to count, BB at 54 (quoting Appx1195 (¶198)); and (2) a POSITA would have known about data blocks, sequence numbers, ARQ/HARQ, status reports, and the 3GPP radio interface protocol stack, BB at 54-55 (citing Appx1121-1143 (¶¶54-97)). However, this testimony by Dr. Kakaes is insufficient because it does not explain how specifically a POSITA would combine this background knowledge with Sachs and why he would have been motivated to do that. Even for an obviousness challenge based on a single reference in view of the knowledge and of a person of ordinary skill in the art, there must be a motivation to make the combination and a reasonable expectation that such a combination would be successful, otherwise a skilled artisan would not arrive at the claimed combination. *See In re Stepan Co.*,

868 F.3d 1342, 1345-46 (Fed. Cir. 2017). Therefore, Dr. Kakaes's testimony was not enough to meet Appellants' burden to prove motivation to combine below.[5] This is precisely why the Board stated that "it is unclear how Petitioner intends to combine Figures 4 and 6 or Figures 5 and 6 and why a POSITA would have been motivated to combine the differing embodiments . . . ." Appx28-29.

### 2. The Board properly analyzed dependent claim 3.

The Board correctly upheld claim 3 after concluding (1) that Sachs's Figure 6 depicts an embodiment different from Figures 4 or 5, and that it matters how status information is provided, and (2) that "something more" than a gap in sequence numbers is required to invalidate claim 3. Appx26. Each reason was well-supported. For example, the Board's first conclusion was supported at least because, as explained directly above, the embodiment in Sachs's Figure 6 uses additional elements (such as algorithm A, state variable X1, and status triggers) that are not present in either Figure 4 or 5 of Sachs and that determine when a status report is sent and influence the sequence of PDUs received. *See supra* Argument.II.B.1; *see also* Appx1294-1296; Appx1281 at 15:6-9; Appx1282 at 16:4-9. The Board's

[5] Appellants erroneously allege that Sisvel's expert Mr. Bates admitted that Challenged Claims 2, 3, 4, 5, and 9 contributed nothing inventive to the '396 patent. BB at 55. Mr. Bates's statement is taken out of context because he was commenting only on "the manner in which the applicant describes detecting a gap in Claims 2, 3, and 4." Appx3128 at 195. Nowhere did Mr. Bates admit that any of the dependent Challenged Claims (as a whole) was not novel or inventive.

second conclusion—that "something more" than a gap is required—was also well reasoned, including because claim 3 describes a specific method (not present in Sachs) of detecting that a data block is missed, namely ascertaining whether "a sequence number (SN) following a SN of a data block with a highest SN among received data blocks is larger than a lowest SN of the at least one data block to be received." Appx209.

Appellants attempt to fault the Board's second conclusion for four reasons, but none has merit.

*First*, Appellants argue that the Board purportedly disregarded Sachs's two-line disclosure of prior art that "the transmission errors are detected by searching for gaps in the sequence numbers of the received PDUs on the receiver side." Appx287 (quoting Appx1268 at 2:17-19). The Board committed no error, though, because this general disclosure does not explain how gaps are detected in Sachs, let alone teaching or suggesting the method recited in claim 3 of the '396 patent.

*Second*, Appellants seemingly argue that the Board incorrectly concluded that the '396 patent's claim 3 is different from claim 2. *See* BB at 57. However, claim 2 is demonstrably different because it recites a different method of detecting a missed block "when a sequence number (SN) of a currently received data block is larger than a SN of a previously received data block." Appx209. Indeed, the Petition acknowledged that the '396 patent's claim 3 is different from claim 2. Appx287.

*Third*, Appellants argue that the Board failed to explain what "something more" was missing from Sachs. BB at 57. However, the Board identified precisely what was missing when it stated, *inter alia*, that "Petitioner does not explain whether and how the state variable affects the sequence of the PDUs received, acknowledged, missing, and unacknowledged in Figure 6." Appx26.

*Fourth*, Appellants argue that the Board failed to "consider Appellants' additional evidence of the detection of a gap in connection with the specification's discussion of Figure 4." BB at 58. However, the Board had nothing to analyze in connection with Sachs's Figure 4 except a string citation in the Petition that read "Kakaes, ¶214; *see also* Ex. 1003, 3:5-16, 12:25-13:9, 15:16-16:2, Figures 7-8[]" and that was devoid of any explanation or even indication that it refers to Figure 4 of Sachs. *See* Appx289. This mere citation did not adequately present this argument because it lacked "an understandable explanation of the element-by-element specifics of its unpatentability contentions." *See Qiagen*, 2021 U.S. App. LEXIS 32391, at *8.

### 3. The Board properly analyzed dependent claims 4 and 9.

Below, Appellants argued that Sachs obviated claims 4 and 9 (1) based on embodiments in Sachs's Figures 4 and 5, as with claims 1 and 8, Appx290; Appx271-283; and (2) based on Figure 6 of Sachs. Appx291-292. In support of the second argument, Appellants provided nothing more than a highlighted and

annotated Figure 6 of Sachs and a lengthy string cite reading "Ex. 1003, Figures 6-8, 2:15-34, 3:5-16, 12:25-13:9, 14:32-15:9, 15:16-16:2." Appx291-292. Like with claim 3, the Board correctly concluded that Appellants did not meet their burden because Appellants did not account for algorithm A and the state variable X1 in Figure 6, did not explain how they affect various types of PDUs, nor did they explain how they would combine Figures 4 and 6 or 5-6 or why a POSITA would have had a motivation to combine them. Appx28-29. The Board's conclusions were well-supported at least because these elements have a direct impact on the sequence of received PDUs and on when the status report is sent in Figure 6. *See supra* Argument.II.B.1-2.

Appellants argue that the Board did not explain why Sachs' description of its teachings in the summary or specifically in connection with Figure 4 fail to disclose dependent claims 4 and 9. BB at 59. This argument is unavailing for two reasons.

*First*, Appellants bore the burden to present an element-by-element argument regarding claims 4 and 9 supported by specific reasoning. *See Magnum*, 829 F.3d at 1380. Appellants failed to meet that burden by simply providing a string cite reading "Ex. 1003, Figures 6-8, 2:15-34, 3:5-16, 12:25-13:9, 14:32-15:9, 15:16-16:2[,]" without any explanations as to why the cited parts of Sachs are relevant to Appellants' position, which does not amount to an element-by-element argument. *See* Appx292.

*Second*, Appellants are wrong that the portions of Sachs to which they cited support their argument. For instance, Appellants attempted to rely on the following disclosure from Sachs: "For example if the PDUs 3, 4, 5, 6, 7 are received as 7, 3, 4, 5, 6 all the PDUs 3, 4, 5, 6 are discarded since the next expected PDU after 7 is 8." BB at 59 (quoting Appx1269 at 3:5-16). This quote is part of Sachs's discussion of prior art and relates to the unacknowledged mode, or UM, which—as Appellants admitted—is irrelevant for the '396 patent. Appx286.

#### 4. The Board properly analyzed dependent claims 5 and 10.

The Board correctly found that Appellants failed to meet their burden as to claims 5 and 10 "[b]ecause it is unclear how Petitioner intends to combine Figures 4 and 7 or Figures 5 and 7 and why a POSITA would have been motivated to combine the differing embodiments." Appx31. This is because these figures are not combinable. For instance, Figure 7 contains elements not present in Figures 4 or 5, such as algorithm B, state variable X1, and status triggers and because these elements determine when a status report is sent and influence the sequence of PDUs received. *See* Appx1294-1295; Appx1297. The timer in Figure 7 of Sachs is also stopped instead of being allowed to expire, which is incompatible with Figure 4 where the timer expires. Appx1294; Appx1279 at 13:1-9.

On appeal, Appellants apparently abandon reliance on Figure 7 and assert only that the Board should have considered whether Figure 5 alone teaches or

suggests these claims because Figure 5 purportedly "teaches that the T_reorder timer is stopped when the missing data blocks are received." BB at 60-61. However, Appellants never provided a specific argument that Figure 5 alone teaches or suggests claims 5 and 10 because Appellants' averments in the Petition regarding that disclosure consisted of a single quote from Sachs reading "the reordering-delay shall preferably be stopped when all outstanding PDUs are received and the sent sequence is re-established[,]", a copy of Figure 5 with added highlights, and a conclusory statement that this figure teaches claims 5 and 10. Appx293 (quoting Appx1280 at 14:1-5); Appx292; Appx294. That conclusory collection of mostly attorney argument provided nothing substantive for the Board to actually consider. *See Intelligent*, 821 F.3d at 1369.

Even if considered, though, that evidence does not prove that Figure 5 alone (reproduced below) discloses all the limitations of claims 5 and 10 because Sachs's Figure 5 shows that the T_reorder timer is stopped "when reordering is finished." Appx1295. Neither Sachs's Figure 5, nor the corresponding disclosure suggest that the T_reorder timer is stopped, as required by claims 5 and 10, "when a sequence number (SN) following a SN of a data block with a highest SN among received data blocks when the timer was started is the same as a SN following the last in-sequence received data block." Appx210.




Figure 5

Appx1295.

Furthermore, Sachs's Figure 5 cannot teach or suggest claims 5 and 10 because the depicted embodiment does not have the "last in-sequence received data block"—the timer in Figure 5 starts immediately, *i.e.*, upon arrival of the first data blocks PDUs 5 and 6, which Appellants and their expert admit arrive out of sequence because PDUs 1, 2, 3, and 4 are expected. Appx274; Appx1176 (¶ 168).

Appellants' reliance on Dr. Kakaes's testimony is also unavailing. In the Petition, Appellants assert that Dr. Kakaes testified that Figure 5 teaches claims 5 and 10 because "the timer is stopped when the received data blocks are in-sequence" and cite—without summarizing or explaining—to four pages of his testimony. *See* Appx294 (citing Appx1209-1213 (¶¶ 221-226)). Dr. Kakaes's actual cited

testimony, however, does not discuss Sachs's Figure 5 but instead discusses a hypothetical system retro-engineered to support Appellants' position. For example, Dr. Kakaes asked the Board to "consider the following sequence of arriving PDUs (consistent with a simplified version of Sachs Figure 5): 1→2→4 →3, 5." Appx1211-1212 (¶224). Sachs's Figure 5 shows a completely different sequence of arriving PDUs: 5, 6→1, 2→7, 8→3, 4→9, 10→11, 12. Appx1295. Thus, this portion of Dr. Kakaes's does not support (let alone require) a finding that Sachs teaches or suggests claims 5 and 10.

### C. The Board Correctly Gave Weight to Sisvel's Expert Because He Exceeded the Level of Expertise Required of a POSITA

Appellants seeking relief from purported violations of the APA bear the burden to prove that an alleged error warrants vacatur and was not harmless. *See Shinseki v. Sanders*, 556 U.S. 396, 406, 409 (2009); *see also* 5 U.S.C. § 706. Appellants have not even attempted to meet this affirmative burden on appeal. They only argue that Sisvel's expert Mr. Bates was not a POSITA (because he did not hold a formal degree in electrical engineering or a similar discipline) and that the Board failed to consider that he was not. BB at 62-63. But Appellants do not explain either why that would matter here by resulting in harm—*i.e.*, was "material to the bottom-line result given other portions of the agency's ruling." *See Ariosa*, 805 F.3d at 1365. Appellants cannot do so now as any such argument about harmlessness was forfeited. *See Omega Patents, LLC v. CalAmp Corp.*, 920 F.3d 1337, 1343 (Fed.

Cir. 2019) ("[A]n issue not raised by an appellant in its opening brief . . . is waived."). Appellants' related argument thus fails as a matter of law.

In any event, Appellants could not meet their burden to show harmful error here even if they had properly tried. There is nothing that requires an expert to be a POSITA to offer helpful testimony to a fact-finder. *See SEB S.A. v. Montgomery Ward & Co.*, 594 F.3d 1360, 1379 (Fed. Cir. 2010) (affirming district court's admission of testimony from the expert that did not possess expertise in the specific field of the actual claimed invention when he still possessed background expertise in elements related to the invention); *cf. Kyocera Senco Indus. Tools, Inc. v. ITC*, 22 F.4th 1369, 1377 (Fed. Cir. 2022) (holding that expert testimony opining on the ultimate question of validity might require POSITA level skill, but not holding that all otherwise relevant testimony by experts on pertinent issues would be excluded).

And even if the Board considered whether Mr. Bates was a POSITA (which they likely did), they would have found (as they almost certainly did) that he was one or at least that he was qualified to opinion on the perspective of a POSITA. *See Plexxikon Inc. v. Novartis Pharm. Corp.*, No. 17-cv-04405-HSG, 2020 U.S. Dist. LEXIS 51894, at *9-10 (N.D. Cal. Mar. 25, 2020) ("[c]onfirming whether an expert is a POSITA is not an exercise in formalism" that ignores reality of experience for titled degrees). Indeed, Mr. Bates's level of expertise exceeds that of a POSITA as defined by the Board and Appellants. Appellants complain that Mr. Bates does not

strictly have a technical degree. BB at 62. But Mr. Bates did not have a technical degree because he was a pioneer in the cellular telecommunications field. Appellants also ignore that Mr. Bates had extensive training beginning with his military service in the U.S. Army and has worked in the telecommunications field *for more than five decades*. Mr. Bates also had an active role in the growth of the telecommunication industry and had personally witnessed, and contributed to, the industry's growth in terms of various technologies and infrastructure. *See, e.g.*, Appx3138-3146 (¶¶ 8-23); Appx3090-3091 (43:12–47:14); Appx3098-3100 (76:22–81:2).

Tellingly, Mr. Bates even personally developed curricula and taught telecommunications classes on-site with many of the world's leading manufacturers and providers of telecommunications equipment and services. Appx3139-3145. Additionally, he authored numerous books on telecommunications technology that became part of electrical engineering curricula at over 166 colleges and universities around the world (*i.e.*, Mr. Bates wrote the book from which students seeking a technical degree in this field study). Appx3139. There can be no dispute that Mr. Bates is exceedingly qualified as a POSITA in this field and at least to opine on what a POSITA would know and understand or important facts one would consider. *See* Appx3145-3146; Appx3165.

## CROSS-APPEAL

## III. CLAIMS 1, 2, AND 6-8 SHOULD HAVE BEEN UPHELD AS VALID OVER SACHS

### A. The Board Erroneously Invalidated Claims 1-2 and 6-8

The majority's holding invalidating claims 1-2 and 6-8 should be reversed, or at minimum vacated, because it was erroneously based on holding that elements 1[c] and 1[d] were conditional elements that need not be taught by a single prior art system.

#### 1. The majority's conditionality framework was legally erroneous.

The majority held that elements 1[c] and 1[d] were conditional claim elements, and that Sachs anticipated and obviated claim 1 because Sachs's Figure 5 taught elements 1[a], 1[b], and 1[c], while a separate embodiment disclosed in Figure 4 taught elements 1[a], 1[b], and 1[d]. Appx19. In other words, the majority's reasoning relied on the purported fact that practicing the whole claimed method did not require each and every step to be performed by one system configured to practice elements 1[a], 1[b], 1[c], *and* 1[d].

The majority committed legal error. The majority relied in its conditionality holding on the Board's prior decision in *Ex parte Schulhauser*, No. 2013-007847, 2016 WL 6277792 (P.T.A.B. Apr. 28, 2016). This Court has previously called *Schulhauser* into question. *See Hytera Communs. Co. v. Motorola Sols.*, Inc., 841 F. App'x 210, 215-17 (Fed. Cir. 2021). Rightly so. As this Court has held, Board

opinions are not binding on this Court. *Noelle v. Lederman*, 355 F.3d 1343, 1350 (Fed. Cir. 2004). And *Schulhauser* conflicts with this Court's precedential decision in *Lincoln Nat'l Life Ins. Co. v. Transamerica Life Ins. Co.*, where this Court held that a patent challenger is "required to prove" that a single prior art system "is configured" to practice each and every step of a claimed method, even if those steps are purportedly conditional. *Lincoln Nat'l Life Ins. Co. v. Transamerica Life Ins. Co.*, 609 F.3d 1364, 1370 (Fed. Cir. 2010). The majority's reasoning (*e.g.*, that Sachs's Figure 5 taught elements 1[a], 1[b], and 1[c], while the separate embodiment disclosed in Figure 4 taught elements 1[a], 1[b], and 1[d]) does not pass muster under that standard. The majority's conditional-element analysis was founded in legal error.

Additionally, as this Court explained in *Hytera*, the conditionality principles of *Schulhauser* would not apply (even assuming they could) if the claimed method read more akin to "one method" instead of "two distinct methods" because, for example, the method would be incomplete after the first supposed conditional step or the method's two optional outcomes must each be performed in "response to either alternative condition." *Hytera*, 841 F. App'x at 217. Each of those two factors exist here so that the claimed methods of the '396 patent are best read as one complete method.

For instance, in accord with Appellants' arguments, elements 1[c] and 1[d] are purportedly each performed in response to an alternative condition—receipt of the missing block while the timer is running. *See* Appx255 n.5; Appx275 n.11. Indeed, that is precisely the same reading that the dissent advanced too. *See* Appx49 ("There are only two possibilities when the timer is started"—"the missing block is received while the timer is running"; "the missing block is not received while the timer is running"). And even under a plain and ordinary meaning untarnished by Appellants arguments or further construction, claim 1 in the alternative reads as a single method that would be incomplete without performing element 1[d].[6] Read together in that alternative fashion, elements 1[c] and 1[d] naturally imply that element 1[c] is not the end of the method—element 1[c] recites that the purpose of the timer is "to prevent a triggering of a status report before the timer expires" when a data block is received and element 1[d] recites sending a status report indicating receipt of a data block. Appx209 (claim 1). Indeed, as Sisvel's expert explained, it would be improper to characterize elements 1[c] and 1[d] as "alternatives" in this fashion. Appx3120 at 162:8-12; *see* Appx3210 (¶ 26); Appx3121 at 167:7-11.

[6] An IPR petition controls the course of an IPR throughout, including the arguments and theories a Petitioner must prove to invalidate a claim. *Intelligent*, 821 F.3d at 1369. Here, Appellants' Petition asserted that "all claim terms should be accorded their plain and ordinary meaning" and Sisvel agreed with that premise "for purposes of this IPR" only. Appx269-270; Appx509. Accordingly, Appellants had the burden to show by preponderance of evidence under that plain and ordinary meaning of the claims that Sachs teaches or suggests every limitation of the challenged claims.

Likewise, claim 1 recites "a method of performing automatic repeat request (ARQ) in a wireless communication system . . . [,]" Appx209 (preamble of claim 1), and therefore it would be unreasonable to conclude that such a method is complete when the timer is stopped upon receipt of a data block in element 1[c], without performing the ARQ incorporating a status report.

#### 2. The majority's legally erroneous conditionality framework warrants reversal because Sachs does not teach or suggest element 1[c].

The Board's error requires vacatur at minimum. But reversal is warranted. Sachs does not teach or suggest element 1[c] because Sachs's T_reorder timer stops when reordering is finished and not when a data block is received. The majority erred when it agreed with Appellants that Sachs's T_reorder timer stops when a block is received, which led to the incorrect finding that Sachs teaches or suggests element 1[c]. Appx17-18.

Sachs's T_reorder timer is tied to delaying the reordering procedure, which means that it stops only after both (1) missing data blocks are received *and* (2) the reordering procedure is finished. *E.g.*, Appx1280 at 14:1-4. In contrast, the timer in element 1[c] of claim 1 is stopped at a different time—when a data block is received. Appx209. Reordering in the patent takes place at a higher level, such as an access gateway. Appx3158-3159 (¶¶ 54-55). This understanding of the

T_reorder timer is supported by Sachs's own disclosure, expert testimony on both sides, and Appellants' own admissions below. *E.g.*, Appx274.

Sachs's Figure 5 (on which Appellants' allegations regarding element 1[c] rely) expressly discloses that the T_reorder timer is "stopped when reordering is finished":




Figure 5

Appx621 (Appellants' Reply reproducing Figure 5 of Sachs with blue and red graphics added by Appellants). In this context, a POSITA would understand reordering to mean reshuffling received PDUs in the buffer, as Appellants' expert Dr. Kakaes admitted:

> Figure 5 explains *to "stop timer when re-ordering is finished."* Here, Sachs refers to the reordering of the received PDUs in sequential order in the buffer. *This reordering in the RLC is part of the 3GPP protocols and ecosystem on which the '396 patent is based; when the missing PDUs are received, the PDUs in the buffer can be reordered.*

Appx1172-1173 (¶ 154) (emphasis added). Sisvel's expert likewise testified that Sachs teaches that a reordering procedure is performed before any other actions are taken—including stopping the T_reorder timer. Appx3211 (¶ 29); Appx3158 (¶ 53). And Appellants themselves also effectively admitted that the T_reorder timer is stopped *after* PDUs are reordered in the buffer. *See* Appx294.

Moreover, Appellants' contrary argument (relied on by the Board) that receipt of missing PDUs alone is enough to stop the T_reorder timer, *e.g.,* Appx294, is contradicted by numerous disclosures in Sachs. For example, Sachs explains in connection with Figure 5's embodiment that "[i]n order to achieve a minimum reaction time of the link protocol, the reordering-delay shall preferably be *stopped when all outstanding PDUs are received and the sent sequence is re-established*." Appx1280 at 14:1-4 (emphasis added). Sachs also explains that "[i]n a preferred embodiment the timer is stopped before the timer expiry *when at the reception of a data packet the sequence is established*[]"—in other words, when data packets are reordered into the correct sequence in the buffer. Appx1275 at 9:34–10:1. If merely receiving PDUs were enough, this could lead to stopping the T_reorder timer prematurely, before ascertaining that the correct PDU sequence was restored. In the '396 patent, reordering (*i.e.*, reshuffling of PDUs in the buffer) would occur at a later time and at a higher level, such as an access gateway, and would gain additional efficiencies. Appx3158-3159 (¶¶ 54-55); Appx515-516; Appx358-359.

The function of Sachs's reorder timer—to delay the reordering procedure—also shows that merely receiving a data packet is not sufficient to stop that timer. The very name of that timer—T_reorder—underscores its connection to the reordering procedure. Other portions of Sachs's disclosure also show that the T_reorder timer is directed to delaying a reordering procedure. *See, e.g.*, Appx1275 at 9:11-15 ("[T]he delay parameter is a timer that is started for every data packets arriving out of sequence, and the triggering of the reordering procedure . . . is delayed by the duration of the timer."); Appx1265 at Abstract; Appx1274 at 8:25-31. In contrast, the timer in element 1[c] is stopped "in order to prevent a triggering of a status report before the timer expires." Appx209 (claim 1). Accordingly, elements in Sachs's Figure 5, including the timer, are not "all . . . arranged or combined in the same way as recited" in the claim 1. *Net MoneyIN*, 545 F.3d at 1371.

Despite this evidence, the majority incorrectly found that the timer in Sachs "is stopped when and because the missing PDUs are received, and not after the occurrence of some additional step in which PDUs in the RLC buffer are shuffled into sequential order." Appx18 (internal citation marks and emphasis omitted). The majority also reasoned that the reordering procedure is "artificial and separate" and that "Figure 5 . . . depicts that the T_reorder timer is stopped when out-of-order PDUs 3 and 4 are received—Sachs does not depict or describe an additional step of reshuffling occurring before the timer is stopped." Appx17-18. These explanations

show that the majority simply (but critically) misunderstood the function of the T_reorder timer. This is important because it is not enough that Sachs discloses a timer. To read on claim 1, and element 1[c] in particular, it is necessary that the timer in Sachs be stopped "when the at least one data block is received from the transmitter." Appx209. Thus, the holding that Sachs teaches element 1[c] is not supported by substantial evidence.

Because there is no basis to affirm a finding that element 1[c] is taught by Sachs, the decision invalidating claims 1, 2, and 6-8 should be reversed. In addition, this is an alternative ground for affirmance for claims 3-5, 9, and 10.

#### 3. The majority's invalidation of claim 8 must be reversed because the majority's conditionality framework cannot apply to that claim under any circumstances.

Even if the Court were to disagree with Sisvel's challenge above to the majority's conditionality framework, the invalidation of claim 8 must be reversed because that framework (even as the majority understood it) cannot apply to that claim.

Again, the majority held that elements 1[c] and 1[d] were conditional claim elements, and that Sachs anticipated and obviated claim 1 because Sachs's Figure 5 taught elements 1[a], 1[b], and 1[c], while a separate embodiment disclosed in Figure 4 taught elements 1[a], 1[b], and 1[d]. Appx19. The majority then extended

that reasoning to claim 8, which it invalidated "[f]or reasons substantially similar to those set forth for independent claim 1[.]" Appx20.

But claim 8 is a system claim, not a method claim. Appx210 (claim 8). The conditionality framework that the majority applied to invalidate claim 1 simply does not apply to system claims. The receiver claimed in claim 8 must be configured to perform *all* the functions recited therein, including stopping the timer when the at least one data block is received from the transmitter while the timer is running under element 8[c] (akin to element 1[c]) and transmitting the status report to the transmitter after the timer expires under element 8[d] (akin to element 1[d]). *See* Appx209 at 16:46-49; Appx210 at 18:1-4. Indeed, even in *Schulhauser* the Board expressly held the following:

> [I]nterpretation of [a] system claim differs from [a] method claim because the structure (i.e., a processor programmed to perform an algorithm for carrying out the recited function should the recited condition be met) *is present in the system regardless* of whether the condition is met and the function is actually performed.

*Schulhauser*, 2016 WL 6277792, at 14 (emphasis original). Thus, even under *Schulhauser*, a prior art system must disclose *all* elements required to be programmed into a claimed system—a finding absent here, where the Board relied on different embodiments disclosing (purportedly) alternative claim elements [c] and [d].

The majority's decision invalidating claim 8 was therefore arbitrary and capricious and infected by legal error. Accordingly, the invalidation of claim 8 should be reversed and remanded. In addition, this is an alternative ground for affirmance of the Board's decision on claims 9 and 10, both dependent from claim 8.

### B. APJ Moore Correctly Concluded that Appellants Did Not Meet Their Burden in Showing that Sachs Anticipates or Obviates Any of the Claims Invalidated by the Majority

APJ Moore correctly argued in dissent that Appellants did not meet their burden to show that Sachs anticipates or obviates claims 1, 2, and 6-8. Appx50. As APJ Moore stressed, Appellants in their Petition asked that all terms be given their plain and ordinary meaning but then belatedly construed element 1[c] in their Reply to avoid the very claim language that they agreed controlled the course of the IPR here and did not require construction. Appx47-48; Appx269-270 (Appellants arguing that no construction was necessary); Appx509 (Sisvel agreeing that no construction was necessary for the purposes of this IPR). Namely, that plain language controlling the IPR included in element 1[c] the requirement that "stopping the timer" was "to prevent a triggering of a status report before the timer expires." Appx209; *see also Intelligent*, 821 F.3d at 1369 (holding that an IPR petition controls the course of an IPR). But, as APJ Moore rightly concluded, Appellants never "even attempt[ed] to explain how Sachs discloses" that claim element.

Appx50. And there is no reasonable dispute that Appellants failed to make that showing. Thus, Appellants failed to meet their burden to prove invalidity of any of the Challenged Claims under the controlling conditions and arguments presented in their IPR petition. The majority's decision invalidating claims 1, 2, and 6-8 should therefore be reversed. This also is an alternative basis for affirmance of claims 3-5, 9, and 10.

## CONCLUSION

For the foregoing reasons, Sisvel respectfully requests that the Board's decision with respect to claims 3-5, 9, and 10 be affirmed and that its decision with respect to claims 1, 2, and 6-8 only be reversed or vacated.

July 24, 2023

Respectfully submitted,

*/s/ Timothy Devlin*

Timothy Devlin
tdevlin@devlinlawfirm.com
Neil A. Benchell
nbenchell@devlinlawfirm.com
Nadiia Loizides
nloizides@devlinlawfirm.com
DEVLIN LAW FIRM LLC
1526 Gilpin Avenue
Wilmington, DE 19806
(302) 449-9010

*Attorneys for Cross-Appellant SISVEL S.p.A.*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the relevant type-volume limitations of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it has been prepared in a proportionally spaced typeface in at least 14-point font and includes 16,078 words, excluding the parts exempted under those Rules.

*/s/ Timothy Devlin*
Timothy Devlin

*Attorney for Cross-Appellant*
*SISVEL S.p.A.*